**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PACIFIC LIFE INSURANCE COMPANY and
PACIFIC LIFE & ANNUITY COMPANY,

                                         Plaintiffs,

           -against-

THE BANK OF NEW YORK MELLON,

                                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 17-1388

**<u>COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ........................................................................................................... 1

PARTIES ............................................................................................................................... 6

JURISDICTION AND VENUE ............................................................................................. 7

FACTUAL ALLEGATIONS ................................................................................................. 7

I.      THE RMBS SECURITIZATION PROCESS ................................................................. 7

II.     BNY MELLON'S DUTIES AND
OBLIGATIONS AS TRUSTEE FOR THE COVERED TRUSTS ................................. 9

     A.     BNY Mellon's Duties Pertaining to the Delivery of Mortgage Files ................... 10

     B.     BNY Mellon's Duty to Provide Notice of
Defaults and Enforce Repurchase Obligations ...................................................... 19

     C.     BNY Mellon's Duty to Act Prudently
Upon the Occurrence of an Event of Default .......................................................... 24

     D.     BNY Mellon's Duty to Address the
Servicers' Failure to Meet Prudent Servicing Standards ....................................... 26

     E.     BNY Mellon's Liability for Negligence in Performing Its Duties ........................ 27

III.    BNY MELLON BREACHED ITS CONTRACTUAL, FIDUCIARY,
AND STATUTORY DUTIES AS TRUSTEE FOR THE COVERED TRUSTS ............ 29

     A.     BNY Mellon Failed to Provide Notice of Countrywide's
Representation and Warranty Breaches and Enforce Repurchase Obligations ..... 29

          1.     Countrywide's Massive Mortgage
Origination and Securitization Fraud ......................................................... 29

          2.     BNY Mellon Had Actual Knowledge of Breaches of
Representations and Warranties Affecting the Covered Trusts ................. 37

          3.     BNY Mellon's Failure to Give
Notice and Enforce Repurchase Obligations ............................................. 46

B.      BNY Mellon Failed to Act Prudently
Upon the Occurrence of Events of Default ..........................................................47

       1.      Events of Default Relating to the Servicers' Failure
to Provide Notice and Enforce Repurchase Obligations............................47

       2.      Events of Default Relating to Document Delivery Failures .....................47

       3.      Events of Default Concerning False Servicer Certifications ....................50

       4.      Events of Default as a Result of Ineligible Certificate Accounts .............52

       5.      Events of Default Related to Servicing Breaches ......................................53

C.      BNY Mellon Failed to Provide PacLife Notice of Events of Default ..................60

D.      BNY Mellon Violated the Streit Act as Trustee for the Covered Trusts ..............61

E.      BNY Mellon Breached the Covenant of Good Faith and Fair Dealing ................65

IV.      BNY MELLON SUFFERED FROM CONFLICTS OF INTEREST ..............................66

V.      BNY MELLON'S CONDUCT INJURED PACLIFE.......................................................68

CAUSES OF ACTION ...................................................................................................................71

FIRST CAUSE OF ACTION (Breach of Contract) ......................................................................71

SECOND CAUSE OF ACTION (Breach of Fiduciary Duty).........................................................72

THIRD CAUSE OF ACTION (Negligence—Failure to Avoid
Conflicts of Interest and Perform Ministerial Acts with Due Care) ..............................................73

FOURTH CAUSE OF ACTION (Violation of the Streit Act)........................................................73

FIFTH CAUSE OF ACTION (Breach of the
Implied Covenant of Good Faith and Fair Dealing) .....................................................................74

SIXTH CAUSE OF ACTION (Violations of the TIA) ...................................................................75

PRAYER FOR RELIEF ................................................................................................................77

Plaintiffs Pacific Life Insurance Company and Pacific Life & Annuity Company ("Plaintiffs" or "PacLife"), by and through its attorneys, bring this action against Defendant The Bank of New York Mellon ("BNY Mellon," "Defendant," or the "Trustee"), and allege as follows:

## NATURE OF ACTION

1.      This action arises out of BNY Mellon's role as trustee for 13 securitization trusts: CWHL 2005-5, CWHL 2005-13, CWHL 2005-17, CWHL 2005-22, CWHL 2006-21, CWALT 2006-32CB, CWALT 2006-45TI, CWALT 2006-OA3, CWALT 2007-5CB, CWALT 2007-17CB, CWALT 2007-18C, CWALT 2007-24, and CWALT 2008-1R (the "Covered Trusts"), and asserts claims against BNY Mellon for breaches of its contractual, fiduciary duties and common law duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act"). BNY Mellon was required under the Countrywide PSA[1] Section 2.06 to exercise all the rights assigned to it as trustee "to the end that the interests of the Holders of the Certificateholders may be adequately and effectively protected." BNY Mellon breached this fundamental obligation to PacLife by failing to take action against Countrywide, including by failing to exercise the repurchase protocol and put back defective Countrywide loans underlying the Covered Trusts to Countrywide.

2.      The Covered Trusts were created to facilitate residential mortgage backed securities ("RMBS") transactions introduced to investors from 2005 to 2008.  Twelve of RMBS transactions were sponsored by Countrywide Home Loans, Inc. ("Countrywide" or

---

[1] Quotations to the Countrywide PSA herein are to the pooling and servicing agreement executed in connection with the CWALT 2006-32CB securitization. The other Covered Trusts were issued pursuant to pooling and servicing agreements with substantially similar language and any differences are immaterial to the issues addressed in this Complaint.

the "Sponsor").  One of the RMBS transactions is a re-securitization transaction—CWALT 2008-1R—which is a trust backed by RMBS certificates issued by underlying trusts. CWALT 2008-1R is backed by senior tranches of CWALT 2007-18CB, one of the Covered Trusts in this action, and CWALT 2007-19.  CWALT 2007-18CB backs the Group 1 certificates while CWALT 2007-19 backs the Group 2 certificates issued by CWALT 2008-1R.  Plaintiffs hold a Group 1 certificate issued by CWALT 2008-1R.  As such, the relevant portion of the corpus of the CWALT 2008-1R trust consists of mortgage loans backing CWALT 2007-18CB.

3.     Plaintiffs acquired RMBS certificates with a purchase value in excess of $400 million issued by the Covered Trusts identified in **Exhibit A** ("the Certificates").  Exhibit A identifies the Certificates Plaintiffs still hold (the "Held Certificates") and the Certificates Plaintiffs sold (the "Sold Certificates").

4.     The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsor and its affiliates or business partners.  The certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsor depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

5.     The certificateholders, however, did not receive any mortgage files that they

2

could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon their trustee representative, BNY Mellon, to protect their contractual and other legal rights.

6.      As trustee for the Covered Trusts, BNY Mellon owes PacLife and the other certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts. BNY Mellon and the relevant servicers (each a "Servicer," and collectively the "Servicers") were required to provide notice of breaches of representations and warranties by the Sponsor and the parties who originated the mortgage loans underlying the Covered Trusts (the "Originators") concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending.  BNY Mellon, and the Servicers, had a duty to enforce the obligation of the responsible parties (typically the Sponsor, and its affiliates that served as the depositors (the "Depositors")) or the Originators to repurchase loans that breached representation and warranty provisions or were missing required documentation.  BNY Mellon was also required to address defaults by the Servicers who were required to engage in prudent servicing and loss mitigation practices.

7.      BNY Mellon was actively involved in various aspects of the process of securitizing mortgage loans and had a very close relationship with Countrywide, and subsequently, Bank of America after it acquired Countrywide.  Nevertheless, as trustee, BNY Mellon was obligated to act against the financial interest of Countrywide and Bank of America when demanded by the circumstances.  BNY Mellon, however, abandoned its obligations to protect the rights of investors.

8.      BNY Mellon's breaches of its contractual, fiduciary, and statutory duties give rise to six distinct legal claims.

9.      <u>Breach of Contract</u>.  BNY Mellon's contractual duties in connection with the Covered Trusts are set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs").  BNY Mellon breached the PSAs by failing to: (i) provide notice of representation and warranty violations by Countrywide; (ii) provide notice of the Servicers' failure to give notice and enforce remedies with respect to those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that breached their representations and warranties or lacked the documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to BNY Mellon under the PSAs upon the occurrence of Events of Default as defined under the PSAs.

10.     <u>Breach of Fiduciary Duty</u>.  Under common law, after an "Event of Default" an indenture trustee becomes a traditional trustee with fiduciary duties to investors.  This duty continues until the Event of Default is cured.  BNY Mellon failed to meet its fiduciary duties because after Events of Default had occurred, it failed to act with undivided loyalty to investors such as PacLife and failed to protect the interests of investors because it had deep financial ties with Countrywide and conflicts of interest.

11.     <u>Negligence</u>.  BNY Mellon had extra-contractual duties to perform ministerial acts with due care and to avoid conflicts of interest.  In connection with the Covered Trusts, BNY Mellon negligently performed ministerial acts by, *inter alia*, failing to provide notices of the numerous defaults that it was aware of under the PSAs.  BNY Mellon violated its duty of independence by failing to take action against Countrywide because, if BNY Mellon

acted, it would have exposed systemic origination and servicing misconduct by BNY

Mellon (or its servicing agents) and would have jeopardized future lucrative engagements

with Countrywide and then Bank of America.

12.     <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>.  BNY Mellon

violated the implied covenant of good faith and fair dealing by depriving PacLife of the

fruits of its investments and the PSAs by inhibiting the processes intended to remove

defective loans from the Covered Trusts, preventing the Servicers from undertaking

imprudent practices that injured the investors, and acting to avoid Events of Default which

would have converted BNY Mellon into a traditional trustee with fiduciary duties to protect

the investors and maximize their recoveries.

13.     <u>Violations of the TIA</u>.  The TIA requires the Trustee to provide

certificateholders with notice of defaults under the operative indentures within 90 days of

becoming aware of such defaults and to act prudently to protect the rights of

certificateholders during the period in which the default remains uncured.  BNY Mellon

violated these provisions by failing to provide notice of defaults it was aware of and failing

to act prudently to protect the certificateholders' interests by exercising all rights and

remedies available to BNY Mellon under the PSAs.

14.     <u>Violation of the Streit Act</u>.  The Streit Act applies to the extent a PSA is not

qualified under the TIA.  Thus, to the extent the TIA is deemed to not apply to any

particular "mortgage investments," the Streit Act provides a similar protection and remedy.

The Streit Act provides a private remedy to any person aggrieved by the act or omission of a

trustee.  BNY Mellon violated the Streit Act through its acts and omissions set forth below,

including its failure to use the same degree of care and skill in its exercise as a prudent

5

person would exercise or use under the circumstances in the conduct of his own affairs to protect the rights of certificateholders during the pendency of an Event of Default under a non-qualified PSA.

15.     By failing to perform its duties, BNY Mellon has caused PacLife to suffer over $80 million in losses in connection with the Certificates.

## PARTIES

16.     Plaintiff Pacific Life Insurance Company is an insurance company incorporated and existing under the laws of Nebraska with its principal place of business in Newport Beach, California.

17.     Plaintiff Pacific Life & Annuity Company is an insurance company incorporated and existing under the laws of Arizona with its principal place of business in Newport Beach, California.

18.     Defendant The Bank of New York Mellon is a bank organized under the laws of the State of New York, with its principal place of business located at 225 Liberty Street, New York, New York 10286.  It serves as the trustee for the Covered Trusts.[2]

19.     The Defendant is a wholly owned subsidiary of The Bank of New York Mellon Corporation.

20.     For the Countrywide Trusts, BNY Mellon signed Certificates incorporating the PSAs.  As the trustee for the Covered Trusts, BNY Mellon owed certificateholders certain statutory and contractual duties with respect to the mortgage loans owned by the Covered Trusts,

---

[2] The Bank of New York signed the Certificates incorporating the PSAs, as Trustee.  After a corporate merger in or about July 2007, The Bank of New York was re-named The Bank of New York Mellon.  All references herein to BNY Mellon refer to The Bank of New York Mellon pre- and post-merger.

6

which it violated.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as Defendant resides or transact business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

23.     This Court has personal jurisdiction over The Bank of New York Mellon because The Bank of New York Mellon is organized under the laws of New York and maintains its principal place of business in New York and a substantial part of the administration of the Covered Trusts is performed in New York.

## FACTUAL ALLEGATIONS

## I.     THE RMBS SECURITIZATION PROCESS

24.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flows from principal and interest payments on the pool of loans after certain costs and fees are deducted.

25.     The first step in each securitization is generally the acquisition of mortgage

loans by a sponsor (or "Seller"), such as Countrywide, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

26.     The depositor then conveys the pool of loans to a trustee, such as BNY Mellon, pursuant to a PSA that establishes various prioritized tranches of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, BNY Mellon acted as the trustee in connection with the relevant RMBS transactions.

27.     Pursuant to the PSAs, a servicer is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

28.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

29.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or

AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the waterfall.

30.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.  A resecuritization trust, such as CWALT 2008-1R, functions similarly to an RMBS trust, except that it is backed by the cash flows stemming from the mortgage loans in the underlying RMBS trusts.  Therefore, any defects in the underlying mortgages of a single loan pool can negatively affect the cash flows to both the underlying trust and the resecuritization trust.

31.     BNY Mellon earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  BNY Mellon also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts.  BNY Mellon maintained accounts for numerous trusts and earned significant sums from the aggregate balances on these accounts.  The RMBS trustee engagements further deepened BNY Mellon's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.  These arrangements included BNY Mellon's participation in credit facilities extended to originators which allowed them to increase the volume of residential mortgage loans they sold and securitized.

