UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PACIFIC LIFE INSURANCE COMPANY and
PACIFIC LIFE & ANNUITY COMPANY,

                    Plaintiffs,

              v.

THE BANK OF NEW YORK MELLON,

                    Defendant.

Case No. 17-cv-01388-KPF

# MEMORANDUM OF LAW IN SUPPORT OF
# THE BANK OF NEW YORK MELLON'S
# <u>MOTION TO DISMISS</u>

MAYER BROWN LLP
Matthew D. Ingber
Christopher J. Houpt
Rory K. Schneider
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND ............................................................................................... 2

    A.     The Trusts and the Governing Agreements ........................................ 2

           1.     The Trustee's limited duties before an Event of Default ........................... 3

           2.     The Trustee's duties after a known servicing Event of Default ................ 3

    B.     The Complaint ............................................................................... 4

           1.     Allegations regarding loan underwriting .................................. 5

           2.     Allegations regarding Events of Default ................................... 5

    C.     The Settlement and Article 77 Proceeding ......................................... 6

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ...................................................................................................... 9

I.      PLAINTIFFS' CLAIMS ARE EITHER UNTIMELY OR BARRED BY THE SETTLEMENT AGREEMENT ................................................... 9

    A.     Claims Based On Conduct Before February 2011 Are Time-Barred ................... 9

    B.     Claims Based on Conduct After October 2010 Are Barred By Res Judicata ...... 10

           1.     BNYM's actions after October 2010 were approved in the Article 77 judgment. ................................................................ 10

           2.     The Article 77 judgment is binding in this Court on PacLife. ................ 11

II.     THE CLAIMS BASED ON UNDERWRITING CLAIMS ACCRUED NO LATER THAN 2009 AND ARE TIME-BARRED ON THEIR FACE ......................... 14

III.    THE COMPLAINT DOES NOT ALLEGE AN EVENT OF DEFAULT THAT TRIGGERED BNYM'S HEIGHTENED DUTIES ........................................ 17

    A.     Plaintiffs' Failure To Plead Written Notice To The Master Servicer Dooms Their Event of Default-Based Claims .................................... 17

           1.     *Bankers Trust* does not permit application of the prevention doctrine here ................................................................. 17

           2.     RMBS cases that overlook *Bankers Trust* are not persuasive authority ................................................................... 20

           3.     The prevention doctrine cannot apply where the implied covenant does not ................................................................. 22

    B.     Plaintiffs' Failure To Plead Written Notice To BNYM Dooms Their Event of Default-Based Claims ................................................ 23

IV.    PLAINTIFFS' OTHER CLAIMS FAIL FOR THE SAME REASONS SET OUT IN WELLS FARGO ......................................................................... 27

**TABLE OF CONTENTS**
(continued)

**Page(s)**

A.    The Fiduciary Duty Claim Is Barred By The Economic Loss Doctrine.............. 27

B.    The Implied Covenant Does Not Apply ............................................. 27

C.    The TIA Does Not Apply To Any of These Trusts ............................... 28

D.    The Complaint Does Not Allege A Streit Act Violation ..................................... 28

V.    PLAINTIFFS LACK STANDING TO PURSUE CLAIMS BASED ON
CERTIFICATES THEY HAVE SOLD........................................................................ 29

CONCLUSION................................................................................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*ACE Secs. Corp. v. DB Structured Prods., Inc.*,
   25 N.Y.3d 581 (2015) ..................................................................................................9

*AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*,
   896 N.E.2d 61 (N.Y. 2008) .........................................................................................23

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011) (per curiam) ...................................................................9

*Amies v. Wesnofse*,
   255 N.Y. 156 (1931) ..............................................................................................18, 19

*Argonaut P'ship L.P. v. Bankers Tr. Co.*,
   2001 WL 585519 (S.D.N.Y. May 30, 2001) .........................................................24, 25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................8, 9

*In re BNYM*,
   127 A.D.3d 120 (N.Y. App. Div. 2015) ....................................................... *passim*

*In re BNYM*,
   42 Misc. 3d 1237(A) (N.Y. Sup. Ct. N.Y. Cnty. 2014) ....................................6, 7, 8

*In re Bankers Trust Co.*,
   450 F.3d 121 (2d Cir. 2006)......................................................1, 18, 19, 20, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................8

*Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*,
   2017 WL 1194683 (S.D.N.Y. Mar. 30, 2017) ............................................... *passim*

*BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp.*,
   673 F.3d 169 (2d Cir. 2012).....................................................................................12

*Campbell v. Culver*,
   56 A.D. 591 (4th Dep't 1900)..................................................................................15

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002).....................................................................................6

*Commerce Bank v. BNYM*,
   141 A.D.3d 413 (1st Dep't 2016) ......................................................2, 13, 21, 25

iii

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Commerzbank AG v. HSBC Bank USA*,
    2016 WL 3211978 (S.D.N.Y. June 8, 2016) ........................................................28

*Cornejo v. Bell*,
    592 F.3d 121 (2d Cir. 2010)..............................................................................26

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)...................................................................................6

*Elkind v. Chase Nat'l Bank of City of N.Y.*,
    259 A.D. 661 (1st Dep't 1940) ...........................................................................24

*Ellington Credit Fund v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d (S.D.N.Y. 2011) ......................................................................22

*FDIC v. Citibank, N.A.*,
    2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016)....................................................29

*Ferguson v. Hannover Ruckverischerungs-Akteiengesellschaft*,
    2007 WL 2493692 (S.D.N.Y. Aug. 21, 2007).....................................................20

*First Am. Title Ins. Co. of N.Y. v. Fiserv Fulfillment Servs., Inc.*,
    2008 WL 3833831 (S.D.N.Y. Aug. 14, 2008) .....................................................15

*Fixed Income Shares: Series M v. Citibank N.A.*,
    130 F. Supp. 3d 842, 855 (S.D.N.Y. 2015).........................................................22

*Giannone v. York Tape & Label, Inc.*,
    548 F.3d 191 (2d Cir. 2008)..............................................................................12

*Hamister v. Liberty Mut. Ins. Co.*,
    2008 WL 4365893 (W.D.N.Y. Sept. 22, 2008) ...................................................16

*Harris v. Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002)................................................................................27

*Jamil v. Solar Power Inc.*,
    2016 WL 6820725 (S.D.N.Y. Nov. 8, 2016).......................................................21

*Magten Asset Mgmt. Corp. v. BNY*,
    2007 WL 1326795 (N.Y. Sup. Ct. N.Y. Cnty. May 8, 2007) ................................22

*Migra v. Warren City Sch. Dist. Bd. of Educ.*,
    465 U.S. 75 (1984)...........................................................................................11

iv

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)..................................................................................................12

*Nacional Financiera SNC v. Bankers Trustee Co.*,
  2000 WL 36564710 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 13, 2000) ............................22

*O'Grady v. BlueCrest Cap. Mgmt. LLP*,
  111 F. Supp. 3d 494 (S.D.N.Y. 2015)....................................................................20

*One William Street Capital Mgmt., L.P. v. Educ. Loan Tr. IV*,
  2015 WL 4501194 (N.Y. Sup. Ct. N.Y. Cnty. July 18, 2015)................................29

*Putman High Yield Tr. v. BNY*,
  7 A.D. 3d 439 (1st Dep't 2004) ..............................................................................25