## II.   BNY MELLON'S DUTIES AND
## OBLIGATIONS AS TRUSTEE FOR THE COVERED TRUSTS

32.     BNY Mellon's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs and under applicable state and federal laws.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  With respect to the twelve RMBS transactions, BNY Mellon entered into PSAs with: (i) CWALT, Inc. or CWMBS, Inc. as Depositor; (ii) Countrywide Home Loans, Inc., as a Seller; (iii) Park Granada LLC, Park Monaco Inc., and/or Park Sienna LLC, as Sellers; and (iv) Countrywide Home Loans Servicing LP, as Master Servicer. With respect to the resecuritization trust, CWALT 2008-1R, BNY Mellon entered a Trust Agreement with: (i) CWALT, Inc. as Depositor and Credit Suisse Securities (USA) LLC as Underlying Certificate Seller (the "CWALT 2008-1R Trust Agreement").[3]

### A.     BNY Mellon's Duties Pertaining to the Delivery of Mortgage Files

33.     Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered Trusts.  Then the Depositor conveyed the mortgage loans to BNY Mellon in its capacity as the trustee for the Covered Trusts to hold for the benefit of the certificateholders.  This process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the Countrywide PSA, which provides in relevant part:

> (a) Each Seller concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise

---

[3] BNY Mellon's duties with respect to CWALT 2008-1R are the same as its duties with respect to CWALT 2007-18CB, one of the Covered Trusts, because the CWALT 2008-1R Trust Agreement incorporates provisions of the PSA for CWALT 2007-18CB.  *See, e.g.*, CWALT 2008-1R Trust Agreement §1.01.  Accordingly, all references or citations herein to the Trustee's duties under the CWALT 2007-18CB PSA also apply to the Trustee's duties under the CWALT 2008-1R Trust Agreement.

conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Mortgage Loans, including all interest and principal received or receivable by such Seller, on or with respect to the Mortgage Loans after the Cut-off Date . . . On or prior to the Closing Date, Countrywide shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule . . .

(b) Immediately upon the conveyance of the Mortgage Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with the Depositor's right to require each Seller to cure any breach of a representation or warranty made herein by such Seller or to repurchase or substitute for any affected Mortgage Loan in accordance herewith.

34.    In addition, Section 2.02 of the Countrywide PSA ("Acceptance by Trustee of the Mortgage Loans") provides that BNY Mellon is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future certificateholders.  It provides:

(a) The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit F-1 and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

35.    Section 2.01(c) of the Countrywide PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans and the time limit to deliver those required documents for "Delay Delivery Loans."  It provides:

(c) In connection with the transfer and assignment set forth in clause (b) above, ***the Depositor has delivered or caused to be***

11

> *delivered to the Trustee (or in the case of the Delay Delivery*
> *Loans that are Initial Mortgage Loans, will deliver or cause to*
> *be delivered to the Trustee within thirty (30) days following the*
> *Closing Date . . .) for the benefit of the Certificateholders the*
> *following documents or instruments with respect to each*
> *Mortgage Loan so assigned*:

(Emphasis added).  The "following documents" that are required to be delivered for each

loan include, among other things, the mortgage note, the mortgage, the assignment of

mortgage, and the title policy.  These documents are defined collectively as the "Mortgage

File."  Countrywide PSA § 1.01.

36. Physical possession of these documents by BNY Mellon was necessary to

transfer the ownership rights to the mortgage loans from Countrywide to the Covered

Trusts.

37. Section 2.01(c) further provides that if a loan is a Delay Delivery Mortgage Loan,

Countrywide must deliver the complete Mortgage File with respect to that loan within 30 days of

the closing, and, if it does not do so, it must repurchase or substitute the loan:

> Notwithstanding anything to the contrary in this Agreement, **within
> thirty (30) days after the Closing Date, Countrywide** (on its own
> behalf and on behalf of Park Granada, Park Monaco and Park
> Sienna) **shall** either (i) **deliver** to the Depositor, or at the Depositor's
> direction, **to the Trustee** or other designee of the Depositor **the
> Mortgage File as required pursuant to this Section 2.01 for each
> Delay Delivery Mortgage Loan or (ii) either (A) substitute a
> Substitute Mortgage Loan for the Delay Delivery Mortgage
> Loan or (B) repurchase the Delay Delivery Mortgage Loan,
> which substitution or repurchase shall be accomplished in the
> manner and subject to the conditions set forth in Section 2.03**
> (treating each Delay Delivery Mortgage Loan as a Deleted
> Mortgage Loan for purposes of such Section 2.03); . . . **provided
> further that** . . . **Countrywide** (on its own behalf and on behalf of
> Park Granada, Park Monaco and Park Sienna) **shall have five (5)
> Business Days to cure such failure to deliver**.

(Emphasis added); *see also* Countrywide PSA Ex. G (form of Delay Delivery Certification).  If

Countrywide fails to deliver the Mortgage File or to repurchase or substitute any Delay Delivery

Mortgage Loans missing collateral documentation within 30 days, it has five additional days to cure the failure to deliver.  Thus, the PSAs contemplated that all Mortgage Files would be complete or, if incomplete, would be removed from each Covered Trust within 35 days from the closing.

38.     BNY Mellon would have knowledge of which loans are missing a portion of the Mortgage File, because, among other reasons, under § 2.01(c), it was obligated to submit a Delay Delivery Certification identifying that it received the documents specified in the PSAs for each Delay Delivery Mortgage Loan, or, if not, identifying in a schedule to the certification those loans with continued documentation defects:

> At the end of such thirty (30) day period the Trustee shall send a Delay Delivery Certification for the Delay Delivery Mortgage Loans delivered during such thirty (30) day period in accordance with the provisions of Section 2.02.

39.     The incomplete, removed loans were to become "Deleted Mortgage Loans," which BNY Mellon was required to assign back to the Seller pursuant to § 2.03(c) ("the Trustee shall release the Mortgage File held for the benefit of the Certificateholders relating to such Deleted Mortgage Loan to the related Seller").  The Servicer was required to "amend the Mortgage Loan Schedule for the benefit of the Certificateholders to reflect the removal of such Deleted Mortgage Loan and the substitution of the Substitute Mortgage Loan or Loans" and to "deliver the amended Mortgage Loan Schedule to the Trustee."  Countrywide PSA § 2.03(c). Then, the Trustee was required to release the Mortgage File for each repurchased or substituted loan and to "execute and deliver . . . such instruments of transfer or assignment . . . as shall be necessary" to transfer title to the Deleted Mortgage Loans from the Trustee to the Seller.  *Id.*

40.     In addition, after a designated period, BNY Mellon was required to issue a final certification and exception report that identified mortgage files that were missing

13

documentation required under the PSA.

41.     BNY Mellon's obligation to prepare these documents is spelled out in Section 2.02(a) of the Countrywide PSA, which provides:  "Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide . . . a Final Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit H-1, with any applicable exceptions noted thereon."

42.     The final certification, called "Form of Final Certification of the Trustee," which was attached to the Countrywide PSA as Exhibit H-1, provides:

> Gentlemen:
>
> In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), *the undersigned, as Trustee, hereby certifies that as to each Initial Mortgage Loan listed in the Mortgage Loan Schedule (other than any Initial Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received*:
>
> (i)  *the original Mortgage Note, endorsed by Countrywide or the originator of such Mortgage Loan*, without recourse in the following form: "Pay to the order of ___ without recourse", *with all intervening endorsements that show a complete chain of endorsement from the originator to Countrywide*, or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from Countrywide, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note;
>
> (ii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, *the original recorded Mortgage*, [and in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan, *the original Mortgage*, noting thereon the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];

14

(iii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, *a duly executed assignment of the Mortgage to "The Bank of New York, as trustee* under the Pooling and Servicing Agreement dated as of [month] 1, 2004, without recourse", or, in the case of each Initial Mortgage Loan with respect to property located in the State of California that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage in blank (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

(iv) *the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage* [(noting the presence of a MIN in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan)];

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

(vi) *the original or duplicate original lender's title policy* or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

In the event that in connection with any Initial Mortgage Loan that is not a MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by Countrywide, the applicable title company, escrow agent or attorney, or the originator of such Initial Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

*Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on*

15

> *their face and related to such Initial Mortgage Loan, and (ii)*
> *the information set forth in items (i), (iv), (v), (vi), (viii), (xi)*
> *and (xiv) of the definition of the "Mortgage Loan Schedule" in*
> *Article I of the Pooling and Servicing Agreement accurately*
> *reflects information set forth in the Mortgage File*.
>
> The Trustee has made no independent examination of any
> documents contained in each Mortgage File beyond the review
> specifically required in the above-referenced Pooling and
> Servicing Agreement.  The Trustee makes no representations as
> to: (i) the validity, legality, sufficiency, enforceability or
> genuineness of any of the documents contained in each Mortgage
> File of any of the Initial Mortgage Loans identified on the
> [Mortgage Loan Schedule] [Loan Number and Borrower
> Identification Mortgage Loan Schedule] or (ii) the collectability,
> insurability, effectiveness or suitability of any such Initial
> Mortgage Loan.
>
> Capitalized words and phrases used herein shall have the
> respective meanings assigned to them in the Pooling and
> Servicing Agreement.
>
> THE BANK OF NEW YORK,<br>as Trustee

(Emphasis added).

43.     Thus, in the final certification and document exception report, BNY Mellon

certified that: (i) there was full and complete loan documentation in accordance with the

requirements of the PSAs for those loans specifically identified on the mortgage loan

schedule; and (ii) BNY Mellon had not obtained complete required documentation for those

loans identified on the document exception report.

44.     If there was a defect with any mortgage file, then the Servicer and BNY

Mellon were obligated to demand that the Sponsor cure the defect leading to the exception

within 90 days or repurchase or substitute the defective loans.  This is set forth in Section

2.02(a) of the Countrywide PSA, which provides:

> *If, in the course of such review, the Trustee finds any document*

16

***constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification***; provided, however, that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. ***Countrywide . . . shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide . . . shall either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide . . . was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days from the Closing Date***.

(Emphasis added). Section 2.03 of the Countrywide PSA provided that the Servicer and BNY Mellon were entitled to reimbursement of any expenses incurred enforcing this repurchase obligation.

45.     Under Section 2.01(b) of the Countrywide PSA:

Immediately upon the conveyance of the Mortgage Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with the Depositor's right to require each Seller to cure any breach of a representation or warranty made herein by such Seller, or to repurchase or substitute for any affected Mortgage Loan in accordance herewith.

46.     Section 2.06 of the Countrywide PSA in turn obligates BNY Mellon to exercise all of its rights, including those assigned to it under Section 2.01(b) above, for the benefit of Certificateholders such as PacLife: "The Trustee agrees to hold the Trust Fund and

17

*exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement, to the end that the interests of the Holders of the Certificates may be adequately and effectively protected*." (Emphasis added).

47.     Additionally, to the extent Countrywide did not voluntarily repurchase Delay Delivery Mortgage Loans or loans with defective documentation, the Master Servicer (a Countrywide subsidiary) was obligated to pursue repurchase claims pursuant to § 3.01, which requires that the Master Servicer "represent and protect the interests of the Trust Fund . . . in any claim, proceeding or litigation regarding a Mortgage Loan."

48.     Under all the PSAs, and applicable tax laws governing REMICS, the responsible party could not cure a document defect by substitution after a specified period, typically 540 days to two years from closing.  This is set forth in Section 2.02(a) of the Countrywide PSA, which provides:

> Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days from the Closing Date . . . .

49.     In any event, because any substituted loans must be virtually identical to the initial loan, including maturity date and other terms, substitution was not generally feasible

more than a year after closing because loans of the same vintage were no longer widely

available for inclusion in securitizations.

### B.   BNY Mellon's Duty to Provide Notice of Defaults and Enforce Repurchase Obligations

50.   Countrywide represented and warranted in the Countrywide PSA that "[e]ach

Mortgage Loan was underwritten in all material respects in accordance with Countrywide's

underwriting guidelines."  Countrywide PSA Schedule III-A, § 36.  Countrywide further

represented and warranted the following:

> (1) The information set forth on Schedule I to the Pooling and Servicing Agreement with respect to each Mortgage Loan is true and correct in all material respects as of the Closing Date.
>
> (2) As of the Cut-off Date, none of the Mortgage Loans is 30 days or more delinquent.
>
> (3) No Mortgage Loan had a Loan-to-Value Ratio at origination in excess of 100.00%.
>
> (4) Each Mortgage is a valid and enforceable first lien on the Mortgaged Property. . . .
>
> (10) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, predatory and abusive lending laws, real estate settlement procedures, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws. . . .
>
> (12) A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, in an amount at least equal to the Cut-off Date Stated Principal Balance of each such Mortgage Loan or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force and effect. . . .
>
> (16) Each Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker

thereof, enforceable in accordance with its terms and under applicable law.  To the best of Countrywide's knowledge, all parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties. . . .

(20) Each Mortgage Note and each Mortgage is in substantially one of the forms acceptable to FNMA or FHLMC, with such riders as have been acceptable to FNMA or FHLMC, as the case may be. . . .

(22) The origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business. . . .

(27) Each Mortgage Loan which had a Loan-to-Value Ratio at origination in excess of 80.00% is the subject of a Primary Insurance Policy that insures that portion of the principal balance equal to a specified percentage times the sum of the remaining principal balance of the related Mortgage Loan. . . .