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. BNYM*,
  775 F.3d 154 (2d Cir. 2014)....................................................................................28

*Rios v. Cartagena*,
  2015 WL 4470433 (S.D.N.Y July 9, 2015) ............................................................16

*Royal Park Investments SA/NV v. HSBC Bank USA, National Association*,
  109 F. Supp. 3d 587 (S.D.N.Y. 2015)....................................................................21

*Spanos v. Skouras Theatres Corp.*,
  364 F.2d 161 (2d Cir. 1966) (en banc)..............................................................17, 18

*Sterling Fed. Bank, F.S.B. v. Countrywide Fin. Corp.*,
  2012 WL 2368821 (N.D. Ill. June 21, 2012)......................................................8, 12

*STS Partners Fund, LP v. Deutsche Bank Secs., Inc.*,
  149 A.D. 3d 667 (1st Dep't 2017) ......................................................................23, 27

*Thor Props., LLC v. Chetrit Grp. LLC*,
  91 A.D. 3d 476 (1st Dep't 2012) ........................................................................22-23

*Veritas Capital Mgmt. L.L.C. v. Campbell*,
  2008 WL 5491146 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 24, 2008) ..............................16

**Statutes**

15 U.S.C. § 77ddd(a)(2)......................................................................................................28

CPLR § 7701........................................................................................................................13

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

CPLR § 213(2) ........................................................................................................9

N.Y. G.O.L.§ 13-107(1) (1963) ...........................................................................29

**Other Authorities**

Restatement (Second) of Trusts, § 192 cmt. (1959) .....................................................12

The Bank of New York Mellon ("BNYM") respectfully submits this memorandum of law in support of its Rule 12(b)(6) motion to dismiss the Complaint filed by Pacific Life Insurance Company and Pacific Life & Annuity Company ("PacLife" or "plaintiffs").

## PRELIMINARY STATEMENT

This Complaint makes the same allegations that have survived dismissal in other cases. This case is different, however, in two interlocking respects. First, this case was filed years after the others, and at least eight years after PacLife alleges BNYM breached its duties. Those claims are time-barred under the six-year statute of limitations. Second, the central claim—that BNYM "fail[ed] to take action against Countrywide" (Compl. ¶ 1)—is false, because, as PacLife admits in the Complaint, in 2011 BNYM recovered $8.5 billion from Countrywide for investors on the very claims that PacLife alleges it failed to pursue. New York courts approved BNYM's negotiation, evaluation, and entry into that settlement "in all respects," and the res judicata effect of that judgment precludes PacLife's claims as to BNYM's actions after negotiations of the settlement began in 2010, and certainly after it was signed in 2011. Thus, the Court can and should dismiss this case in full without revisiting its recent *Wells Fargo* decision.

If the Court reaches the merits of the Event of Default claims, we urge it to consider the effect of two binding decisions that independently doom those claims for different reasons. The first is *Bankers Trust*, a 2006 Second Circuit decision on the prevention doctrine that has escaped the attention of district courts considering that doctrine in cases brought against RMBS trustees. In this case, PacLife does not allege that the contractually-defined conditions to an Event of Default were ever actually met. It argues instead that BNYM waived its ability to rely on those conditions—including notice to the master servicer and expiration of a cure period—because it supposedly could have brought them about itself. But *Bankers Trust* holds that a party does not waive a condition unless (1) it had not just the ability, but the *duty*, to bring about the condition

or (2) it took affirmative steps to prevent the condition from being satisfied. The agreements preclude a finding of the first, and there are no allegations to support a finding of the second.

The second decision is *Commerce Bank*—but not the part of that decision about representations and warranties that this Court addressed in *Wells Fargo*. The Appellate Division separately considered a contractual provision pertinent to whether an Event of Default triggered BNYM's heightened duties. The same language appears in the PSAs here. It held that if "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof," then the Trustee does not have post-Event of Default duties unless it receives such written notice. Because the Complaint does not allege written notice to BNYM, *Commerce Bank* requires dismissal of PacLife's Event of Default-based claims.

In addition to those reasons, virtually all of PacLife's other claims—for breach of fiduciary duty, implied covenant of good faith and fair dealing, the Trust Indenture Act, and the Streit Act—should be dismissed for the reasons this Court stated in *Wells Fargo*.

## BACKGROUND

### A. The Trusts and the Governing Agreements

Plaintiffs allege that they invested in RMBS issued by twelve securitization trusts and one re-securitization trust for which BNYM is the trustee.[1] The securitization trusts are each governed by a separate Pooling and Servicing Agreement ("PSA"), while the re-securitization trust is governed by a Trust Agreement. Compl. ¶ 32.

---

[1]   The Complaint incorporates the governing agreements by reference. Like PacLife (Compl. ¶ 1 n.1), we use the PSA governing the CWALT 2006-32CB trust as a model. Unless otherwise indicated, citations to "PSA" refer to that agreement, which is attached as Ex. 1 to the Declaration of Christopher J. Houpt ("Houpt Decl.").

1.   The Trustee's limited duties before an Event of Default

As this Court has recognized, "the duties of an RMBS trustee are distinct from those of an ordinary trustee, which might have duties extending well beyond the [governing] agreement.'" *Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.* ("*Wells Fargo*"), 2017 WL 1194683, at *3 (S.D.N.Y. Mar. 30, 2017) (internal quotation marks omitted). The governing agreements memorialize the trustee's limited role: Among other things, they each provide that "unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of th[e] Agreement" and "no implied covenants or obligations shall be read into this Agreement against the Trustee." PSA § 8.01(i). The agreements "specifically set forth" a set of ministerial tasks that the Trustee must perform pre-Event of Default, including collecting and distributing loan payments, holding and inventorying mortgage files, posting monthly data about the underlying loans to a public investor reporting website, and preparing various regulatory filings. *See, e.g.*, *id.* §§ 2.02, 4.06, 11.04.

The Trustee does not have any duty to investigate underwriting or the representations about underwriting that Countrywide made. Its only duty with respect to the quality of the loans is that "[u]pon discovery by any of the parties hereto of a breach of a representation or warranty with respect to a Mortgage Loan . . . that materially and adversely affects the interests of the Certificateholder in that Mortgage Loan, the party discovering such breach shall give prompt notice there of to the other parties." PSA § 2.03(c).

2.   The Trustee's duties after a known servicing Event of Default

The day-to-day management of underlying mortgage loans that remain in the trust is the responsibility of the master servicer. The agreements require it to "service and administer the Mortgage Loans in accordance with . . . customary and usual standards of practice of prudent

3

mortgage loan servicers." PSA § 3.01. A serious breach by the master servicer can ripen into an "Event of Default" if certain conditions are satisfied. Specifically, a "failure by the Master Servicer to observe or perform in any material respect any [of its] covenants or agreements" becomes an Event Default only if it "materially affects the rights of Certificateholders" and "continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates." *Id.* § 7.01(ii).