(29) If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property. . . .

(37) Other than with respect to any Streamlined Documentation Mortgage Loan as to which the loan-to-value ratio of the related Original Mortgage Loan was less than 90% at the time of the origination of such Original Mortgage Loan, prior to the approval of the Mortgage Loan application, an appraisal of the related Mortgaged Property was obtained from a qualified appraiser, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; such appraisal is in a form acceptable to FNMA and FHLMC. . . .

(40) The Mortgage Loans were selected from among the outstanding fixed-rate one- to four-family mortgage loans in the portfolios of the Sellers at the Closing Date as to which the representations and warranties made as to the Mortgage Loans

set forth in this Schedule III-A can be made.  Such selection was not made in a manner intended to adversely affect the interests of Certificateholders . . . .

(42) With respect to any Mortgage Loan as to which an affidavit has been delivered to the Trustee certifying that the original Mortgage Note is a Lost Mortgage Note, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage by or on behalf of the Trustee will not be materially adversely affected by the absence of the original Mortgage Note.  A "Lost Mortgage Note" is a Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

(43) The Mortgage Loans, individually and in the aggregate, conform in all material respects to the descriptions thereof in the Prospectus Supplement. . . .

(46) The Master Servicer has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files related to the Mortgage Loans to Equifax, Experian and Trans Union Credit Information Company (three of the nationally recognized credit bureaus) on a monthly basis. . . .

(49) None of the Mortgage Loans are "high cost" loans as defined by applicable predatory and abusive lending laws. . . .

(55) All of the Mortgage Loans were originated in compliance with all applicable laws, including, but not limited to, all applicable anti-predatory and abusive lending laws. . . .

(61) The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension.  Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had the reasonable ability to make timely payments on the mortgage loan….

51.     Section 2.03(c) of the Countrywide PSA describes the nature of the notice and

repurchase enforcement obligations triggered by the discovery of a breach of the above

representation and warranties:

> ***Upon discovery by any of the parties hereto of a breach of a representation or warranty with respect to a Mortgage Loan*** made pursuant to Section 2.03(a) that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan***, the party discovering such breach shall give prompt notice thereof to the other parties. Each Seller hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty with respect to a Mortgage Loan sold by it*** pursuant to Section 2.03(a) which materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, ***it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a 'Deleted Mortgage Loan') from the Trust Fund and substitute in its place a Substitute Mortgage Loan***, in the manner and subject to the conditions set forth in this Section; or ***(ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below. . . .*** The Seller repurchasing a Mortgage Loan pursuant to this Section 2.03 (c) shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach. With respect to the representations and warranties described in this Section which are made to the best of a Seller's knowledge, if it is discovered by either the Depositor, a Seller or the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders therein, notwithstanding that Seller's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable representation or warranty. Any breach of a representation set forth in clauses (45) through (63) of Schedule III-A with respect to a Mortgage Loan shall be deemed to materially and adversely affect the Certificateholders.

(Emphasis added).

      52.    Thus, any party, including BNY Mellon and Countrywide as Servicer, that

discovers a breach of a representation or warranty about any Mortgage Loan materially and

adversely affecting the Certificateholders' interests "shall" give prompt notice to the other parties.  In light of the specific representations and warranties quoted above, this means that BNY Mellon and the Servicer were both obligated to give notice of breaches discovered as to any specific mortgage loan or that the loans in the trusts, "in the aggregate," suffered from pervasive underwriting deficiencies.

53.     Section 2.03 also provides indemnification of the Trustee by the applicable Seller for its expenses in "enforcing the remedies for such breach."

54.     Further, Section 2.04 requires BNY Mellon to provide notice of all breaches of representations and warranties that materially and adversely affect Certificateholders, which would include "pervasive breaches:"  "Upon discovery by the Depositor or the Trustee of a breach of any of the foregoing representations and warranties set forth in this Section 2.04 (referred to herein as a 'breach'), which breach materially and adversely affects the interest of the Certificateholders, the party discovering such breach shall give prompt written notice to the others and to each Rating Agency."

55.     As set forth above, Section 2.06 requires BNY Mellon to exercise all its rights set forth in Article II, including BNY Mellon's right to require the repurchase of defective loans, "to the end that the interests of the Holders of the Certificates may be adequately and effectively protected."  Upon discovering breaches of representations and warranties, BNY Mellon was obligated, before any Event of Default, to enforce repurchase remedies on behalf of certificateholders such as PacLife.

56.     In addition, after the occurrence of an Event of Default, the Trustee assumes the same duties as a common law trustee, which include, among other things, providing beneficiaries notice of all defaults under the operative trust documents, which include the

PSAs here.

57.     Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

58.     Under Section 315(b) of the TIA, BNY Mellon was required to give certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).

59.     As set forth in Section III.A hereof, BNY Mellon failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law, and the TIA.

### C.     BNY Mellon's Duty to Act Prudently Upon the Occurrence of an Event of Default

60.     Under the PSAs and applicable law, BNY Mellon owed a fiduciary duty to certificateholders upon the occurrence of an Event of Default.  BNY Mellon's post-default fiduciary duty is described in Section 8.01 of the Countrywide PSA, which provides in relevant part, "[i]n case an Event of Default has occurred . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs."

61.     Section 7.01 of the Countrywide PSA defines Events of Default, which include:

> any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement (except with respect to a failure related to a Limited Exchange Act Reporting Obligation), which failure materially affects the rights of

> Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; provided, however, that the sixty-day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery….

Under Section 7.01 of the PSA, BNY Mellon was obligated to provide the Master Servicer notices of the Master Servicers' breaches under the PSA.

62.     Additionally, BNY Mellon was required to provide the Master Servicer notice of "reportable events" under Section 11.03 of the Countrywide PSA and provide public notice of material breaches of pool asset representations or warranties or transaction covenants on Form 10-Ds.

63.     Because the cure period "shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery," the Event of Default related to Delay Delivery Loan failures is triggered automatically—no additional notice or opportunity to cure is required.

64.     Section 7.03 ("Notification to Certificateholders") of the Countrywide PSA requires BNY Mellon to notify all Certificateholders of every uncured Event of Default known to BNY Mellon:

> (b) Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived.

65.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a "default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent

man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

66.     The Streit Act provides that upon the occurrence of an Event of Default, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  Section 130-e of the Streit Act provides a private remedy to any person aggrieved by the act or omission to act of a trustee.

67.     Upon the occurrence of an Event of Default, a prudent trustee would have, among other things, (i) taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts; (ii) ensured that the appropriate parties were receiving notification of breaches of representations and warranties or documentation defects from servicers; (iii) enforced the responsible parties' repurchase obligations with respect to breaching mortgage loans; (iv) addressed servicer breaches; and (v) otherwise exercised all rights and remedies under the PSA to maximize recoveries for certificateholders such as PacLife.

### D.     BNY Mellon's Duty to Address the Servicers' Failure to Meet Prudent Servicing Standards

68.     Each PSA required the Servicers to service the loans underlying the Covered Trusts prudently.

69.     Section 3.01 of the Countrywide PSA provides:  "For and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and customary and usual standards of practice of prudent mortgage loan servicers."  Section 3.01 further provides:  "[T]he Master Servicer shall not take any action that is inconsistent with or prejudices the interests of the Trust

26

Fund or the Certificateholders in any Mortgage Loan or the rights and interests of the Depositor, the Trustee and the Certificateholders under this Agreement."

70.   Upon an Event of Default, the Trustee was obligated to act.  BNY Mellon had a duty to provide notice when it became aware of breaches of the PSAs by the Servicers.  If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults.  For example, the Countrywide PSA provides that once an Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations of the Master Servicer," Countrywide PSA § 7.01, and "assume all of the rights and obligations of the Master Servicer."  Countrywide PSA § 3.04.  More generally, BNY Mellon, as Trustee, had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so with due care.

71.   As set forth in Section III, BNY Mellon breached its statutory, fiduciary, and contractual duties by failing to take actions to address Servicer defaults and Events of Default.

### E.   BNY Mellon's Liability for Negligence in Performing Its Duties

72.   Section 8.01 of the Countrywide PSA provides in relevant part:

> ***No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct***; provided, however, that:
>
> (i) unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and the

27

> Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;
>
> (ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless *it shall be finally proven that the Trustee was negligent in ascertaining the pertinent facts*.

(Emphasis added).

73.     Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust.  BNY Mellon can be held liable for its own negligence in failing to perform its requisite ministerial acts which include, among other things, its responsibilities to: (i) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsor's widespread practice of including in securitization trusts loans that breached such representations and warranties; (ii) take steps to cause Countrywide to repurchase defective loans, and (iii) provide notices of servicing related breaches known to the Trustee.

74.     Every trustee—including BNY Mellon—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and arises independently of the PSAs.

75.     BNY Mellon's duties in respect to the re-securitization trust, CWALT 2008-1R, are the same as its duties with respect to the underlying RMBS trust, CWALT 2007-18CB, because the CWALT 2008-1R Trust Agreement incorporates many of the provisions of the PSA for CWALT 2007-18CB, including the same definition of Event of Default.  CWALT 2008-1R

28

Trust Agreement § 1.01 (*see* "Underlying Event of Default").  Section 3.01 of the Trust

Agreement further provides that if "the Trustee shall gain actual knowledge of any default under

the [CWALT 2007-18CB PSA], the Trustee  shall promptly notify the Depositor, the Underlying

Certificate Seller and the Certificateholders, and shall . . . pursue such remedies as may be

available to it . . . with the terms of the [CWALT 2007-18CB PSA]."  CWALT 2008-1R Trust

Agreement § 3.01.

## III.   BNY MELLON BREACHED ITS CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES AS TRUSTEE FOR THE COVERED TRUSTS

### A.   BNY Mellon Failed to Provide Notice of Countrywide's Representation and Warranty Breaches and Enforce Repurchase Obligations

#### 1.   Countrywide's Massive Mortgage Origination and Securitization Fraud

76.     Countrywide's origination and securitization of mortgage loans were subject

to widespread and systemic failures to comply with their representations and warranties.

77.     From 2000 to 2003, Countrywide rose to prominence as a mortgage lender

originating hundreds of billions of dollars of loans annually and securitizing them for sale.

Business expanded so rapidly that Countrywide's founder and CEO, Angelo Mozilo, stated

publicly that, by 2006, Countrywide would be the nation's "dominant" home-mortgage lender.

By 2004, however, Countrywide recognized that it would be unable to reach its lofty goals if it

limited itself to lending to borrowers who qualified under prudent loan underwriting standards.

78.     In order to fuel Countrywide's growth, Countrywide resolved to approve any loan

that could be securitized for sale to third parties, without regard to whether the loan complied

with Countrywide's already lax underwriting standards.  As Countrywide's CFO, David Sambol,

stated in a February 13, 2005 email (made public years later):  "We should be willing to price

virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."  Amanda Bransford, *MassMutual Brings New RMBS Suit Against Countrywide Execs*, Law360 (Apr. 24, 2012), http://www.law360.com/ articles/333621/massmutual-brings-new-rmbs-suit-againstcountrywide-execs.

79.     Additionally, the SEC has released documents showing that Countrywide adopted a "matching" strategy whereby it would provide any mortgage product feature offered by a competitor.  This "matching" strategy could only be implemented through abandonment of Countrywide's supposed credit-risk-reducing underwriting guidelines.  To get around its own requirements, Countrywide set up a system whereby any loan could be approved by way of underwriting "exceptions" and coached borrowers on how to apply for loan products that required little or no income or asset verification.

80.     Internal documents that have since become public show that "exceptions" were involved in upwards of one-third of all loans, and were based purely on the desire to increase loan volume (and profits) and not on "compensating factors" as represented.  Countrywide deliberately offloaded the worst of these loans to securitizations sold to investors such as PacLife.

81.     In 2006, Countrywide's internal reviews concluded that one-third of all Countrywide loans violated its underwriting guidelines.  As set forth in the complaint in *American Fiduciary Assurance Company v. Countrywide Financial Corporation*, "Frank Aguilera, a Countrywide Managing Director responsible for risk management, reported the 'particularly alarming' result . . . that 23% of the subprime loans," which were often included as prime or Alt-A loans in Countrywide's securitizations, were generated as exceptions, even taking into account "all guidelines, published and not published, approved and not yet approved."  The

30

exception rate for "80/20" products (which [were] particularly risky because they required 100%
financing) was even higher.  Aguilera wrote at the time:  "[t]he results speak towards our
inability to adequately impose and monitor controls on production operations."  Compl. ¶ 124,
*Am. Fid. Assurance Co. v. Countrywide Fin. Corp.*, No. 11-361D (W.D. Okla. Apr. 1, 2011).
Another internal review conducted around the same time concluded that "approximately 40% of
the Bank's reduced documentation loans . . . could potentially have income overstated by more
than 10% and a significant percent of those loans would have income overstated by 50% or
more."  *See id*. ¶ 116 (omitted text in original).