If an Event of Default occurs and becomes "known to the Trustee," the Trustee must notify the investors within 60 days. PSA § 7.03(b). "[T]he Trustee [must then] exercise such of the rights and powers vested in it . . . , and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances." *Id.* § 8.01. To ensure that there is no ambiguity about when the Trustee is required to exercise its expanded duties, these PSAs (unlike some others) state that "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof." *Id.* § 8.02(viii).[2]

## B.  The Complaint

PacLife filed suit on February 23, 2017, alleging that BNYM's failure to satisfy its duties as trustee caused its investments to lose value. PacLife asserts causes of action for breach of contract; breach of fiduciary duty; negligence; violation of the New York Streit Act; breach of

---

[2]      The Trust Agreement provides that "the Trustee shall not be deemed to have notice of . . . any . . . event of default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default or breach is received by the Trustee at [its] Corporate Trust Office . . . , and such notice references the Certificates and this Agreement." Trust Agreement § 5.02(ix) (Houpt Decl. Ex. 2).

the implied covenant of good faith and fair dealing; and violation of the TIA. Its factual allegations regarding BNYM's conduct (as opposed to its legal conclusions about BNYM's contractual duties) fall into two main categories pertinent here.

1.   Allegations regarding loan underwriting

The first set of factual allegations concerns BNYM's purported mishandling of breaches of representations and warranties about the underwriting of loans. The Complaint alleges that BNYM "had actual knowledge of breaches of representations and warranties affecting the covered trusts." Compl. Part III.A.2. It alleges that "[a]s early as July 2007" BNYM was concerned about its "exposure to Countrywide." Id. ¶ 100. BNYM allegedly received notices during the next two years about potential breaches and acknowledged the problem internally. Id. ¶¶ 101-20 "By October 2009, at the absolute latest," the Complaint states, "BNY Mellon was aware that RMBS such as the Covered Trusts were essentially junk bonds, and the sponsors and originators had systematically failed to comply with represented underwriting standards." Id. ¶ 123. PacLife claims that BNYM also discovered underwriting breaches on specific loans but failed to notify the other parties under Section 2.03(c). Id. ¶¶ 127-30.

2.   Allegations regarding Events of Default

The second set of factual allegations concerns the purported occurrence of Events of Default. Because, aside from the notice duty in Section 2.03(c), the investigation and enforcement that the Complaint alleges BNYM should have undertaken are not mentioned anywhere in the governing agreements, the Complaint relies heavily on allegations that an Event of Default occurred and fundamentally transformed BNYM's role. It alleges that such events resulted from the master servicer's: failure to provide notice of breaches and enforce the seller's obligation to repurchase affected loans (Compl. ¶ 132); failure to make the seller repurchase loans with incomplete mortgage files (id. ¶¶ 133-41); provision of false certifications of its

compliance with the agreements (*id.* ¶¶ 142-45); use of an ineligible bank account (*id.* ¶¶ 146-50); and failure to prudently service the underlying mortgage loans (*id.* ¶¶ 151-71). PacLife claims that BNYM failed to give notice to certificateholders of resulting Events of Default and act prudently thereafter.

### C.  The Settlement and Article 77 Proceeding

The Complaint references a settlement that BNYM negotiated on behalf of 530 trusts Compl. ¶ 203. Plaintiffs stated at the pre-motion conference that "all of the[] trusts [in this case] were part of [that] settlement." May 9, 2017 Hr'g Tr. (Houpt Decl. Ex. 3), at 19. That can be confirmed by comparing Exhibit A to the Complaint with Exhibit A to the settlement agreement. Houpt Decl., Ex. 4. The one re-securitization trust (CWALT 2008-IR) holds RMBS securities rather than mortgage loans and so was not covered directly by the settlement, but PacLife alleges that "the relevant portion of the corpus of the CWALT 2008-IR trust consists of mortgage loans backing CWALT 2007-18CB" (Compl. ¶ 2), and that trust is in the settlement (Houpt Decl., Ex. 4, at A-2). Given how prominently it features in this motion, additional background about the settlement is necessary.[3]

Beginning in October of 2010, BNYM, together with the holders of over \$100 billion in securities, began pressing loan-repurchase, document delivery, and servicing claims against Countrywide and its successor, Bank of America. *See In re BNYM*, 42 Misc. 3d 1237(A), at \*6-7 (N.Y. Sup. Ct. N.Y. Cnty. Jan 31, 2014). Those efforts culminated in a settlement signed on June 28, 2011. *See id.* at \*7; Houpt Decl., Ex. 5. The trusts' investors received \$8.5 billion, plus

---

[3]     The Court may consider the settlement agreement, which is described in paragraph 203 of the Complaint, is in the public domain, and is discussed in various published court opinions. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider . . . documents plaintiffs had either in [their] possession or had knowledge of and upon which they relied in bringing suit." (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991))).

improvements in Bank of America's servicing practices that were worth billions more. *See In re BNYM*, 42 Misc. 3d 1237(A), at *10. Effective immediately upon signing, BNYM agreed not to prosecute any of the affected claims, and instead to seek direction from the court before taking any such action. Houpt Decl., Ex. 5 ¶ 15(a).

Upon court approval, the agreement released all claims against Countrywide and its parent Bank of America relating to, among other things:

- "the origination, sale, or delivery of the Mortgage Loans to the Covered Trusts, including the representations and warranties in connection with the origination, sale, or delivery of Mortgage Loans to the Covered Trusts," and obligations "to repurchase . . . any Mortgage Loan on the basis of any representations or warranties . . . , including all claims arising in any way from or under Section 2.03 . . . of the Governing Agreements." Houpt Decl., Ex. 5 ¶ 9(a); *see also* Compl. ¶ 203 ("The settlement includes repurchase claims owned by 530 trusts, including many of the Covered Trusts."); *In re BNYM*, 42 Misc. 3d 1237(A), at *19 (settlement covers "claims arising out of the alleged failure to repurchase loans that breached representations and warranties.");

- "the documentation of the Mortgage loans held by the Covered Trusts . . . including with respect to alleged defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note." Houpt Decl., Ex. 5 ¶ 9(a); *see also In re BNYM*, 42 Misc. 3d 1237(A), at *19 (settlement covers "claims arising out of Countrywide's failure to deliver all of the required mortgage documentation"); and

- "the servicing of the Mortgage Loans . . . including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, . . . or that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by the Master Servicer, Seller, or any other Person." Houpt Decl., Ex. 5 ¶ 9(a); *see also* Compl. ¶ 203 ("BNY Mellon agreed to release Countrywide and Bank of America for all . . . servicing-related claims").

As the Complaint acknowledges, the agreement was approved in full in 2015. Compl. ¶ 203; *see also In re BNYM*, 127 A.D.3d 120, 124-25 (1st Dep't 2015).

That approval resulted from a proceeding that BNYM initiated under Article 77, which "provides a single mechanism for the New York court to consider all certificateholders'

objections." *Sterling Fed. Bank, F.S.B. v. Countrywide Fin. Corp.*, 2012 WL 2368821, at *14 (N.D. Ill. June 21, 2012). Objecting certificateholders came forward and challenged the adequacy of the settlement and the manner in which it was negotiated and evaluated by BNYM. *See In re BNYM*, 127 A.D.3d at 124-25 (objectors argued, among other things, that BNYM "fail[ed] to represent [their] interests during settlement negotiations, . . . retain[ed] conflicted counsel who immediately focused on a settlement, . . . and . . . fail[ed] to insist on a loan file review"); *In re BNYM*, 42 Misc. 3d 1237(A), at *10-13 (detailing challenges to the "Trustee's Conduct During Settlement Negotiations"). After a nine-week trial and an appeal, the New York courts rejected those arguments and approved BNYM's actions "in all respects," "noting that it would have been unreasonable [for BNYM] to decline to enter into the settlement with the expectation of obtaining a much greater judgment after years of litigation." *In re BNYM*, 127 A.D.3d at 127-28.