82.     On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,
alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the others misled
investors about the credit risks that Countrywide created with its mortgage origination business,
telling investors that Countrywide was primarily involved in prime mortgage lending, when it
was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.
*See* Compl., *SEC v. Mozilo*, No. 09-cv-3994-JFW (C.D. Cal. June 4, 2009).  Mozilo and the
other executives settled the charges with the SEC for $73 million on October 15, 2010.  *See*
Walter Hamilton, E. Scott Reckard & Angelo Mozilo, *Other Former Countrywide Execs Settle
Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

83.     Internal Countrywide emails that the SEC released in connection with its lawsuit
demonstrate the extent that Countrywide systematically deviated from its underwriting
guidelines.  For example, in an April 13, 2006 email from Mozilo to other top Countrywide
executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious
disregard for process [and] compliance with guidelines."  Email from Angelo Mozilo, CEO,
Countrywide Financial, to Eric Sieracki, Stan Kuland, Dave Sambol, David Spector & John

Murray, Managing Directors, Countrywide Financial (Apr. 23, 2006 7:42 PM PST), *available at* https://www.sec.gov/news/press/2009/2009-129-email.htm.  Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."  *Id.*

84.   A Countrywide internal quality control report, emailed on June 2, 2006, showed that for stated income loans, 50.3 percent of loans indicated a variance of 10 percent or more from the stated income in the loan application.  *See* Email from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006).

85.   Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  Email from Angelo Mozilo to David Sambol, Managing Director, Countrywide Financial (Sept. 26, 2006), *available at* https://www.sec.gov/news/press/2009/2009-129-email.htm.  Yet such loans were securitized and passed on to unsuspecting investors such as the PacLife.

86.   On March 27, 2006, Mozilo reaffirmed the need to "avoid the errors of both judgment and protocol that have led to the issues that we face today" and that the 100% loan-to-value subprime product is "the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."  Email from Mozilo to former Countrywide Managing Directors (Mar. 27, 2006), *available at* https://www.sec.gov/news/press/2009/2009-129-email.htm.

87.   Yet Countrywide routinely found exceptions to its underwriting guidelines

without sufficient compensating factors.  In an April 14, 2005 email, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed.  He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Email from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing Director, Countrywide (Apr. 14, 2005).  Aguilera further stated, "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines."  *Id.* Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice.

88.     "It appears that [Countrywide Home Loans'] loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions.  I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry. . . ." *Id*.

89.     Internal reports created months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. Email from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PST).

90.     Still, in February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little

change in overall execution unless these exceptions can be contained." Email from Frank

Aguilera, Countrywide, to Mark Elbuam, Countrywide, among others (Feb. 21, 2007).

91.     John McMurray, a former Countrywide managing director, expressed his opinion

in a September 2007 email that "the exception process has never worked properly." Email from

John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept.

7, 2007).

92.     Countrywide conceded that the poor performance of loans it originated was, in

many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high CLTV

ratio stated income loans were performing worse than those of its competitors. After reviewing

many of the loans that went bad, a Countrywide executive stated that "in most cases [poor

performance was] due to poor underwriting related to reserves and verification of assets to

support reasonable income." Email from Russ Smith, Countrywide to Andrew Gissinger,

Managing Director, Countrywide (Apr. 11, 2007).

93.     Not surprisingly, Countrywide's complete disregard for proper loan underwriting

has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic

analyses and re-underwritten entire loan files and found a staggering number of loans breaching

the associated representations and warranties. *See, e.g.*, Compl., *Mass. Mutual Life Ins. Co. v.

Countrywide Fin. Corp.*, No. 11-cv-30215-MGM (D. Mass. Sept. 1, 2011) (including Covered

Trust CWALT 2006-OA3); Compl., *Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 10-cv-

9591-MRP (S.D.N.Y. Dec. 27, 2010) (including Covered Trust CWALT 2006-45T1). This is

evident from an SEC Quarterly Report filed by Bank of America for the period ending March 31,

2011, which disclosed over $13.5 billion in outstanding repurchase requests based on breach of

representation and warranty claims.

34

94.     These repurchase claims were unquestionably meritorious as evidenced by the sums Bank of America was paying to resolve them.  For example, as reported in the SEC Quarterly Report, Bank of America paid $577 million during the three months ending March 31, 2011 and $1.1 billion for the three months ending March 31, 2010, in order to resolve $723 million and $1.2 billion of repurchase claims on both Bank of America and legacy Countrywide originations.  These repurchase claims resulted in a loss on the related loans totaling $346 million and $707 million respectively.  Bank of Am. Corp., Quarterly Report (Form 10-Q) (May 5, 2011).

95.     Further, in August 2014, Bank of America reached a $16.65 billion settlement with the United States Department of Justice ("DOJ") to resolve federal and state claims against Bank of America and its former and current subsidiaries, including Countrywide.  The resolution required Bank of America to provide much needed relief to underwater homeowners and potential homebuyers.  In connection with the settlement, defendant "made admissions concerning their conduct, including that they were aware that many of the residential mortgage loans they had made to borrowers were defective, that many of the representations and warranties they made to the GSEs about the quality of the loans were inaccurate, and that they did not self-report to the GSEs mortgage loans they had internally identified as defective."  *Bank of America to Pay $16.65 Billion in Historic Justice Department Settlement for Financial Fraud Leading up to and During the Financial Crisis*, Department of Justice Office of Public Affairs (Aug. 21, 2014), http://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department-settlement-financial-fraud-leading.

96.     Specifically, Bank of America admitted, among other things, the following statements concerning Countrywide's conduct:

35

• "[F]rom 2005 to 2007, Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides.  At the same time, employees of Countrywide received information indicating that there was an increased risk of poor performance for certain mortgage programs and products that were being included in RMBS.  Despite having access to this information, Countrywide's RMBS offering documents generally did not disclose the extent to which underlying loans were originated as exceptions to its Loan Program Guides.  Nor did Countrywide disclose in its RMBS offering documents the results of certain reviews and internal reports related to loan performance."  Annex 1 to the Settlement Agreement (Bank of America Corporation Statement of Facts) at 6.

• "Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides. . . .an internal Countrywide email indicated that during May 2006, for prime loans, exceptions constituted by dollar amount approximately 30% of funding for certain fixed loans, 40% for Pay-Option ARMs, and 50% for expanded criteria hybrid loans."  *Id.* at 10.

• "During the period from August 2005 to 2007, Countrywide received information regarding the performance and characteristics of loans that it originated under various products and programs and securitized into RMBS.  That information suggested that certain products had the potential to perform poorly, particularly in a challenging economic environment."  *Id.* at 11.

• "On February 3, 2006, an article in Inside Mortgage Finance Publications reported on a study that Countrywide presented at the American Securitization Forum Conference.  The article reported that a Countrywide executive had stated that 'Pay Option Arms were found to be the riskiest product on the market. . . . Throughout 2006 and 2007, Countrywide continued to originate Pay-Option ARMs, including as exceptions to its Loan Program Guides, and to securitize these Pay-Option ARMs into RMBS.  As disclosed in Offering Documents, in certain RMBS backed by Pay-Option ARMs, as many as 90% of the loans that backed the certificates were originated under reduced documentation programs."  *Id.* at 13-14.

• "Countrywide also received information indicating that some borrowers who applied for loans in which they stated their incomes without providing verification may have been overstating their incomes on their loan applications."  *Id.* at 14.

• In May 26, 2006, a report found "that approximately 40% of [Countrywide's] reduced documentation loans in the portfolio could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more."  *Id.*

• "Although Countrywide originated an increasing number of mortgage loans as exceptions to its Loan Program Guides from 2005 to 2007, Countrywide generally did not disclose in its RMBS Offering Documents the scope of the exceptions to

its Loan program Guides.  Throughout this time period, Countrywide received information on risks associated with certain mortgage products and programs. Countrywide did not disclose in its RMBS Offering Documents the results of certain reviews and internal reports that analyzed this information." *Id.* at 15.

• "A significant percentage of loans that Countrywide sold to [government-sponsored entities ("GSEs")] during 2004 to 2008 were originated by Countrywide's prime retail division, known as the Consumer Markets Division ("CMD").  During this time, Countrywide was aware that many of the residential mortgage loans originated through CMD were defective and/or otherwise ineligible for sale to the GSEs." *Id.* at 28.

97.     These facts demonstrated that the Countrywide regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans, and failed to meet state and federal lending guidelines.  While investors such as PacLife lacked the ability to determine whether the publicly reported misconduct by Countrywide impacted specific loans backing the Covered Trusts, BNY Mellon had knowledge of specific problems with specific loans, as well as access to the mortgage loan files as set forth below.

### 2.  BNY Mellon Had Actual Knowledge of Breaches of Representations and Warranties Affecting the Covered Trusts

98.     BNY Mellon knew that Countrywide regularly disregarded its underwriting guidelines and representations and warranties made to securitization trusts, including the Covered Trusts, long before certificateholders learned of such problems.

99.     BNY Mellon served as trustee for over 700 Countrywide RMBS trusts created between 2004 and 2007.  In the course of administering these trusts, BNY Mellon learned that Countrywide had departed from their underwriting guidelines, engaged in predatory lending, and failed to ensure mortgage loans complied with state and federal laws.

100.    As early as July 2007, BNY Mellon internally raised "red flags" due to the bank's

37

exposure to Countrywide.  These concerns were elevated to BNY Mellon's most senior

management, including Karen Peetz, now President of BNY Mellon, in August 2007.[4]  W&S Ex.

36.

101.    A former officer responsible for Countrywide accounts in BNY Mellon's Default

Administration Group became so concerned upon learning of a Florida Attorney General

subpoena of Countrywide in January 2008 that he elevated the issue to senior management at

BNY Mellon.  W&S Ex. 24.  Senior management never acted on his sounding of the alarm, a

non-response that would become BNY Mellon's *modus operandi*, unbeknownst to

certificateholders such as PacLife, as its awareness of Countrywide's mortgage fraud, including

breaches of the PSAs for the Covered Trusts, mounted.  W&S Ex. 2.

102.    In fact, in 2008, BNY Mellon acknowledged Countrywide's "raft of severe

financial and regulatory problems," including i) investigations by the FBI and SEC into

Countrywide's conduct during the mortgage crisis, and ii) lawsuits brought by four state

attorneys general against Countrywide for alleged widespread deceptive mass-mortgage lending

practices.  *BNYM v. Countrywide Financial Corp.*, No. 3935-VCP, p. 9-10, n. 12, 30 (Del. Ch.

Aug. 18, 2008).

103.    BNY Mellon's concerns regarding Countrywide with respect to its own exposure

were so severe by August 2007 that it threatened to pull the plug on Countrywide's $45 billion

repo book.  BNY Mellon's concerns required intervention from the president of the New York

---

[4]  Much of the information concerning BNY Mellon's knowledge of Countrywide's problems
cited herein became publicly available for the first time in May 2016 when plaintiffs in *Western
& Southern Life Ins. Co. v. The Bank of New York Mellon ("Western and Southern")*, Case No.
A1302490-SEM (Ohio Ct. of Common Pleas, Hamilton County) filed an opposition to BNY
Mellon's motion for summary judgment citing this evidence.  The court denied BNY Mellon's
motion for summary judgment.  "W&S Ex. __" refers to exhibits attached to plaintiffs' summary
judgment opposition brief in *Western & Southern*.

Federal Reserve in order to avoid an unprecedented event with a potentially devastating impact on the financial market.  Timothy Geithner, *Stress Test: Reflections on Financial Crises*, (2014).

104.    The head of BNY Mellon's team that handled the Countrywide RMBS trusts has testified that BNY Mellon received a "high volume" of notices from certificateholders and other parties notifying BNY Mellon of non-compliant Countrywide loans.  W&S Ex. 43.  And one of her direct reports testified that he was aware of reports that Countrywide had a widespread company culture that encouraged employees to push mortgages through without regard to underwriting standards.  W&S Ex. 6.

105.    By February 12, 2009, BNY Mellon internally estimated that there were 8,900 outstanding repurchase requests in connection with Countrywide RMBS, to which the head of BNY Mellon's Countrywide team observed, "my god boy the number is growing."  W&S Ex. 65.  The volume of written repurchase requests for Countrywide loans that breached their representations and warranties that BNY Mellon received became so large that BNY Mellon eventually created a repurchase tracking tool to manage the massive volume.  W&S Ex. 66.  PacLife neither had access to this information, until very recently, nor a way of confirming breaches of representations and warranties in the Covered Trusts because it did not have access to the mortgage loan files.

106.    BNY Mellon received written notice from investors and other parties specifically notifying BNY Mellon of breaches with respect to the Covered Trusts, information which became public in May 2016.

107.    For example, on January 14, 2008, BNY Mellon received a repurchase request notice from Hanover Capital Mortgage Holders in connection with two of the Covered Trusts, CWHL 2005-13 and CWHL 2005-17.  W&S Ex. 57.  Hanover explained that the bases of the

repurchase requests included breaches of the origination guidelines and misrepresentations of the mortgage loan schedule. *Id.* The letter noted that Countrywide has refused to comply with the repurchase requests, some of which had been outstanding for nearly a year. The letter also notified BNY Mellon that Countrywide has refused to provide Hanover access the mortgage files and expressly requested BNY Mellon's assistance in facilitating a resolution of the repurchase requests. *Id.*

108.    As another example, on November 9, 2010, AIG notified BNY Mellon of breaches of representations and warranties with respect to numerous Countrywide RMBS trusts, including CWHL 2005-13. AIG notified BNY Mellon that the interests of certificateholders in CWHL 2005-13, and the other Countrywide trusts, "may have been materially and adversely impacted by underwriting errors and/or breaches of the representations and warranties contained in the contracts and offering materials relating to the Securities." W&S Ex. 58. AIG further reminded BNY Mellon: "As trustee, you are empowered to safeguard the interests of the Certificateholder whose assets Bank of New York Mellon in administering." *Id.* AIG requested the BNY Mellon exercise its right to obtain mortgage loan files so that AIG could conduct a reunderwriting review and determine whether a repurchase demand is appropriate, and even offered to reimburse BNY Mellon for any costs incurred in obtaining mortgage loan files. Numerous BNY Mellon employees have admitted under oath that it never obtained mortgage files from Countrywide for any investor notwithstanding investor requests.