The resulting final judgment states that the "Trustee appropriately evaluated the terms, benefits, and consequences of the Settlement"; engaged in "arm's-length negotiations that . . . appropriately focused on the strengths and weaknesses of the Trust Released Claims"; and "acted in good faith, within its discretion, and within the bounds of reasonableness" in entering the settlement. Houpt Decl., Ex. 6 ¶¶ i-k. The court accordingly "approve[d] the actions of the Trustee in entering into the Settlement Agreement in all respects." *Id.* ¶ l.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[L]egal conclusion[s] couched as [] factual allegation[s]" need not be accepted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And even if it is factual, when an "allegation in the complaint is contradicted by a document attached

to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam). If, based on the surviving allegations, "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

## ARGUMENT

## I. PLAINTIFFS' CLAIMS ARE EITHER UNTIMELY OR BARRED BY THE SETTLEMENT AGREEMENT.

Although copied almost verbatim from complaints that have survived complete dismissal elsewhere, plaintiffs' allegations face a unique and insurmountable hurdle. Any claim that BNYM failed to act before February 23, 2011 is barred by the statute of limitations. But by that date, BNYM was acting on behalf of each of the trusts by negotiating what became the largest private litigation settlement in American history—conduct that the New York courts "approved in all respects." On June 28, 2011, BNYM signed a settlement so favorable to the trusts that the New York Appellate Division found that "it would have been *un*reasonable to *decline* to enter into the settlement." *In re BNYM*, 127 A.D.3d at 127 (emphasis added). Whatever point in time plaintiffs say BNYM should have acted, then, its claim is either time-barred or barred by res judicata.

### A. Claims Based On Conduct Before February 2011 Are Time-Barred.

The longest limitations period for any of plaintiffs' claims is New York's six-year statute of limitations for contract claims. CPLR § 213(2). "[T]he statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury." *ACE Secs. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 593-94 (2015) (internal quotation marks and citations omitted). Plaintiffs

therefore cannot assert any claims based on conduct that occurred more than six years before they filed suit on February 23, 2017. Indeed, they expressly disavowed any such claims at the pre-motion conference: "we are not asserting any claims that arose six years prior to when we filed our complaint" because "[w]e are mindful of the statute of limitations at issue here." Houpt Decl. Ex. 3, at 19.[4] Thus, all of the allegations in the Complaint about what BNYM should have done before 2011 are time-barred.

**B.  Claims Based on Conduct After October 2010 Are Barred By Res Judicata.**

All allegations in the Complaint about what BNYM should have done in or after 2011 run headlong into the settlement agreement and Article 77 judgment.

1.  <u>BNYM's actions after October 2010 were approved in the Article 77 judgment.</u>

Plaintiffs claim that, as trustee, BNYM should have responded to alleged seller breaches of representations and warranties and servicer Events of Default by pursuing claims against Countrywide. They claim that "[i]f BNY Mellon had met its contractual, statutory, and fiduciary duties as trustee for the Covered Trusts . . . it would have caused Countrywide to substitute or repurchase all loans where Countrywide failed to deliver required documentation . . . or breached representations and warranties regarding the mortgage loans." Compl. ¶ 200; *see also id.* ¶ 198 ("If BNY Mellon had performed its duties as trustee for the Covered Trusts, it would have enforced the obligations of Countrywide under the repurchase protocol in the PSAs and caused it to buy back the vast majority, if not all, of the loans that ultimately defaulted."). They further claim that BNYM should have "address[ed] the Servicers' failure to adhere to prudent servicing practices" by "commenc[ing] damages actions against the[m]." *Id.* ¶¶ 199, 201.

---

[4]      While the Complaint plainly does allege that BNYM should have acted before 2011, counsel's statements accurately describe the effect of the statute of limitations.

Those are precisely the claims covered by the settlement. They relate to: "representations and warranties [made] in connection with the origination, sale, or delivery of Mortgage Loans" including obligations "arising in any way from or under Section 2.03 . . . of the Governing Agreements"; "the documentation of the Mortgage loans held by the Covered Trusts . . . including with respect to alleged defective, incomplete, or non-existent documentation"; and "the servicing of the Mortgage Loans." *See* p. 7 *supra* (quoting Houpt Decl., Ex. 5 ¶ 9(a)). By October 2010, BNYM was doing what plaintiffs claim it should have done by pressing underwriting, document-delivery, and servicing claims against Countrywide and Bank of America. And when the negotiations concluded with the signing of the settlement agreement on June 28, 2011, BNYM could not have done what plaintiffs claim it should have done: the claims could not be prosecuted and then were released.

As we explained, BNYM's conduct in negotiating, evaluating, and entering into the settlement was approved "in all respects" following the Article 77 proceeding. *See* p. 8 *supra*. Thus, any claim here that BNYM should not have negotiated the settlement starting in 2010 (or should have negotiated it differently) is barred by res judicata. So is any claim that it should have prosecuted claims after June 2011, because that would have required "declin[ing] to enter into the settlement with the expectation of obtaining a much greater judgment after years of litigation," precisely the course that the New York courts held would have been "unreasonable." *In re BNYM*, 127 A.D.3d at 127-28.

2.   <u>The Article 77 judgment is binding in this Court on PacLife.</u>

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). "Under New York law, a final judgment on the merits of an action precludes the parties or their privies from relitigating

issues that were or could have been raised in that action." *Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 193 (2d Cir. 2008) (internal quotation marks omitted).

In particular, federal courts have long recognized the power of state courts to issue judgments that are binding on all beneficiaries of state-law trusts. In *Mullane v. Central Hanover Bank & Trust Co.*, the Supreme Court considered the predecessor to Article 77 and wrote that "whatever the technical definition of its chosen procedure, the interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or nonresident, provided its procedure accords full opportunity to appear and be heard." 339 U.S. 306, 313 (1950). That power includes the ability to "cut off [beneficiaries'] rights to have the trustee answer for negligent or illegal impairments of their interests." *Id.*

In remanding the Article 77 case to state court, the Second Circuit pointed out that "[s]uch proceedings are used by trustees to obtain instruction as to whether a future course of conduct is proper." *BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp.*, 673 F.3d 169, 174 (2d Cir. 2012). That judicial power to instruct trustees specifically includes the power to evaluate conditional settlements, like the one at issue in *In re BNYM*. The Restatement (Second) of Trusts provides that "[i]f the trustee is in doubt whether he should compromise . . . a claim, he may ask the instruction of the court or he may agree thereto conditionally upon the subsequent approval of the court. § 192 cmt. (1959); *see also Sterling Fed. Bank*, 2012 WL 2368821, at *14 ("The Article 77 Proceeding provides a single mechanism for the New York court to consider all certificateholders' objections . . . to the Settlement Agreement.").