109.    Monoline insurers also repeatedly sent BNY Mellon notices of breaches of representations and warranties in Countrywide RMBS trusts. W&S Ex. 5. Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults. Countrywide made representations and warranties concerning the underwriting

standards of the loans in the governing agreements for the insured RMBS. The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

110.    Monoline insurers have filed many complaints against Countrywide for breaches of their representations and warranties in connection with other RMBS trusts. *See, e.g.,* Compl., *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 653979/2014-MF (N.Y. Sup. Ct. Dec. 30, 2014); Am. Compl., *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008-EB (N.Y. Sup. Ct. Aug. 24, 2009); Compl., *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, No. 650042/2009-EB (N.Y. Sup. Ct. May 6, 2010).

111.    Prior to filing suit against mortgage loan sponsors, monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue and informed the trustee of the results. Monoline insurers, such as MBIA, Syncora Guarantee, Inc., and Ambac Assurance Corporation, all sent BNY Mellon notices of loans underlying numerous Countrywide RMBS breached their representations and warranties, often attaching spreadsheets with loan-by-loan explanations of the breaches. *See* W&S Exs. 7, 60, and 61.

112.    To the extent BNY Mellon had any doubt as to widespread defects among loans in the Countrywide RMBS trusts, including the Covered Trusts, Fannie Mae put an end to it. On January 15, 2009, Fannie Mae sent a letter to BNY Mellon expressing concern with the quality of loans underlying Countrywide RMBS held by Fannie Mae. Fannie Mae informed BNY Mellon that its review of foreclosed Countrywide loans, nearly half were "troubled loans" in violation of at least one representation or warranty. Because Fannie Mae's review was based on Countrywide loans in Fannie Mae's "Single Family Program," Fannie estimated that the

41

incidence of violations would be even higher in private label securitizations, such as those at issue in the Covered Trusts. Fannie Mae noted "*[i]t would be nothing short of negligence* for anyone having business dealing with Countrywide *not* to question the quality of Countrywide's mortgage loans." W&S Ex. 62 (Second emphasis in original). Fannie Mae pleaded with BNY Mellon to take action and appoint Fannie Mae to hire outside consultants to perform a forensic review of Countrywide loan files. *Id.* BNY Mellon never obtained or provided loan files requested by Fannie Mae.

113.    Likewise, on October 29, 2009, Freddie Mac sent BNY Mellon written notice "that it believes that representations and warranties that were made in connection with the mortgage loans sold and assigned to the Trusts for the benefit of the securityholders may have been breached." W&S Ex. 40. Freddie Mac likewise requested that BNY Mellon obtain Countrywide mortgage loan files for its review to no avail. *Id.*

114.    Countrywide also obtained knowledge of breaches of representations and warranties for the Covered Trusts separate and apart from the notices it received from investors and other parties.

115.    For example, while serving as trustee for Countrywide RMBS trusts, BNY Mellon was presented with a large number of defaulted loans, and foreclosures were often commenced in BNY Mellon's name, including for loans in the Covered Trusts. *See, e.g.*, *Bank of N.Y. Mellon v. Brunsman*, No. 2008-CA-019077-O (Fla. Cir. Ct. Aug. 5, 2008) (CWALT 2007-17CB); *Bank of N.Y. Mellon v. Brown*, No. CV146015305S (Conn. Super. Ct. July 1, 2015) (CWALT 2006-OA3).

116.    Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized. In each foreclosure, BNY Mellon was the named plaintiff and real

party in interest as it allegedly held title to the notes and mortgage as trustee for the benefit of the certificateholders.  As the real party in interest it had knowledge of the contents of the foreclosure filings.

117.    Through its review of these filings, BNY Mellon knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

118.    Additionally, by the summer of 2009, BNY Mellon learned that the SEC had uncovered internal Countrywide documents reflecting a widespread scheme to inflate loan volume and increase market share through the systemic abandonment of its underwriting guidelines.

119.    In July 2009, BNY Mellon internally circulated a complaint by MBIA against Countrywide asserting that Countrywide "developed a systematic pattern and practice of abandoning its own underwriting guidelines in pursuit of loan origination at all costs."  W&S Ex. 70.  MBIA noted that a "loan review by MBIA has revealed that approximately 91% of the defaulted or delinquent loans in the Countrywide securitizations show material discrepancies from the underwriting guidelines that Countrywide represented it would follow."  *Id.*

120.    BNY Mellon itself was named as a defendant in a number of the lawsuits against Countrywide.  For example, Old Republic, a mortgage insurer for thousands of loans securitized by Countrywide, sued both BNY Mellon and Countrywide in December 2008.  W&S Ex. 71.  Old Republic sought rescission due to Countrywide's systemic violations of underwriting guidelines.  *Id.*  Loretta Lundberg, head of BNY Mellon's Default Administration Group, testified that she and her team were aware that Old Republic had denied 2,000 mortgage loan

insurance claims made by BNY Mellon because of breaches of underwriting guidelines, and more than 4,000 others because Countrywide did not provide information in response to requests.  W&S Ex. 21.

121.    AIG affiliate United Guaranty Mortgage Indemnity Company also sued BNY Mellon and Countrywide for misrepresentations associated with over $1 billion of Countrywide mortgages.  W&S Exs. 72, 73.

122.    BNY Mellon received various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties.  For example, Countrywide's systemic abandonment of its underwriting guidelines has had a devastating effect on the performance of the Covered Trusts. Many of the Certificates acquired by PacLife were triple-A or double-A rated at the time of purchase.  *See* **Exhibit B**.  Now many are "junk" bonds that do not qualify for any investment grade rating.  *See id.*  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning Countrywide's systemic abandonment of underwriting guidelines.  A summary of the Covered Trusts' high default and delinquency rates is attached as **Exhibit C**. Indeed, BNY Mellon employees internally observed that a staggering "1 out of 4 Countrywide loans in our deals is in some stage of delinquency."  W&S Ex. 41.  BNY Mellon was aware of the high level of defaults and should have carefully investigated these issues, notified certificateholders, including PacLife, of the issues, and taken action to address these issues.

123.    By October 2009, at the absolute latest, BNY Mellon was aware that RMBS such as the Covered Trusts were essentially junk bonds, and the sponsors and originators had systemically failed to comply with represented underwriting standards.  During an

interview in October of 2009, Bob Kelly, the chief executive of BNY Mellon admitted that:

> [W]e bought a lot of securities that were Triple-A rated . . . that turned out, at best, to be Triple-C in terms of quality.  Shame on us because we should have done a lot more work in understanding the fundamental cash flows and other characteristics of those securities instead of relying on rating agencies.

Janet Whitman, *Saturday Interview: Nova Scotia native Bob Kelly*, Financial Post, Oct. 16, 2009, *available at* http://www.financialpost.com/related/topics/2111634/story.html.  Mr. Kelly further acknowledged that the U.S. mortgage market "do[es] not have any underwriting standards . . . including basic stuff like mortgage brokers who are not registered and trained."  *Id.*

124.   Further, consistent with BNY Mellon's view that triple-A rated RMBS are "junk," BNY Mellon took a $4.8 billion charge against earnings for its own RMBS holdings in 2009 and subsequently sold some of its lowest-quality securities.  Michael Rapoport, *'Toxic' Assets Still Lurking at Banks*, Wall St. J., Feb. 7, 2011, http://www.wsj.com/articles/SB10001424052748704570104576124701144189910.  On a conference call at the time, BNY Mellon's chief executive acknowledged BNY Mellon's desire "to sell the securities where we think there is just no value there."  *Id.*

125.   By 2012, the Countrywide trusts were so mangled by Countrywide breaches and BNY Mellon inaction that BNY Mellon did away with the Trust Administration Group and consolidated all of its efforts in its Default Administration Group—implicitly conceding that all of the loans—including those underlying the Trusts—were in default.  W&S Ex. 74.

126.   BNY Mellon was aware of the information cited above concerning breaches of representations and warranties, and it also had additional information concerning representation and warranty violations that it learned in the course of administering the Covered Trusts,

information unavailable to investors such as PacLife.  *See, e.g.*, W&S Exs. 5, 6, 43, 62, 69.

Additionally, BNY Mellon, unlike PacLife, had access to non-public information regarding the

Covered Trusts, such as mortgage files, which would have confirmed the representation and

warranty violations if it had not ignored the notices presented to it and refused to act.

### 3.  BNY Mellon's Failure to Give Notice and Enforce Repurchase Obligations

127.    Despite a responsibility to take action and address representation and warranty

violations, BNY Mellon ignored calls to action from investors, including Fannie Mae and

Freddie Mac, and other parties.  *See, e.g.*, W&S Exs. 57, 62, 140.

128.    The testimony by the head of BNY Mellon's Countrywide team confirms that

BNY Mellon never so much as analyzed the many breach notices it received, let alone

attempted to enforce Countrywide's repurchase obligations.  W&S Ex. 43.  BNY Mellon's

duty to enforce repurchase claims against Countrywide was especially important since the

only other party with the ability to enforce repurchase claims against Countrywide was

Countrywide's own servicer affiliate.

129.    Further, deposition testimony from various other Countrywide employees that

worked on Countrywide RMBS confirms that when investors placed the trustee on notice of

problems with Countrywide loans, BNY Mellon sat on its hands.  W&S Exs. 24, 56, 145.

130.    If BNY Mellon had provided the required notices, it would have forced

Countrywide to repurchase the defective loans pursuant to the repurchase protocol in the

PSAs and Countrywide would not have been able to issue additional fraudulent RMBS

certificates.  BNY Mellon had a continuing duty to provide such notice but failed to do so

throughout its tenure as trustee.

**B.     BNY Mellon Failed to Act Prudently
Upon the Occurrence of Events of Default**

131.    Numerous Events of Default occurred in each of the Covered Trusts.[5]  BNY

Mellon's failure to take any actions for years to exercise rights and remedies in the PSAs for

the benefit of certificateholders or to maximize the recoveries for investors violated BNY

Mellon's post-Event of Default duty of prudence.  Accordingly, BNY Mellon has repeatedly

breached of its duty to exercise due care throughout the life of the Covered Trusts.  As

described below, numerous Events of Default occurred under the terms of the PSAs.

**1.     Events of Default Relating to the Servicers' Failure
to Provide Notice and Enforce Repurchase Obligations**

132.    As set forth above, BNY Mellon was aware that the Servicer failed to provide

notice or exercise repurchase remedies in connection with the representation and warranty

violations that occurred in the Covered Trusts.  The Servicer's failure to provide notice and

enforce repurchase of loans in the Covered Trusts that breached their representations and

warranties triggered Events of Defaults in all of the Covered Trusts.

**2.     Events of Default Relating to Document Delivery Failures**

133.    Due to its role in the mortgage file delivery process described above, *see*

Section II.A, *supra*, BNY Mellon knew of numerous instances where it did not receive: (i)

the original mortgage note with all intervening endorsements showing a complete chain of

endorsement from Countrywide, or a lost mortgage note affidavit and a duly executed

assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded

mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans

---

[5]  To the extent that any Event of Default required notice to the Servicer, BNY Mellon cannot
rely on the lack of notice to the Master Servicer as it was obligated to provide such notices to the
Servicer.

that were MERS loans; or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

134.    BNY Mellon was aware of Countrywide's pervasive failure to deliver complete mortgage files to Countrywide-sponsored RMBS trusts, including the Covered Trusts. This problem fully dawned on BNY Mellon in November 2008, almost a year after the closing of the most recent Covered Trust, and well after the cure period under the PSA.  In a November 7, 2008 email, BNY Mellon internally acknowledged that because the document exceptions had not been cured within the 90-day cure period, it "appears to be out of compliance per certain sections of the CHL Pooling Agreements."  W&S Ex. 44.

135.    The head of BNY Mellon's Countrywide team, acknowledged that Bank of America/Countrywide was breaching the PSAs as a result of the missing mortgage loan file documents.  In a September 2009 email circulated internally within BNY Mellon with the subject "Risk," the head of BNY Mellon's Countrywide team described "potential risks spanning large populations of deals," including "[e]xisting and proliferating loan document exceptions relating to collateral for the CW/BoA book of business."  W&S Ex. 55.

136.    BNY Mellon provided a series of notices to Countrywide (including in its capacity as Servicer) advising Countrywide of its failure to cure the document exceptions.  *See, e.g.*, W&S Exs. 45, 46, 47.  When Countrywide failed to repurchase the affected loans in response to this notification, an Event of Default occurred under Section 7.01(ii) of the PSA for each Trust, triggering BNY Mellon's duty to act prudently.  In fact, Events of Default occurred due to Countrywide's failure to cure or repurchase Delay Delivery Mortgage Loans shortly after

48

closing of each Covered Trust as Delay Delivery Mortgage Loan Events of Default occur automatically without the need for notices.

137.    Once BNY Mellon became aware that Countrywide did not repurchase after receiving notification of its failure to cure, the bank as a prudent trustee should have undertaken a review of all defaulted mortgage loans to determine whether any should be put back to Countrywide due to missing documentation (or for some other reason such as a representation and warranty violation).