12

New York courts have twice ruled that the Article 77 judgment in BNYM's favor bars claims that were, or could have been, raised as objections to the settlement. *See Commerce Bank v. BNYM*, 141 A.D.3d 413, 416 (1st Dep't 2016) (claim that BNYM acted negligently by failing to recover adequately on servicing claims was "barred by our approval of the settlement in *Bank of N.Y. Mellon* 'in all respects, including the aspect releasing the loan modification claims'" (citing *Commerce Bank* Compl. ¶ 188(g) (attached as Houpt Decl., Ex. 7))); *In re BNYM*, Index No. 150973/2016, Decision/Order, at 7 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 4, 2017) (NYSCEF No. 193) (Houpt Decl., Ex. 8) ("Because TIG had a full and fair opportunity to raise its objection to the Settlement Agreement's terms in the prior proceeding, [its] objection in this proceeding is now barred by *res judicata*."). This Court should do the same.

Certificateholders like PacLife challenged the course that BNYM embarked upon starting in October 2010, and they lost. Having invoked the procedural mechanism that New York provides for "any matter relating to an express trust" (CPLR § 7701), BNYM cannot now be subject to liability based on its failure to act in a manner directly contrary to that which the New York courts approved. That is what the Complaint seeks to do: hold BNYM liable for failing to pursue claims against Countrywide that it instead chose to settle. Res judicata precludes all of plaintiffs' non-time-barred claims.

\* \* \*

In sum: The intersection of the statute of limitations and res judicata bars all of the claims in the Complaint. Claims based on conduct before February 23, 2011 are barred by the statute of limitations. Plaintiffs cannot argue that BNYM should have done anything other than what it did between October 18, 2010 and June 28, 2011 in responding to allegations of breaches by Countrywide, because those actions were the subject of the Article 77 proceeding and were

"approved in all respects" after investors received notice and an opportunity to be heard. Nor can they claim that BNYM should have continued any prosecution after June 28, 2011, because by then it was impossible for BNYM to enforce those claims against Countrywide given the court-approved standstill and settlement agreement.

## II. THE CLAIMS BASED ON UNDERWRITING CLAIMS ACCRUED NO LATER THAN 2009 AND ARE TIME-BARRED ON THEIR FACE.

As we have shown, plaintiffs do not have any conceivable claim that would not be barred by the statute of limitations, res judicata, or both. But for much of the Complaint, the timing of the alleged breach is clear; notwithstanding plaintiffs' promise at the pre-motion conference that they did not intend to allege breaches before 2011, that is exactly what the Complaint does with respect to underwriting breaches. These claims can be dismissed based on the statute of limitations alone.

Plaintiffs claim that BNYM neglected to provide notice of breaches of representations and warranties. Section 2.03 of the PSAs provides: "Upon discovery . . . of a breach of a representation or warranty with respect to a Mortgage Loan . . . that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, the party discovering such breach shall give *prompt* notice thereof to the other parties." PSA § 2.03(c) (emphasis added). Accordingly, any breach occurs—and any claim accrues—"prompt[ly]" after BNYM discovers an underwriting violation.

Where a defendant is required to act within a specific period, but "could have" acted belatedly thereafter, the claim still accrues, and the limitations period begins to run, on the date of the initial breach. Addressing a claim that a title agent failed to record a mortgage, Judge Buchwald wrote that to hold otherwise would "overlook[] the distinction between a breach and the ability to cure a breach. The fact that defendant could have recorded the mortgages at any

14

point before the properties were sold to bona fide purchasers does not mean that its failure to record them initially was not a breach." *First Am. Title Ins. Co. of N.Y. v. Fiserv Fulfillment Servs., Inc.*, 2008 WL 3833831, at *2 (S.D.N.Y. Aug. 14, 2008) (citing *Campbell v. Culver*, 56 A.D. 591, 594 (4th Dep't 1900) (addressing a continuing failure to pay property taxes; "if further and substantial damages subsequently accrued, *they were not the result of a new or continuous breach of contract, but related back to the original breach which gave the right of action for their recovery*" (emphasis in *First Am. Title Ins. Co. of N.Y.*))).

In their attempt to allege BNYM's discovery of breaches with a semblance of specificity, plaintiffs plead themselves out of court: The Complaint alleges discovery *only* at times that are more than six years before this suit was filed. With the exception of a single allegation concerning a notice sent in November 2010 (still outside the limitations period), all of the factual allegations about BNYM's purported discovery of breaches of representations and warranties concern events in 2007, 2008, and 2009. *See* Compl. ¶¶ 98-126. A pair of allegations makes the untimeliness of plaintiffs' claim particularly stark: According to the Complaint, "[t]o the extent [BNYM] had any doubt as to widespread defects among loans in the Countrywide RMBS trusts, including the Covered Trusts, Fannie Mae put an end to it" with a letter sent on January 15, 2009. *Id.* ¶ 112. "By October 2009, *at the absolute latest*," it says, citing a statement by BNYM's chief executive, BNYM "was aware that RMBS such as the Covered Trusts were essentially junk bonds, and the sponsors and originators systematically failed to comply with represented underwriting standards." *Id.* ¶ 123 (emphasis added). The "absolute latest" that BNYM allegedly breached its duty to give "prompt notice," then, was promptly thereafter—well more than six years before suit was filed. On the face of the Complaint, the contract claim is untimely and should be dismissed.

This Court recently addressed a somewhat similar argument in a footnote to its *Wells Fargo* opinion. *See* 2017 WL 1194683, at *33 n.24. After finding the defendant's limitations argument against Commerzbank's claim under New York law waived, the Court stated in *dicta* that it would fail anyway because the face of the complaint did not specify when the defendant "knew of the loan-specific breaches." *Id.* But in that case, Commerzbank alleged that "in 2009 and 2010 facts *began* to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties." Compl., *Commerzbank AG v. Wells Fargo Bank, N.A.*, No. 15-cv-10033-KPF-SN (ECF Doc. 1) at ¶ 83, (Houpt Decl., Ex. 9) (emphasis added). Dismissal here would be consistent with the Court's prior decision: Commerzbank filed its complaint (in December 2015) less than six years after the earliest alleged breach, whereas PacLife filed its Complaint (in February 2017) more than six years after the latest alleged breach.

Should the Court decide that the absence of even a single allegation that BNYM discovered breaches within the limitations period does not, for some reason, entirely doom plaintiffs' contract claim, it should at least dismiss as untimely the portion that is based on breaches that occurred before February 23, 2011. *See, e.g.*, *Rios v. Cartagena*, 2015 WL 4470433, at *4-5 (S.D.N.Y July 9, 2015) ("All allegations of breaches of contract which occurred prior to August 15, 2008 are dismissed under New York's six-year statute of limitations."); *Hamister v. Liberty Mut. Ins. Co.*, 2008 WL 4365893, at *14 (W.D.N.Y. Sept. 22, 2008) (similar); *Veritas Capital Mgmt. L.L.C. v. Campbell*, 2008 WL 5491146, at *13-14 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 24, 2008) (similar).

### III. THE COMPLAINT DOES NOT ALLEGE AN EVENT OF DEFAULT THAT TRIGGERED BNYM'S HEIGHTENED DUTIES.

The portion of the Complaint that is not based on discovery of underwriting breaches is predicated on the occurrence of a contractually defined Event of Default. One element of the particular Event of Default alleged here is that the master servicer have received written notice of its breaches from either the trustee or a sufficiently large group of investors. PSA § 7.01(ii) (servicing breach ripens into Event of Default if it "continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given"). And BNYM need only notify certificateholders of such an Event of Default if that event is "hereunder known" to it, and under the PSAs BNYM "shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof." PSA § 8.02(viii). The Complaint alleges neither type of written notice, let alone both.