138.    Instead, BNY Mellon initiated a belated "Document Cure Project" despite the fact that pursuant to Section 2.02(a) of the PSA, after 90 days, Countrywide was no longer permitted to simply clear document exceptions.  At this late date the only step Countrywide could take under the PSA was to repurchase the loans with missing documents.  W&S Ex. 43.  BNY Mellon did not provide notice to certificateholders that Countrywide was attempting to cure document exceptions after the cure period ended.

139.    Based on BNY Mellon's internal documents only recently made public, BNY Mellon concluded that hundreds of thousands of Countrywide loans were missing required documentation as part of the "Document Cure Project." Yet, BNY Mellon failed to disclose and affirmatively hid BNY Mellon's failure to convey the required documents under the PSAs in its Regulation AB filings. W&S Exs. 123-126.

140.    Rather than take action to ensure the responsible parties cured such defects (during the cure period) or substituted or repurchased the affected loans, BNY Mellon stood by while Countrywide and agents of BNY Mellon and Countrywide engaged in so called "robo-signing" on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.  W&S Exs. 51, 52, 96.  BNY Mellon and

49

Countrywide have been implicated in numerous governmental reports, court orders, and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal.  Gretchen Morgenson, *Mortgage Settlement Challenged*, N.Y. TIMES, Aug. 4, 2011, at B1.  This is powerful evidence of the systemic document delivery failures and BNY Mellon's knowledge of such failures.  In fact, one of BNY Mellon's servicing agents invoked Fifth Amendment immunity at a deposition for fear of prosecution for her participation in robo-signing misconduct involving Countrywide loans.  W&S Ex. 170.

141.    These Events of Default triggered BNY Mellon's duty to act prudently to protect the interests of the certificateholders in all respects, and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased.  BNY Mellon had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as Trustee, including any loans on the final exception report that defaulted.  BNY Mellon also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred.  BNY Mellon has repeatedly breached these duties throughout its tenure as Trustee.

### 3.    Events of Default Concerning False Servicer Certifications

142.    Each PSA obligated the Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations.  For example, Section 3.16(a) of the Countrywide PSA requires the Servicer to certify, among other things, that:

> (i)    a review of the activities of the Servicer during the preceding calendar year (or applicable portion thereof) and of the performance of the Servicer under this Agreement has been made under such officer's supervision and

> (ii)     to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement in all material respects throughout such year (or applicable portion thereof), or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

143.     The failure to provide a conforming certification is an Event of Default under each of the PSAs.  BNY Mellon was not entitled to rely on certifications that it knew to be false and, thus, BNY Mellon's failure to provide notices of breaches relating to false Servicer certifications triggered its post-Event of Default duties.

144.     BNY Mellon received certifications that it knew to be false because the Servicers were not in fact meeting their obligations under the PSAs and failed to disclose numerous representation and warranty violations.  As set forth below, the Servicers breached the PSAs in many other ways including by attempting to foreclose on defective loans rather than tendering loans for repurchase or substitution, and by not prudently servicing the mortgage loans.

145.     In addition, under the PSAs the Servicers provided a representation and warranty that all reports provided under the PSA, including servicing compliance certifications, were accurate and complete.  For example, Section 2.08 of the Countrywide PSA provides:  "[N]o written information, certificate of an officer, statement furnished in writing or written report delivered to the Depositor, any affiliate of the Depositor or the Trustee and prepared by the Servicer pursuant to this Agreement will contain any untrue statement of a material fact or omit to state a material fact necessary to make such information, certificate, statement or report not misleading."

### 4.      Events of Default as a Result of Ineligible Certificate Accounts

146.    Each of the Countrywide PSAs requires the Servicer to establish and maintain an account in which the Servicer will deposit the payments received under the PSA ("Certificate Account").  *See, e.g.*, Countrywide PSA Section 3.05(b).  The PSAs provided requirements to ensure the viability of the financial institution in which the Certificate Accounts were held.  Following a short cure period, any failure by the Servicer regarding the Certificate Accounts ripens into Events of Default.  For example, Section 7.01 (i) of the Countrywide PSA provides an Event of Default upon:

> [A]ny failure by the Master Servicer to deposit in the Certificate Account or remit to the Trustee any payment required to be made under the terms of this Agreement, which failure shall continue unremedied for five days after the date upon which written notice of such failure shall have been given to the Master Servicer. . .

147.    The eligibility requirements and short cure period for Events of Default relating to the Certificate Accounts were intended to protect the payments received under the PSAs from failures of a financial institution that held, or may have held, the Certificate Accounts.

148.    At various points between March 2005 and August 2007, Countrywide Bank was rated below the requisite threshold required under the PSAs for the Countrywide Trusts. *See, e.g.*, *Rating Action: Moody's Lowers Countrywide debt to Baa3 from A3; rating remain on review down*, August 16, 2007, *available at* https://www.moodys.com/research/Moodys-lowers-Countrywide-debt-to-Baa3-from-A3-ratings-remain--PR_139423.  Nevertheless, new deals were closed with Countrywide Bank as the account bank, which was in clear violation of the PSA.

149.    In June 2008, BNY Mellon internally acknowledged Countrywide's failure to

maintain bank accounts relating to Countrywide RMBS in a bank with the credit rating required under certain of the PSAs, a failure that lasted for multiple years.  An internal BNY Mellon memorandum, just recently made public, concluded that the ineligible accounts required BNY Mellon to notice the rating agencies and send a notice of default to Countrywide to cure the default within the requisite time frame.  W&S Ex. 92.  BNY Mellon then was required to send notice of an Event of Default to the certificateholders upon Countrywide's failure to cure.  *See* Countrywide PSA Section 10.05 ("Notices").

150.    Countrywide reached out to BNY Mellon and requested that BNY Mellon not force Countrywide to move the accounts as required under the PSA.  W&S Ex. 94.  Rather than send the required notices, BNY Mellon took no action at the behest of Countrywide. This does not change the fact that BNY Mellon disregarded its duties under the PSA, failed to declare a clear Event of Default, and instead kowtowed to Countrywide.

### 5.  Events of Default Related to Servicing Breaches

151.    In pertinent part, Section 3.01 of the PSA ("Master Servicer to Service Mortgage Loans") states:  "For and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and customary and usual standards of practice of prudent mortgage loan servicers."

152.    BNY Mellon had a variety of tools to address failures by Countrywide to prudently service the loans in the Covered Trusts, including providing notice of noncompliance pursuant to Section 7.01(ii) of the PSA and taking action against Countrywide.  BNY Mellon further had the ability under Section 7.01 to remove Countrywide as servicer.  BNY Mellon chose not to address the defaults by Countrywide and then Bank of America as Servicer because the bank was too conflicted to take action against its most important client.  Moreover, under the

PSAs, BNY Mellon typically was the party that would be stuck with acting as back-up servicer if Countrywide needed to be replaced.

153.     BNY Mellon had knowledge of numerous ways Countrywide failed to prudently service loans in the Covered Trusts, each of which resulted in Events of Default under the PSAs. For example: (1) Countrywide unduly delayed foreclosures; (2) Countrywide charged unnecessary and excessive fees for servicing defaulted loans; (3) Countrywide failed to charge-off delinquent loans; (4) Countrywide modified loans without repurchasing those loans; and (5) Countrywide fabricated or robo-signed missing documents for use in foreclosures filed in BNY Mellon's name.  W&S Exs. 75, 76.

**Servicer Unduly Delayed Foreclosures**

154.     BNY Mellon was aware of significant delays in foreclosures by Countrywide's mortgage loan platform since it received regular notice of the prolonged periods that loans languished in foreclosure, and was a party to foreclosure proceedings.  For example, one investor notified BNY Mellon that "Countrywide has not been foreclosing upon or otherwise converting properties with respect to certain mortgage loans that are severely delinquent."  W&S Ex. 77.

155.     Despite learning that Bank of America, as successor servicer to Countrywide, stopped foreclosing upon mortgage loans nationwide in 2010, (W&S Ex. 79), BNY Mellon never took steps to give notice to Bank of America to cure its noncompliance or replace Bank of America as servicer.  BNY Mellon's internal documents acknowledge that prolonged foreclosure timelines "would increase the costs for the ultimate disposition of the loan due to higher carry costs," and result in "a loss to the trust."  W&S Ex. 78.

**Servicer Charged Unnecessary and Excessive Fees for Servicing Defaulted Loans**

156.     From 2005 until today, the Servicer has failed to prudently service loans in the Covered Trusts after default by, *inter alia*, charging improper and excessive fees

(including, without limitation, fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors, and failing to maintain defaulted properties.  Press Release, Fed. Trade Comm'n**,** *FTC Returns Nearly $108 Million to 450,000 Homeowners Overcharged by Countrywide for Loan Servicing Fees (July 20, 2011)*, https://www.ftc.gov/news-events/press-releases/2011/07/ftc-returns-nearly-108-million-450000-homeowners-overcharged; Edward Wyatt, *Countrywide Settles Fee Complaint*, N.Y. TIMES, June 7, 2010, at B1.

157.    When a defaulting borrower's home is foreclosed upon and sold, the Servicer deducts its fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

158.    Bank of America uses affiliated entities, including LandSafe Default, Inc. (also known as LandSafe National Default) and ReconTrust Company, N.A. to hire third party vendors to perform default-related services.  Bank of America in turn charges the defaulting borrowers.  Notwithstanding that mortgage loan documents require Countrywide/Bank of America to charge no more than actual cost, it routinely marked up its servicing charges by up to 100%.  Press Release, Fed. Trade Comm'n**,** *FTC Returns Nearly $108 Million to 450,000 Homeowners Overcharged by Countrywide for Loan Servicing Fees (July 20, 2011)*, https://www.ftc.gov/news-events/press-releases/2011/07/ftc-returns-nearly-108-million-450000-homeowners-overcharged (noting how the subsidiaries "allegedly marked up the price of the services charged by the vendors – often by 100 percent or more").

159.    David Sambol, former CEO of Countrywide, touted this profiteering from default-

related services during an October 2007 earnings call:

> Now, we are frequently asked what the impact of our servicing costs and earnings will be from increased delinquencies and [loss] mitigation efforts, and what happens to costs. And what we point out is, as I will now, is that increased operating expenses in times like this tend to be fully offset by increases in ancillary income in our servicing operation, greater fee income from items like late charges, and importantly from in-sourced vendor functions that represent part of our diversification strategy, a counter-cyclical diversification strategy such as our businesses involved in foreclosure trustee and default title services and property inspection services.

Lesley Fair, *$108 Million for Homeowners in Distress*, Bureau of Consumer Protection Business Center, http://www.business.ftc.gov/blog/2011/07/108-million-homeowners-distress (last updated July 20, 2011 11:27 AM).

160.     On June 7, 2010, the Federal Trade Commission ("FTC") commenced a lawsuit against Countrywide and Bank of America for overcharging borrowers for default-related services. Countrywide and Bank of America eventually paid $108 million to settle the charges. Press Release, Fed. Trade Comm'n, Countrywide Will Pay $108 Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled Loans of Borrowers in Bankruptcy (June 7, 2010), *available at* http://www.ftc.gov/news-events/press-releases/2010/06/countrywide-will-pay-108-million-overcharging-struggling.

161.     The FTC found that Countrywide and Bank of America committed numerous acts of frauds in bankruptcy proceedings. According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans. Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts." *Id.*

162.     On February 9, 2012, Bank of America agreed to settle FTC charges that it

illegally assessed more than $36 million worth of fees against struggling homeowners, in violation of an earlier settlement with the FTC.  In its press release, the FTC noted "[i]t's clear to us that the Bank of America subsidiary violated the 2010 court order, and as a result, they will have to return all of the money they illegally charged homeowners who were already having trouble paying their mortgages."  Press Release, Fed. Trade Comm'n, Bank of America Subsidiary Reversing or Refunding $36 Million in Fees to Resolve FTC Allegations That it Overcharged Struggling Homeowners (Feb. 9, 2012), *available at* http://www.ftc.gov/news-events/press-releases/2012/02/bank-america-subsidiary-reversing-or-refunding-36-million-fees.

163.    Countrywide and Bank of America also ran an insurance scheme involving property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happened, Bank of America replaced the borrowers' homeowner policies with policies underwritten by Balboa Insurance Company ("Balboa"), an affiliate of Bank of America until mid-2011.  Balboa charges substantially above-market premiums for these so called force-placed insurance policies, typically several times the premium under the original policy.  This force-placed insurance scam violated Countrywide and Bank of America's obligation to service loans prudently.

164.    On April 18, 2013, the New York State Department of Financial Services announced a settlement of its investigation into Balboa, which includes restitution for homeowners who were harmed, a $10 million penalty paid to the State of New York, and a set of reforms.  *See Cuomo Administration Settles With Country's Second Largest 'Force-Placed' Insurer, Leading Nationwide Reform Effort and Saving Millions for Homeowners and Investors* (Apr. 18, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-settles-countrys-second-largest-force-placed-insurer-leading-nationwide.

165.    Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of state attorneys general and federal agencies (the "Coalition") reached a settlement with, among others, Bank of America.  In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that Bank of America committed unfair and deceptive practices including (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the Banks; and (iv) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage.  *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

166.    Bank of America, including as successor to Countywide, was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its servicing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations include servicers' deceptive practices in the offering of loan modifications and failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

167.    Finally, Bank of America often failed to maintain defaulted properties, leaving them dilapidated and thereby decreasing their value.  This phenomenon became so widespread in connection with defaulted securitized loans, that the properties have been coined "zombie"

properties.  Bank of America's failure to maintain "zombie" properties subjected it to regulatory scrutiny, including by the New York Department of Financial Services.  These practices constitute yet another violation of the Servicer's obligation to prudently service mortgage loans.