### A. Plaintiffs' Failure To Plead Written Notice To The Master Servicer Dooms Their Event of Default-Based Claims.

1. *Bankers Trust* does not permit application of the prevention doctrine here.

Plaintiffs presumably will rely on the "prevention doctrine" to argue that the Court may overlook the absence of written notice to the master servicer of violations that ripened into an Event of Default because BNYM waived its right to rely on that pre-condition. That use of the prevention doctrine is contrary to binding appellate authority.

We note at the outset that the prevention doctrine is not a source of implied duties: If plaintiffs contend that BNYM breached a duty to trigger an Event of Default by failing to send notice to the master servicer, the prevention doctrine cannot be the basis of that duty. As Judge Friendly explained, "[o]ne who unjustly prevents the performance or happening of a condition of his own promissory duty thereby *eliminates it as such a condition*." *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966) (en banc) (emphasis added). Thus, the outcome of the

prevention doctrine is merely the waiver of a condition—here, satisfaction of the contractual elements of an Event of Default. To determine whether the defendant has acted "unjustly" so as to trigger the doctrine in the first place, the Court must look elsewhere.

The Second Circuit recently set out a clear two-part test for applying the prevention doctrine. *See In re Bankers Trust Co.*, 450 F.3d 121 (2d Cir. 2006). Remarkably, although certain district courts have invoked the doctrine in cases like this, only a handful have cited that decision, and none have actually applied its test. In *Bankers Trust*, the court identified the circumstances in which a party may be held to have waived a condition to its performance:

> Where a promisor has no duty to bring about the condition precedent to his promise, only active conduct by the promisor to frustrate the occurrence of the condition precedent constitutes waiver of that condition precedent.

*Id.* at 128. The court elaborated on the second prong, stating that "only affirmative steps by the defendants to prevent the [condition] would have constituted waiver of the condition precedent; '[p]assive acquiescence in [the buyers'] declared default and its consequences was not an act of prevention or hindrance.'" *Id.* (quoting *Amies v. Wesnofse*, 255 N.Y. 156, 165 (1931)). Thus, to apply the doctrine, a court must find either (1) that the defendant had a pre-existing duty to "bring about" the condition precedent (a duty that cannot be implied by way of the prevention doctrine itself) or (2) that the defendant engaged in "active conduct . . . to frustrate the occurrence of the condition precedent." *Id.*

Those are the only two conditions that would allow a court to characterize a defendant as having "*unjustly* prevent[ed]" a condition precedent. *Spanos*, 364 F.2d at 169 (emphasis added). A defendant who simply fails to bring about a condition that it had no obligation to bring about has not done anything wrong and so has not waived any contractual rights.

The Second Circuit derived this test from the New York Court of Appeals decision in *Amies*. There, a broker sought a fee from his client even though the sale of the property—a

condition to the fee being due—had failed to close. The broker argued that because his client had the *ability* to sue the reneging buyer for specific performance, and thereby force the buyer to close the sale but had declined to do so, the client had waived the condition. The *Amies* court looked to whether the client had a "duty to his broker to enforce specific performance by the vendee, when commissions are conditioned upon performance." 255 N.Y. at 163-64. Because the client had no duty to sue, neither did its failure to sue waive the condition. *Id.* And the court made clear that the prevention doctrine itself could not be the source of an implied duty to do so: "No such doctrine [of waiver] can be efficacious to compel positive action by the promisor to bring about the performance of the condition. *For that result the implication of a promise would be requisite.*" *Id.* at 163 (emphasis added).

The Second Circuit emphasized that because the "sellers in *Amies* had made no promise (and had no duty) . . . to sue for specific performance . . . , only active frustration of the occurrence of the condition precedent would constitute waiver of the precondition." *Bankers Trust*, 450 F.3d at 128. In *Bankers Trust* itself, the court only found that the trustee had waived the condition through acquiescence because it had a "duty [that] was expressly imposed by [Trust Indenture Act] § 315(a), and under Indenture § 601." *Id.*

Here, neither prong of the *Bankers Trust* test is met. There is no contractual duty for the Trustee to send a notice to the master servicer to start the 60-day cure period running. Until an Event of Default, the Trustee has "no implied duties" and "undertake[s] to perform such duties and only such duties as are specifically set forth in" the governing agreements. PSA § 8.01. Therefore, in order for the Trustee's failure to send notice to the master servicer to constitute a waiver, that duty would need to be expressly set forth in the agreements—and it is not. Other notice provisions are explicit: The Trustee is required, for example, to notify other parties of

19

underwriting breaches (*id.* § 2.03(c)) and undelivered mortgage files (§ 2.02(c)). But there is no such requirement for servicing breaches.

Nor is there any allegation that BNYM "actively frustrated" any investor's efforts to notify the master servicer of breaches and trigger an Event of Default. The Complaint alleges only that BNYM *did not do so itself*. But "passive acquiescence" is "not an act of prevention or hindrance." 450 F.3d at 128. In *O'Grady v. BlueCrest Cap. Mgmt. LLP*, Judge Stein found that an amendment asserting prevention would be futile, because "[w]hen pressed for factual support regarding his allegation that BlueCrest 'stymied' his execution of a valid release, plaintiff offered a lone fact: that defendant never provided O'Grady with a release." 111 F. Supp. 3d 494, 504 (S.D.N.Y. 2015). Allegations that a defendant merely did not do something *itself*, though, do not "substantiate [a] *frustration* argument." *Id.* (emphasis added).

2.  RMBS cases that overlook *Bankers Trust* are not persuasive authority.

Courts in this district have consistently applied *Bankers Trust* in cases not brought against RMBS trustees. In *Ferguson v. Hannover Ruckverischerungs-Akteiengesellschaft*, Judge Leisure declined to apply the prevention doctrine, even though the defendant unquestionably could have brought about the relevant condition. He wrote that "[t]o prove violation of the doctrine of prevention, some intent must be proved. . . . A promisor's 'passive acquiescence,' alone, will not constitute an actionable prevention or hindrance to the promisee's ability to satisfy its condition precedent." 2007 WL 2493692, at *18 (S.D.N.Y. Aug. 21, 2007). Following *Bankers Trust*, he then considered whether there was either an express prior duty or active prevention, but found both lacking: "the Cooperation Clause did not obligate Clarendon, Hannover, or Mr. Redpath to initiate communications with Sun Life. Moreover, even though plaintiff claims that it believes it did not make sense for Mr. Jacobs to contact Sun Life directly, nothing Hannover has done actually prevented him from doing so." *Id.*

20

Judge Rakoff stated the same rule in *Jamil v. Solar Power Inc.*, but applied the doctrine because the defendant did have an express prior duty to bring about the condition. "This principle [*i.e.*, the prevention doctrine] applies to failures to act, *provided a party was under a duty to act*. Thus, Solar Power's failure to tender a release, *where it was charged with doing so*, and which caused Jamil's failure to sign one, waived the condition." 2016 WL 6820725, at *5 (S.D.N.Y. Nov. 8, 2016) (emphasis added) (citing *Bankers Trust*).