***Servicer Failed to Charge Off Delinquent Loans***

168.    BNY Mellon also received notices from investors, which have recently become public, notifying BNY Mellon of the Servicer's failure to write down the balance of 180-day delinquent loans to zero as required by Section 4.06(a) of the PSAs, and demanding that BNY Mellon address the issue.  W&S Ex. 80, 81, 141.  By not charging off these loans, Countrywide deprived the Trusts of payments from certificate insurance policies to which the Trusts are contractually entitled.  While it appears that BNY Mellon forwarded such notice letters to Countrywide, (W&S Ex. 82), BNY Mellon did not otherwise take any other steps to protect the interests of investors.  W&S Ex. 24, 141.

***Servicer Modified Loans without Repurchasing Them***

169.    The Countrywide PSAs provide that the Servicer may not modify a loan unless Countrywide, the Sponsor, repurchases the loan.  *See* Section 3.11(b) of the Countrywide PSA. Nevertheless, the Servicers allowed loans to be modified without requiring Countrywide to repurchase the modified loans.

170.    Following the settlement with the State Attorneys General requiring Countrywide to modify hundreds of thousands of loans, BNY Mellon received a number of notices from investors inquiring whether Countrywide was repurchasing modified loans or instead keeping those loans in the RMBS trusts and therefore requiring investors to foot the bill for Countrywide's misconduct and resulting settlements.  The letters, which were recently made public, notified BNY Mellon that Countrywide's failure to purchase modified loans is a "direct breach of the PSAs."  W&S Ex. 86.

*Servicer Fabricated or Robo-Signed Missing*
*Documents for Use in Foreclosures Filed in BNY Mellon's Name*

171.    As set forth above, *see* Section III.B.2, *supra*, Countrywide and Bank of

America engaged in so-called "robo-signing," which involved fabricating and submitting

forged documents to courts, on a widespread basis when missing mortgage file documents

were needed to foreclose on properties underlying the Covered Trusts.  Countrywide and

Bank of America have been implicated in numerous governmental reports, court orders, and

press reports regarding "robo-signing" scandal.  Not only is the "robo-signing" scandal

evidence of the cover-up of Countrywide's failure to transfer required mortgage

documentation to RMBS trusts, but it also constitutes imprudent mortgage loan servicing

and breaches of the Servicers' duties under the PSAs, as fabricating documents an

submitting forged documents to Court clearly is not prudent conduct.

### C.  BNY Mellon Failed to Provide PacLife Notice of Events of Default

172.    Section 7.03 ("Notification to Certificateholders") requires BNY Mellon to notify

all Certificateholders of every uncured Event of Default known to BNY Mellon:

> (b) Within 60 days after the occurrence of any Event of Default,
> the Trustee shall transmit by mail to all Certificateholders notice of
> each such Event of Default hereunder known to the Trustee, unless
> such Event of Default shall have been cured or waived.

Notwithstanding BNY Mellon's knowledge of the multitude of uncured Events of Default

described above, it never gave certificateholders, such as PacLife, notice of an Event of Default.

173.    In addition, Countrywide failed to file Forms 8-K with the Securities and

Exchange Commission disclosing that Events of Default had occurred, as it was required to do.

BNY Mellon's failure to give notice to PacLife and other Certificateholders, when it learned of

Events of Default for each of the Trusts, is a cause of the damages suffered by PacLife.  Had

BNY Mellon provided the required notice to PacLife when BNY Mellon knew of Events of

Default, which were ongoing since at least 2006 and which still existed at the time of PacLife's last investment in a Covered Trust, PacLife would not have invested in the later RMBS, and would have sold what it already owned, long before the financial crisis.

### D. BNY Mellon Violated the Streit Act as Trustee for the Covered Trusts

174.    BNY Mellon violated its statutory duties under the Streit Act with respect to the Covered Trusts for which the Trust Indenture Act does not apply.

175.    The Streit Act's preamble, entitled "Purpose and application of article," provides: "It is the purpose of the legislature, in enacting this article, to provide for the regulation and supervision of the appointment, creation, agreements, acts, conduct, practices and proceedings of trustees . . . ." N.Y. Real Prop. Law § 124. Section 130-h of the Act further states: "This article shall be construed liberally to effectuate its purpose." *Id*. § 130-h.  Section 130-e of the Act provides for broad relief, in the form of the removal of the trustee, to any person aggrieved by any act or omission to act of a trustee.  Section 126 governs both the terms of an indenture (or PSA) and how a trustee must act, specifying minimum trustee powers and duties, including, as this Court has held, the obligation to exercise prudent-person duties post-Event of Default.[6]

176.    The Streit Act was enacted in the 1930s.  The United States experienced a real estate boom in the 1920s.  N.Y. Leg. Doc. (1936) No. 66 at 14.  The real estate boom was financed through mortgage-backed securities ("MBS").  *Id*.  The MBS market in the 1920s consisted of both commercial MBS and residential MBS, known in the 1920s as "guaranteed mortgage participation certificates."  Goetzmann & Newman, "Securitization in the 1920's,"

---

[6]  To the extent that BNY Mellon contends that the Streit Act only requires that the PSAs include provisions specified in Section 126 of the Streit Act, then, in the alternative, BNY Mellon violated the Streit Act because the PSAs do not include all of the provisions set forth in Section 126.

Dec. 11, 2009 at 4-5.

177.    There was little regulation of such MBS in the 1920s.  Beginning in late-1926, the New York Attorney General conducted an investigation into MBS practices and sought to reform the industry, including mandating the appointment of truly independent trustees.  "Asks More Reform in Realty Bonds," *New York Times*, Feb. 8, 1927.  Meanwhile, the American Construction Council, chaired by Franklin D. Roosevelt, called a national conference to discuss State supervision of bond houses, uniformity in appraisal procedure, and other problems in the MBS market.  "Realty Bond Houses Adopt New Rules," *New York Times*, Feb. 7, 1927 at 1.  The *New York Times* article reporting on this national conference noted that "[t]he practice of having the issuing house act as its own trustee, or provide a trustee which is not a bank or trust company, has been criticized as setting up a 'straw man' as trustee for the funds of the investor." *Id.* at 2.

178.    These initial attempts to regulate the MBS market, however, did not prevent the market from suffering a "catastrophic decline beginning in late 1928," as "[t]he market fell from a peak in May 1928 of 100.10, a premium versus par, to a low of just 24.75 cents on the dollar in April 1933."  Goetzmann & Newman, "Securitization in the 1920's," Dec. 11, 2009 at 16.  "By nearly every measure, real estate securities were as toxic in the 1930s as they are now."  *Id.* at 18.  The New York Moreland Act Commissioner appointed in 1934 to investigate mortgage insurance in connection with MBS called the collapse of MBS "one of the greatest disasters which has falled upon our investing community in the history of our state."  Report of the Moreland Commission, Oct. 5, 1934 at 1-2.

179.    The loans underlying MBS in the 1920s suffered from many of the same problems as the loans backing RMBS issued in recent years.  For example, according to the

Moreland Act Commissioner's report, loans underlying MBS consisted of loans on vacant or foreclosed properties, loans with inflated appraisals, loans in default, and poorly performing loans initially included or later substituted into the trusts.  *Id.* at 93-95, 112-14, 118-19.

180.    There was a substantial public uproar regarding the abuses in MBS.  For example, during a 1934 grand jury investigation into irregularities in mortgage companies, more than 200 individual MBS investors stormed the New York County Criminal Court building demanding to be heard by the grand jury.  "Mortgage Inquiry Stormed by Crowd," *New York Times*, Aug. 9, 1934.

181.    Amidst the public uproar, in the summer of 1934, Governor Herbert Lehman urged the New York Legislature to pass legislation to bring relief to MBS investors, noting that "it would be unconscionable for the Legislature to continue to neglect the plight and the needs of the certificate holders and to disregard the benefits that legislation could bring to them."  "Text of Lehman's Radio Mortgage Appeal," *New York Times*, Aug. 16, 1934.  A "Joint Legislative Committee to Investigate Bondholders' Committees, Stockholders' Committees, Creditors' Committees, Certificate Holders' Committees, Corporations, Trustees and Fiduciaries" chaired by Saul S. Streit (the "Streit Committee") was created pursuant to an April 16, 1935 resolution of the Legislature.  N.Y. Leg. Doc. (1936) No. 66 at 3.

182.    The Streit Committee found that as a result of massive MBS defaults, "a fertile field was created for unscrupulous underwriters who sold the bonds . . . the enrichment of trustees and of managing companies, many of whom under the pretense of protecting the unsuspecting victim of a defaulted bond profited at the expense of the bewildered bondholder." N.Y. Leg. Doc. (1936) No. 66 at 15.

183.    Regarding trustees specifically, the Streit Committee concluded that "[m]any

trustees were generally negligent and remiss in their duty to bondholders." *Id*. at 10.  The

Committee observed:  "After a default, however, with the scattered ownership of the bonds, the

trustee's duties ought to be for the protection of the bondholders' interest.  Yet there is no

responsibility imposed upon the trustee." *Id*. at 19.  For example, the Streit Committee found

that the Continental Bank and Trust Company, the trustee for 126 MBS, engaged in "revolting"

conduct and that the bank "was remiss in its duty as trustee, overcharged the bondholders, was

dilatory in presenting plans for reorganization and indulged management companies in

committing waste and extravagance." *Id*. at 41.  When Edward Weinfield, then chief counsel for

the Streit Committee, questioned trustee witnesses, they admitted that they did "nothing" for

their fees and permitted companies servicing the properties underlying MBS to engage in vast

waste.  "Vast Waste Seen on Straus Bonds," *New York Times*, Nov. 27, 1935.

184.    Indeed, the Streit Committee found that the "general attitude of the trustees and

their attorneys who appeared before this committee was that a trustee because of the claimed

inadequacy of compensation prior to default could not be expected to assume active trust duties."

N.Y. Leg. Doc. (1936) No. 66 at 20.  An attorney for a trustee for over 100 MBS testified to the

Committee:  "It (the trustee) was relieved from practically every duty by an exculpatory clause –

the trustee under this indenture could sit down and do nothing." *Id*. at 19.  The same attorney

stated:  "I think in a sense it was fraud on the investors, because, I think, the ordinary man who

buys a bond with a trust company as trustee imagines that the company has some duties to

perform in looking after the security whereas in point of fact the trust indenture reads that the

trustee can 'sit still and fold his hands if he chooses.'" *Id*. at 20.

185.    In May 1936, the New York Legislature passed the Streit Act.  According to a

subsequent Streit Committee report, the Act was "intended to afford genuine and not feigned

protection to bondholders where issues were in default and imposing active duties upon a trustee under trust indentures." N.Y. Leg. Doc. (1937) No. 94 at 7. "These statutes looked toward adequate control of issues and sought to prevent continued waste in the administration of properties. They also sought to provide full protection to bondholders with respect to the operation and management of properties secured by mortgages, participations of which in various forms had been sold and distributed to the public at large." *Id.*

186.    As set forth above, *see* Section III.A.3, *supra*, BNY Mellon has engaged in the same conduct and aggrieved PacLife in the same ways as the Depression-era trustees whose conduct the Streit Act was passed to remedy. Like its predecessor MBS trustees, BNY Mellon has sat on its hands and done nothing in response to widespread breaches and defaults in the Covered Trusts and catastrophic losses suffered by certificateholders such as PacLife. Instead of exercising its powers to protect certificateholders such as PacLife, BNY Mellon sat idly and permitted servicers to loot the trust assets. And BNY Mellon failed to act prudently post-Events of Default as set forth above. BNY Mellon's action and failures to act—precisely the type of misconduct the Streit Act was enacted to remedy—violated the Streit Act.

**E. BNY Mellon Breached the Covenant of Good Faith and Fair Dealing**

187.    BNY Mellon's actions set forth above have had the effect of destroying and injuring the right of PacLife to receive the fruits of the contracts in connection with the Covered Trusts. BNY Mellon has engaged in an elaborate charade whereby it assumed all rights to enforce remedies on behalf of investors, such as PacLife in the Covered Trusts, but abdicated all responsibility to enforce such rights.

188.    For example, as set forth above, *see* Section II.B., *supra*, upon discovery or notice of breaches of representations and warranties for loans underlying the Covered

65

Trusts, BNY Mellon was obligated to provide notice to the other parties to the PSAs, which would lead to enforcement of the loan sellers' obligation to repurchase the defective loans. BNY Mellon also had the duty to provide notice when it became aware of loan servicers' breaches of the PSAs, which triggered Events of Default and, in turn, BNY Mellon's heightened duties to protect certificateholders such as PacLife.

189.    While BNY Mellon discovered or received notice of such breaches, *see, e.g.*, W&S Ex. 57, BNY Mellon, as a result of conflicts of interest described below, actively sought to preclude or hinder the occurrence of those conditions precedent because it did not want to shed light on its own participation in the same type of breaches or jeopardize lucrative client relationships.  BNY Mellon's actions deprived PacLife of the fruits of its contracts in violation of the covenant of good faith and fair dealing.

## IV.    BNY MELLON SUFFERED FROM CONFLICTS OF INTEREST

190.    BNY Mellon failed and unreasonably refused to take action to protect the Covered Trusts and the certificateholders against Originator breaches and Servicer violations because it would reveal that BNY Mellon was an active participant in various servicing related misconduct and imperiled lucrative business relationships with Countrywide and Bank of America.