By contrast, courts considering RMBS trustee cases have overlooked this binding precedent. For example, in *Royal Park Investments SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587 (S.D.N.Y. 2015), the court found that "[u]nder New York law [t]he implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence." *Id.* at 605 (internal quotation marks omitted). Because "the Agreements specifically designate [the trustee] as one of the parties who *could* give the required notice to trigger an Event of Default," its failure to do so "excused" the requirement. *Id.* (emphasis added).

By equating the ability ("could") to give notice with either a duty to do so or an independent basis for applying the prevention doctrine, that court went far wide of the mark. The plaintiffs in *Amies* and *Ferguson* could have satisfied the conditions there, but the doctrine was not applied because they had no *obligation* to. New York State courts have held consistently that trustees do not have any duty either to cause or to investigate the possibility of an Event of Default. *See Commerce Bank*, 141 A.D.3d at 415 ("[I]n order to give plaintiffs such notice [of servicing breaches], defendant would have had to monitor other parties. A failure to monitor other parties 'plainly does not involve the performance of basic non-discretionary ministerial

21

tasks.'" (quoting *Ellington Credit Fund v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 193 (S.D.N.Y. 2011))); *Magten Asset Mgmt. Corp. v. BNY*, 2007 WL 1326795, at *7 (N.Y. Sup. Ct. N.Y. Cnty. May 8, 2007) ("BNY's duty did not extend to undertaking a complicated and unavoidably speculative investigation in order to decide whether there was or would be an event of default."); *Nacional Financiera SNC v. Bankers Trustee Co.*, 2000 WL 36564710, at *7 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 13, 2000) ("The fact that such an investigation might have been an 'inordinately simple' one to perform, as Nafin claims[,] is irrelevant, since BT had no express or implied duty to investigate.").

In another trustee case, the court found that "*[w]hether or not Citibank had a contractual duty to give notice*, it certainly had the *power* to do so, and it has been established for over a century that a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party itself." *Fixed Income Shares: Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 855 (S.D.N.Y 2015) (emphasis added). That statement is plainly inconsistent with the holding in *Bankers Trust* that puts the contractual duty front and center: "[w]here a promisor has no duty to bring about the condition precedent to his promise, only active conduct" will suffice to cause waiver. 450 F.3d at 128.

However similar they may be on the facts, these cases, and others that apply the prevention doctrine without mentioning *Bankers Trust* at all, or that cite it only for the notion that the prevention doctrine exists, are not persuasive authority.

3.   <u>The prevention doctrine cannot apply where the implied covenant does not.</u>

Even if the prevention doctrine could apply on its own terms, it cannot apply here for the independent reason that the implied covenant does not. As acknowledged in the *Royal Park* case cited above, the entire prevention doctrine is no more than a "variant of the implied covenant of good faith and fair dealing." *Thor Props., LLC v. Chetrit Grp. LLC*, 91 A.D. 3d 476, 477 (1st

Dep't 2012). The New York Appellate Division recently held that the implied covenant of good faith and fair dealing does not apply at all to trust agreements that disavow implied obligations. *See STS Partners Fund, LP v. Deutsche Bank Secs., Inc.*, 149 A.D. 3d 667, 669 (1st Dep't 2017) ("The claim for breach of the implied covenant of good faith and fair dealing was correctly dismissed as against Wells Fargo, because section 6.01(e)(i) of the trust agreements states, '[N]o implied covenants or obligations shall be read into this Agreement against the Trustee.'").

If the implied covenant does not apply here at all, then neither does the prevention doctrine. And without the ability to allege an actual Event of Default, complete with notice to the master servicer, or the ability to lean on the prevention doctrine, all of the Event of Default claims fail. That includes the fiduciary duty claim, because plaintiffs "cannot point to any provision in the indentures that [imposes] fiduciary obligations . . . prior to an event of default." *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 157-58 (2008).

## B. Plaintiffs' Failure To Plead Written Notice To BNYM Dooms Their Event of Default-Based Claims.

Whether an Event of Default occurred is a separate question from whether such an event triggered BNYM's heightened duties. As discussed above, the first question depends on several conditions having been satisfied, including the master servicer's receipt of written notice of material servicing violations. The second question also depends on written notice, but of a different type—namely, written notice *to the trustee* that the master servicer failed to cure its violations and that an Event of Default resulted. Plaintiffs have similarly not alleged receipt of *that* notice, and they do not even attempt to excuse the omission.

Plaintiffs allege that BNYM breached its post-Event of Default duties by failing to (1) "provide certificateholders notice of Events of Default" and (2) "exercise prudence concerning the exercise of appropriate remedies following Events of Default." Compl. ¶ 209.

23

Those are duties that only apply to "Event of Default[s] *hereunder known to the Trustee*." PSA § 7.03(b) (emphasis added); *see also id.* § 8.01(i). Under each of the PSAs, the circumstances under which BNYM can be found to know of an Event of Default are narrowly circumscribed: "[T]he Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received *written notice* thereof." *Id.* § 8.02(viii) (emphasis added).[5]

As a court in this district has explained, "[i]t is reasonable for the Indenture[s] to specify a particular single act (here, written notice of an Event of Default . . .) which must occur before [the trustee] is charged with knowledge of the default or obliged to exercise any remedies, rather than leaving questions of the timing and amount of its knowledge (and hence its obligation to act) to the uncertainties of later litigation over when such knowledge should be imputed." *Argonaut P'ship L.P. v. Bankers Tr. Co.*, 2001 WL 585519, at *2 (S.D.N.Y. May 30, 2001). New York courts have long recognized as much: Over 75 years ago, the New York Appellate Division addressed a claim that a trustee had failed to take appropriate action in response to a servicer's "failure to foreclose" on certain property. *Elkind v. Chase Nat'l Bank of City of N.Y.*, 259 A.D. 661, 666 (1st Dep't 1940). The court explained that "the [trust] indenture expressly provide[d] that unless the trustee receive[d] written notice [of a default] from the holders of not less than ten percent of bonds outstanding, the trustee may conclusively assume that no default has occurred and shall not be required to take action in respect of a default." *Id.* Because "[t]he complaint allege[d] no facts complying with these conditions," the court dismissed the claim. *Id.*

---

[5]     As we said earlier, the re-securitization Trust Agreement contains a different provision, under which "actual knowledge" *or* "written notice" of an Event of Default suffices. *See* note 2 *supra*.

Courts in the state have continued to strictly enforce these types of written-notice requirements. *See, e.g.*, *Putman High Yield Tr. BNY*, 7 A.D.3d 439, 439 (1st Dep't 2004) (affirming dismissal of claims where "the Indenture expressly require[d] 'actual knowledge' of a default in the form of written notification" and "[t]here [was] no allegation of such notice"); *Argonaut*, 2001 WL 585519, at *2 (dismissing fiduciary duty claims because "particular written notice [of Event of Default] was not received"). This Court should do the same.