191.    If BNY Mellon had met its obligations, it would have revealed that BNY Mellon was the named plaintiff in proceedings in which forged, perjured, or other improper evidence was introduced by its attorneys on its behalf.  Thus, BNY Mellon had a powerful incentive to keep secret Countrywide's malfeasance.

192.    Moreover, as stated above, BNY Mellon earned substantial fees in its capacity as trustee typically based on the percentage of principal outstanding on the loans underlying

the RMBS.  BNY Mellon was Countrywide's trustee of choice for over 530 RMBS trusts.

193.   BNY Mellon provided "a one-stop service from the initial funding of mortgage loans through to their eventual securitizations" for Countrywide's mortgage business.  The Bank of New York 2006 Annual Report, p. 19, *available at* https://www.bnymellon.com/_global-assets/pdf/investor-relations/archive/bankofnewyork/ annual-report-2006-the-bank-of-new-york-company-inc.pdf.  Although BNY Mellon was obligated to act on behalf of certificateholders, its employees considered Countrywide to be BNY Mellon's real "client."

194.   These trustee engagements deepened BNY Mellon's business relationships with Countrywide, leading to more lucrative future engagements.  For example, according to BNY Mellon, as Countrywide grew "in both sophistication and global reach, [the BNY Mellon and Countrywide] relationship has expanded accordingly, and now includes securities clearing and tri-party repo collateral management for both Countrywide and its broker-dealer, Countrywide Securities."  *Id.*

195.   Exemplifying the close relationship between BNY Mellon and Countrywide/ Bank of America, following Bank of America's acquisition of Countrywide, Bank of America negotiated with BNY Mellon's CEO to become its new CEO.  *See* Katie Benner & Shawn Tully, *Robert Kelly: Inside the fall of a superstar banker*, Fortune (Nov. 21, 2011), http://archive.fortune.com/2011/11/18/news/companies/robert_kelly_bank_new_york.fortune/ind ex.htm.

196.   Further, BNY Mellon agreed to the proposed settlement of Countrywide's repurchase obligations only after Bank of America agreed to indemnify BNY Mellon for liabilities under the PSAs and the settlement agreement.

## V.     BNY MELLON'S CONDUCT INJURED PACLIFE

197.    BNY Mellon's breaches of its contractual, statutory, and fiduciary duties have caused PacLife to suffer massive losses in connection with its investments in the Covered Trusts.

198.    If BNY Mellon had performed its duties as trustee for the Covered Trusts, it would have enforced the obligations of Countrywide under the repurchase protocol in the PSAs and caused it to buy back the vast majority, if not all, of the loans that ultimately defaulted and caused PacLife's losses.  And if BNY Mellon had enforced these repurchase obligations, as it was required to do, the Certificates would have retained their market value, as highly rated bonds with similar coupon rates are now trading at a very significant premium.  BNY Mellon's breaches caused PacLife losses in connection with both its Held Certificates and Sold Certificates, which were sold between 2011 and 2014. PacLife did not transfer its legal claims in connection with any of the sales.

199.    Further, BNY Mellon's failure to address the Servicers' failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in, *inter alia*, increased servicing fees, increased property taxes and utility expenditures, which were borne by the Covered Trusts, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trusts and certificateholders. The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Servicer from foreclosure sale proceeds.

68

200.    If BNY Mellon had met its contractual, statutory, and fiduciary duties as trustee for the Covered Trusts with respect to the delivery of complete mortgage files to the Trustee, it would have caused Countrywide to substitute or repurchase all loans where Countrywide failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.  Moreover, these document delivery failures have placed a cloud over title and have limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts, which has ultimately impacted the market value of the Certificates.  Additionally, BNY Mellon's failure to commence damages actions against the Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

201.    BNY Mellon's failure to meet its contractual, fiduciary, statutory, and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by Countrywide further caused harm.  If BNY Mellon had provided notice of representation and warranty violations and defaults and acted prudently as it was required to do upon the occurrence of a default or Event of Default, it would have caused Countrywide to repurchase loans and required the Servicers to replace the assets they have looted from the Covered Trusts.

202.    BNY Mellon's breach of its duties further damaged PacLife because it was reasonably foreseeable that BNY Mellon's cloaking of mortgage origination and servicing abuses infecting Countrywide RMBS would perpetuate fraudulently assembled RMBS proximately causing repeat bond purchasers, such as PacLife, to continually acquire Countrywide RMBS and not sell the RMBS it already purchased.  All of PacLife's losses would

have been avoided if BNY Mellon performed its duties and provided PacLife the notices it was entitled to receive.

203.    BNY Mellon's belated Article 77 Settlement with Bank of America does not absolve BNY Mellon of liability to PacLife or come close to compensating PacLife for the losses caused by BNY Mellon's breaches. The $8.5 billion to be paid by Bank of America pales in comparison to the value of the claims to be released. *See In re The Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct. 2011) [Dkt. No. 1]. The settlement includes repurchase claims owned by 530 trusts, including many of the Covered Trusts. *Id.* The aggregate amount of loans in such trusts, according to BNY Mellon, is $208 billion. Based on analyses that have been conducted by monoline insurers with access to loan files for Countrywide's defaulted loans in other matters, 75%–90% of loans violated representation and warranty provisions and, as a result, should have been repurchased by Countrywide. Nevertheless, despite the clear right of the trusts to put back defective loans to Countrywide under the PSAs' repurchase protocol, BNY Mellon agreed to release Countrywide and Bank of America for all breaches of representations and warranties and servicing-related claims in connection with the 530 trusts for only $8.5 billion. A New York appellate court did not approve the Article 77 Settlement as not being an abuse of BNY Mellon's discretion until March 2015. A court did not approve the way the settlement would be allocated until May 2016.

204.    Moreover, BNY Mellon has had notice of Countrywide's defaults for years but failed to take any steps to protect certificateholder rights. If it had, it would have forced Countrywide to repurchase or substitute the loans that ultimately caused massive losses for certificateholders at a time when Countrywide itself had ample assets.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Breach of Contract)

205.     PacLife repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

206.     The PSAs are valid and binding contracts entered into between BNY Mellon, each Covered Trust, the Sponsor, the Servicers, and the Depositors.

207.     The PSAs provide, among other things, the terms under which BNY Mellon acts as trustee for the Covered Trusts.

208.     As current holders and/or former holder of Certificates or Notes issued by each Covered Trust, PacLife is or was an express, intended third-party beneficiary under the PSAs entitled to enforce the performance of the Trustee.

209.     BNY Mellon breached several obligations that it undertook on behalf of PacLife as certificateholder in the Covered Trusts including, without limitation, to:

>    (a)     take steps to cause Countrywide to repurchase loans eligible for repurchase and to pursue remedies against parties that breached their duties in connection with the collateral backing the Covered Trusts;
>
>    (b)     give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans upon discovery;
>
>    (c)     exercise prudence concerning the exercise of appropriate remedies following Events of Default;
>
>    (d)     provide certificateholders notice of Events of Default; and
>
>    (e)     provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs.

210.     The specific provisions of the PSAs breached by BNY Mellon are further detailed herein.

211.     BNY Mellon's breach of its duties set forth in the PSAs, as described above, caused PacLife's losses on its Certificates and diminished their value.

212.     PacLife has performed its obligations under the PSAs.

213.     BNY Mellon is liable to PacLife for the losses it suffered as a direct result of BNY Mellon's failure to perform its contractual obligations under the PSAs.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

214.     PacLife repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

215.     As set forth in detail above, BNY Mellon owed certificateholders and noteholders, including PacLife, a duty to exercise all powers under the PSAs to act prudently to protect certificateholders' and noteholders' rights once an Event of Default occurred or payments to certificateholders or noteholders became impaired.  This included, without limitation, duties to protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following Events of Default, and enforce the repurchase obligations of Countrywide.

216.     As set forth in detail above, BNY Mellon breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

217.     The violations by BNY Mellon of its fiduciary obligations impaired certificateholders' and noteholders' ability to fully collect the principal and interest due on their certificates and notes and caused losses in the value of PacLife's Certificates.

**THIRD CAUSE OF ACTION**
**(Negligence—Failure to Avoid Conflicts of Interest and**
**Perform Ministerial Acts with Due Care)**

218.    PacLife repeats and realleges each and every allegation set forth in the

preceding paragraphs above as if fully set forth herein.

219.    BNY Mellon owed certificateholders and noteholders, including PacLife,

extra-contractual duties to perform ministerial acts with due care and avoid conflicts of

interests.  As described above, BNY Mellon performed or failed to perform its

responsibilities in a grossly inadequate and negligent manner.

220.    BNY Mellon's negligence and gross negligence impaired certificateholders'

and noteholders' ability to fully collect the principal and interest due on their certificates and

notes and caused losses in the value of PacLife's Certificates.

**FOURTH CAUSE OF ACTION**
**(Violation of the Streit Act)**

221.    PacLife repeats and realleges each and every allegation set forth in the

preceding paragraphs above as if fully set forth herein.

222.    As a certificateholder, PacLife is a trust beneficiary entitled to the protections

afforded under the Streit Act.  The Streit Act was enacted to provide for the proper

administration of mortgage trusts and requires that the trustee must exercise due care in

performing its obligations.  N.Y. Real Prop. Law § 124.

223.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y.

Real Prop. Law § 125(1).

224.    The PSAs underlying and establishing the Covered Trusts are "indentures,"

and BNY Mellon is a "trustee" under the Streit Act.  N.Y. Real Prop. Law § 125(3).

225.    Section 126(1) of the Streit Act provides that upon an "event of default" the

73

indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

226.    Section 130-e of the Streit Act provides that "[a] trustee, committee or any member thereof and a depositary may be removed by the court *for cause shown upon the application of any person aggrieved by the act or omission to act of such trustee*, committee, member or depository after such notice and opportunity to be heard in his or its defense as the court shall direct."

227.    As set forth above, BNY Mellon failed to exercise its rights under the PSAs after becoming aware of "events of default" by failing to:

(a) protect the interest of the beneficiaries of the Covered Trusts;

(b) take steps to cause Countrywide to repurchase loans eligible for repurchase and to pursue remedies against parties that breached their duties in connection with the collateral backing the Covered Trusts;

(c) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans upon discovery;

(d) exercise prudence concerning the exercise of appropriate remedies following Events of Default;

(e) provide certificateholders notice of Events of Default; and

(f) provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs.

228.    BNY Mellon is liable to PacLife for damages incurred as a result of its violations of the Streit Act.

## <u>FIFTH CAUSE OF ACTION</u>
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

229.    PacLife repeats and realleges each and every allegation set forth in the

preceding paragraphs above as if fully set forth herein.

230.    At all relevant times, BNY Mellon owed PacLife, as an express, intended third-party beneficiary under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required BNY Mellon to ensure that it did not, by act or omission, injure the rights of PacLife to receive the benefits and protections provided for under the PSAs.

231.    As set forth above, BNY Mellon deprived PacLife of the fruits of its contracts by, for example, acting to prevent the processes from occurring that would have removed defective loans from the Covered Trusts, placed heightened duties on BNY Mellon to act with prudence and maximize recoveries for certificateholders, and halted the Servicers' breaches of their duties under the PSAs.

232.    By the conduct described above, BNY Mellon breached its duty of good faith and fair dealing under the PSAs.

233.    BNY Mellon's breaches are material.

234.    As a result of these breaches, PacLife has suffered damages and will continue to suffer damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Violations of the TIA)[7]**

235.    PacLife repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

236.    The PSAs underlying and establishing the Covered Trusts are "indentures," and BNY Mellon is an "indenture trustee" under the TIA.  15 U.S.C. § 77aaa(7), (10).

---

[7]  PacLife acknowledges that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to certain of the RMBS at issue here.  PacLife includes a claim under the TIA with respect to those RMBS to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

237.    As a certificateholder, PacLife is a trust beneficiary entitled to the protections afforded under the TIA.

238.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

239.    BNY Mellon violated the TIA in at least three ways.

240.    First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, BNY Mellon failed to carefully investigate serious, known issues with the loans in the Covered Trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

241.    Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above, BNY Mellon did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties, servicer defaults, and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

242.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates

expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).  BNY Mellon has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which it failed to take action to correct.  In addition, BNY Mellon has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

243.    These breaches materially and adversely affected the interests of the certificateholders, including PacLife, because they resulted in the Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties.

244.    BNY Mellon is liable to PacLife for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** PacLife prays for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of PacLife against BNY Mellon for breaches of its statutory, contractual, and fiduciary duties, its gross negligence, ordinary negligence, and negligent misrepresentations, in an amount to be proven at trial, including interest thereon;

B.    Requiring BNY Mellon to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its trustee obligations under the PSAs and applicable laws, to cease breaching its duties under the PSAs and applicable laws, and to protect certificateholders, including Plaintiffs, in the Covered Trusts from a repeat of the damaging events described herein;

C.    Awarding PacLife its reasonable costs and expenses incurred in this action,

including counsel fees and expert fees; and

D.   Such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

PacLife hereby demands a trial by jury on all issues triable by jury.

Dated: February 23, 2017

Respectfully submitted,

/s/ *David H. Wollmuth*
David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane
Marissa A. Dioguardi
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
mdioguardi@wmd-law.com

*Attorneys for Plaintiffs*