Indeed, the Appellate Division's decision in *Commerce Bank v. BNYM*, 141 A.D. 3d 413 (1st Dep't 2016), requires it to do so. That case is indistinguishable from this one with respect to alleged Events of Default: the PSAs similarly provided that "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof"; and the plaintiff similarly claimed that BNYM had failed to notify certificateholders of, and act appropriately in response to, an Event of Default. The court affirmed the trial court's dismissal of that claim because there was no allegation that a responsible officer of BNYM had received written notice that an Event of Default had occurred. *See id.* at 414-15. There, like here, the plaintiff had alleged that BNYM had actual knowledge of improper servicing, and, unlike here, even identified a letter, received from certificateholders with a directing percentage of holdings, identifying alleged servicing breaches that they believed could lead to an Event of Default if not cured within 60 days. The court held that the letter was just "a notice of events that, with time, might ripen into events of default." *Id.* at 415. Absent a subsequent written notice that the violations had not been cured and that an Event of Default resulted, BNYM was not required to act in accordance with post-Event of Default duties.

As this Court recognized in *Wells Fargo*, the relevance of *Commerce Bank* is beyond dispute, and the Court is bound to follow the decision absent persuasive evidence that the New

York Court of Appeals would reach a different conclusion. *See* 2017 WL 1194683, at *10 (quoting *Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2010)). We recognize that the Court proceeded to find that *Commerce Bank* "d[id] not change [its] analysis" of whether the complaint in *Wells Fargo* sufficiently pled that the trustee had discovered breaches.

Whatever the Court thinks of *Commerce Bank*'s treatment of claims regarding breaches of representations and warranties, the Appellate Division's separate holding regarding notice of Events of Default is surely binding and must be applied here. The court held that the absence of an allegation that an officer of BNYM received written notice of an Event of Default requires dismissal of any Event of Default-based claim if, as here, "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof." PSA § 8.02(viii). That holding is consistent with authorities from both federal and state court strictly enforcing similar written-notice provisions. *See* pp. 24-25 *supra*. Unlike on underwriting, the First Department did not approvingly cite contrary federal cases on this point. Under the *Erie* doctrine, "it is the duty of the [federal courts] in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law' and *however much the state rule may have departed from prior decisions of the federal courts.*" *West v. AT&T*, 311 U.S. 223, 237 (1940) (emphasis added).

The written notice clause here is identical to the one that the Appellate Division interpreted in *Commerce Bank*. Plaintiffs' Event of Default claims must be dismissed because there is no allegation that BNYM received written notice of any Event of Default.

## IV. PLAINTIFFS' OTHER CLAIMS FAIL FOR THE SAME REASONS SET OUT IN *WELLS FARGO*.

All of plaintiffs' remaining claims except negligence cannot proceed for reasons already adopted by this Court to dismiss equivalent claims in *Wells Fargo*.

### A. The Fiduciary Duty Claim Is Barred By The Economic Loss Doctrine.

Plaintiffs base their fiduciary duty claim on BNYM's purported failure to (1) exercise due care and avoid conflicts of interest, and (2) perform its post-Event of Default obligations. See Compl. ¶¶ 216-16. As this Court held in *Wells Fargo*, the former cannot make out a fiduciary duty claim. 2017 WL 1194683, at *12 ("These pre-default obligations are not constructed as *fiduciary* duties, but as obligations whose breach may subject the trustee to *tort* liability." (internal quotation marks omitted) (emphases in original)). The latter fails not only because the Complaint does not plausibly allege a known Event of Default (*see* Part III *supra*), but also because of the economic loss doctrine. *See id.* at *16.

### B. The Implied Covenant Does Not Apply.

After the Court issued its opinion in *Wells Fargo*, the New York Appellate Division held that implied covenant claims against RMBS trustees must be dismissed if, as here, implied duties are expressly negated by contract. *STS Partners Fund, LP*, 149 A.D. 3d at 667. Under that binding authority, there can be no implied covenant claim in this context. But either way, the particular claim that plaintiffs have pled cannot proceed because, like the implied covenant claims in *Wells Fargo*, it is based on the same facts as the contract claim. *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Indeed, the Complaint includes allegations that are identical to those on which the Court relied to dismiss the implied covenant claims there. *Compare* 2017 WL 1194683, at *15 *with* Compl. ¶ 230.

## C.  The TIA Does Not Apply To Any of These Trusts.

Twelve of the thirteen trusts in this case issued certificates and are governed by PSAs. Those securities are indistinguishable from those the Second Circuit held are excluded from the TIA. *See Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. BNYM*, 775 F.3d 154, 165 (2d Cir. 2014). CWALT 2008-IR is a "resecuritization" trust that is exempt for the same reasons. It issued (1) "certificate[s] of interest of participation" (2) in "two or more securities" that (3) "hav[e] substantially different rights and privileges." 15 U.S.C. § 77ddd(a)(2). The only difference between the RMBS trusts in *Retirement Board* and the resecuritization trust here is that the former issued certificates of interest in mortgage loans (which are "securities" under the TIA) and the latter issued certificates of interest in RMBS securities. Compl ¶ 2.

## D.  The Complaint Does Not Allege A Streit Act Violation.

Though the Streit Act may apply to the certificates at issue, plaintiffs' claim under that statute fares no better. Plaintiffs here allege that BNYM violated Section 126(1) of the Streit Act when it "failed to exercise its rights under the PSAs after becoming aware of 'events of default.'" Compl. ¶ 225, 227. However, as the Court recognized in *Wells Fargo*, "[c]ourts in this District have held consistently that Section 126(1) 'requires only that trust instruments include certain provisions, and does not itself impose any affirmative duties on trustees.'" 2017 WL 1194683, at *20 (quoting *Commerzbank AG v. HSBC Bank USA N.A.*, 2016 WL 3211978, at *2 (S.D.N.Y. June 8, 2016)). Recognizing that roadblock, plaintiffs assert in a footnote that, "in the alternative, [BNYM] violated the Streit Act because the PSAs do not include all of the provisions set forth in Section 126." Compl. ¶ 175 n.6. That is woefully deficient to state a claim: There are no factual allegations whatsoever supporting that conclusory assertion.

## V.  PLAINTIFFS LACK STANDING TO PURSUE CLAIMS BASED ON CERTIFICATES THEY HAVE SOLD.

Plaintiffs do not even currently hold certificates in six of the trusts included in the Complaint. *See* Compl., Ex. A. Under New York law, when an investor sells a security, it automatically sells any claims against the trustee. *See* N.Y. G.O.L. § 13-107(1) (1963). It therefore lacks standing to pursue claims as to those certificates. *See FDIC v. Citibank N.A.*, 2016 WL 8737356, at *5 (S.D.N.Y. Sept. 30, 2016) (holding under New York and Delaware law that plaintiff lacked standing to pursue claims on RMBS securities that it had sold because "any claims that [it] might have held, travelled with the bonds when they were transferred"); *One William St. Capital Mgmt., L.P. v. Educ. Loan Tr. IV*, 2015 WL 4501194, at *3-5 (N.Y. Sup. Ct. N.Y. Cnty. July 18, 2015) (finding that plaintiff lacked standing to assert claims related to notes that it had sold).

### CONCLUSION

For all of the foregoing reasons, BNYM respectfully requests that the Complaint be dismissed with prejudice.

Dated: June 9, 2017
     New York, New York

MAYER BROWN LLP

By:  <u>/s/ Christopher J. Houpt</u>
     Matthew D. Ingber
     Christopher J. Houpt
     Rory K. Schneider
     1221 Avenue of the Americas
     New York, New York 10020
     Tel.: (212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*