UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                :

PACIFIC LIFE INSURANCE COMPANY and  :
PACIFIC LIFE & ANNUITY COMPANY,     :
                :

            Plaintiffs,    :
                :
        v.              :
                :
THE BANK OF NEW YORK MELLON,     :
                :
            Defendant.  :
                :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 16, 2018

17 Civ. 1388 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

The instant action is one of a growing number of cases in which certificateholders of residential mortgage-backed securities ("RMBS") trusts have brought claims against their common trustees. Here, Pacific Life Insurance Company ("PacLife") and Pacific Life & Annuity Company (together, "Plaintiffs"), certificateholders of 13 securitization trusts (the "Trusts"),[1] claim that The Bank of New York Mellon ("Defendant") breached its contractual, fiduciary, and common law duties, as well as its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, and the Streit Act, N.Y. Real Property Law § 124. Plaintiffs also claim that Defendant was negligent in failing to avoid conflicts of interest and to perform ministerial acts with due care.

---

[1]      Between 2011 and 2014, Plaintiffs sold six of the thirteen certificates (the "Sold Certificates") at issue in this case; they continue to hold the remaining seven certificates (the "Held Certificates").

Defendant has moved to dismiss nearly all of the causes of action against it for failure to state a claim.[2] For the reasons set forth below, Defendant's motion to dismiss Plaintiffs' breach of contract claims is denied; its motion to dismiss Plaintiffs' tort claims is granted in part and denied in part; its motion to dismiss Plaintiffs' claim under the TIA is granted; and its motion to dismiss Plaintiffs' claims under the Streit Act is granted.

## BACKGROUND[3]

### A.    Factual Background

This Court has previously explained the typical formation process and structure of RMBS trusts. *See, e.g.*, *BlackRock Allocation Target Shares: Series S Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n* (hereinafter, "*BlackRock Series S*"), 247 F. Supp. 3d 377, 383-84 (S.D.N.Y. 2017); *see also BlackRock Allocation Target Shares* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 9371 (KPF) (SN),

---

[2]    Defendant does not seek dismissal of Plaintiffs' negligence claim. (Def. Br. 27).

[3]    The facts in this section are drawn from Plaintiffs' complaint ("Complaint" or "Compl." (Dkt. #1)). The Court takes all well-pleaded allegations therein as true, as it must at this stage. *See, e.g.*, *Peralta* v. *St. Luke's Roosevelt Hosp.*, No. 14 Civ. 2609 (KPF), 2015 WL 3947641, at *1 n.1 (S.D.N.Y. June 26, 2015). The Court has also reviewed the briefing submitted by the parties. For ease of reference, the Court will refer to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #30); Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #31); Defendant's reply brief in further support of its motion to dismiss as "Def. Reply" (Dkt. #35); Plaintiffs' supplemental letter brief, filed pursuant to the Court's February 12, 2018 Order (Dkt. #50), as "Pl. Supp." (Dkt. #51); and Defendant's supplemental letter brief as "Def. Supp." (Dkt. #52). The Court refers to declarations in support of this briefing and exhibits attached thereto by the name of the declarant and the exhibit designation, e.g., "[ ] Decl., Ex. [ ]."

For future submissions to the Court, the parties are directed to refrain from employing transparent-but-improper space-saving machinations, including the shunting of text into small-type footnotes and the incorporation by reference of arguments made by other litigants in other matters.

2017 WL 953550, at *1-3 (S.D.N.Y. Mar. 10, 2017). Accordingly, the Court provides but a brief description for context.

### 1. RMBS Trusts Generally

The Trusts in the instant action were securitized by residential mortgage loans, and "were created to facilitate [RMBS] transactions introduced to investors from 2005 to 2008." (Compl. ¶ 2). Such RMBS Trusts are formed according to the following process: First, institutions known as "sponsors" or "sellers" acquire and pool residential mortgage loans. (*Id.* at ¶ 25). Once the loans are originated and selected for securitization, the seller, through an affiliate called the depositor, "conveys the pool of loans to a trustee, such as [Defendant], pursuant to a [pooling and servicing agreement ('PSA')] that establishes various prioritized tranches of interests in payments made by borrowers on the loans." (*Id.* at ¶ 26). Finally, the depositor sells the certificates to an underwriter, which markets and sells them to investors. (*Id.*).

Pursuant to the PSA, "a servicer is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee." (Compl. ¶ 27). The servicer's function is to "monitor[] delinquent borrowers, foreclos[e] on defaulted loans, monitor[] compliance with representations and warranties regarding loan origination, track[] mortgage documentation, and manag[e] and sell[] foreclosed properties." (*Id.*). The servicer also provides data to the trustee, which in turn delivers monthly remittance reports to certificateholders describing the performance of underlying loans and compliance with the PSA. (*Id.* at ¶ 28).

3

## 2.    The Trusts, the PSAs, and Defendant's Duties Thereunder

Plaintiffs invested in RMBS issued by twelve securitization trusts and one resecuritization trust. Defendant served as the Trustee for each. The twelve securitization trusts were all sponsored by Countrywide Home Loans, Inc. ("Countrywide" or the "Sponsor"). (Compl. ¶ 2). The resecuritization trust, CWALT 2008-1R, was "backed by RMBS certificates issued by underlying trusts," including by "senior tranches" of "one of the [twelve securitization] Trusts[.]" (*Id.*). Plaintiffs acquired over $400 million of RMBS certificates issued by the Trusts. (*Id.* at ¶ 3).

Defendant's duties as the Trustee are set forth in the PSAs. An RMBS trustee's duties are "distinct from those of an 'ordinary trustee,' which might have duties extending well beyond the agreement." *Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon* (hereinafter, "*PL/BNYM*"), No. 14 Civ. 10104 (VEC), 2015 WL 5710645, at *2 (S.D.N.Y. Sept. 29, 2015) (citing *AG Capital Funding Partners, L.P.* v. *State St. Bank & Tr. Co.*, 11 N.Y.3d 146, 156 (2008)); *see also Fixed Income Shares: Series M* v. *Citibank N.A.* (hereinafter, "*Fixed Income Shares*"), 130 F. Supp. 3d 842, 857-58 (S.D.N.Y. 2015). In contrast, an RMBS trustee's duties are "governed solely by the terms of the [agreement.]" *Blackrock Series S*, 247 F. Supp. 3d at 385 (internal quotation marks and citation omitted). "This is true regardless of whether the trust is an indenture trust or a PSA [trust]." *Royal Park Invs. SA/NV* v. *HSBC Bank USA, Nat'l Ass'n* (hereinafter, "*RP/HSBC*"), 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) (citing *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC* v. *Countrywide Fin. Corp.*,

603 F.3d 23, 29 (2d Cir. 2010); *Bank of N.Y. Mellon* v. *Walnut Place LLC*, 819 F.

Supp. 2d 354, 364-65 & n.6 (S.D.N.Y. 2011)).

Plaintiffs argue that the PSAs at issue here impose four fundamental

duties on Defendant.  *First*, Defendant was required to "take physical

possession of the mortgage loans and the accompanying mortgage files [ —

including the mortgage note, the mortgage, the assignment of mortgage, and

the title policy — ] for the exclusive use and benefit of all current and future

certificateholders."  (Compl. ¶¶ 34, 35).  For "Delay Delivery Mortgage Loans,"

Defendant was required to identify which, if any, lacked necessary paperwork.

(*Id.* at ¶¶ 37, 38).  Where paperwork was missing, Defendant was required to

issue a Delay Delivery Certification and assign back to the Seller any

incomplete loans, which the Seller would then have to substitute with loans

whose paperwork was complete.  (*Id.* at ¶¶ 38, 39).  Defendant was then

required to issue a final certification and exception report that "identified

mortgage files that were missing documentation required under the PSA" and

demand that any such defect be cured.  (*Id.* at ¶¶ 40, 44).

*Second*, Defendant was obligated to provide notice of defaults and to

enforce repurchase obligations.  In each PSA, Countrywide made various

representations and warranties regarding the characteristics of the mortgage

loans, including, *inter alia*, loan-to-value ratios; priority held by the liens on the

mortgaged properties; compliance with applicable laws; validity of the

mortgages and mortgage notes; the origination, underwriting, and collection

practices used; and the mortgage loans' conformity with the descriptions in the

prospectus supplements. (Compl. ¶ 50). Upon discovery of a breach of a representation or warranty that materially affected the investors' interests, Defendant was obligated to "give prompt notice thereof to the other parties." (*Id.* at ¶ 51 (citing PSA § 2.03(c))). Once notified of a breach, the Seller had 90 days to cure the breach or remove the loan from the Trust. (*Id.*).

*Third*, "[u]nder the PSAs and applicable law, [Defendant] owed a fiduciary duty to certificateholders upon the occurrence of an Event of Default." (Compl. ¶ 60).[4] Section 8.01 of the PSA provides that, upon an Event of Default, "the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs." (*Id.*).

Section 7.01 defines Events of Default to include:

> [A]ny failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement … which failure materially affects the rights of [c]ertificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the [h]olders of [c]ertificates evidencing not less than 25% of the [v]oting [r]ights evidenced by the [c]ertificates; provided, however, that the sixty-day cure period shall not apply to the initial delivery of the [m]ortgage [f]ile for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery[.]

---

[4]     Plaintiffs argue that the TIA and the Streit Act imposed fiduciary duties upon Defendant in the event of default. (*See* Compl. ¶¶ 65, 66).

(Compl. ¶ 61). Plaintiffs conclude that, "[u]nder Section 7.01, [Defendant] was obligated to provide the Master Servicer notices of the Master Servicers' breaches under the PSA." (*Id.*). Defendant must also provide the Master Servicer notice of "reportable events" under Section 11.03 of the PSA and "provide public notice of material breaches of pool asset representations or warranties or transaction covenants on Form 10-Ds." (*Id.* at ¶ 62). Within 60 days of an uncured Event of Default ("EOD"), Defendant was required to notify all certificateholders known to Defendant. (*Id.* at ¶ 64).

Some Events of Default could be triggered without written notice. "Because the cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery, the Event of Default related to Delay Delivery Loan failures is triggered automatically — no additional notice or opportunity to cure is required." (Compl. ¶ 63 (internal quotation marks omitted)).

Plaintiffs contend that, upon the occurrence of an Event of Default, a prudent investor would have:

> [i] taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts; [ii] ensured that the appropriate parties were receiving notification of breaches of representations and warranties or documentation defects from servicers; [iii] enforced the responsible parties' repurchase obligations with respect to breaching mortgage loans; [iv] addressed servicer breaches; and [v] otherwise exercised all rights and remedies under the PSA to maximize recoveries for certificateholders[.]

(Compl. ¶ 67).

*Fourth*, and finally, Defendant had a duty to address the Servicers' failures, if any, to meet prudent servicing standards. If "defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults." (Compl. ¶ 70). It "had the authority and obligation to 'terminate all of the rights and obligations of the Master Servicer … [and] assume all of the rights and obligations of the Master Servicer.'" (*Id.* (citing PSA § 7.01)). And it generally "had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so with due care." (*Id.*).

Defendant's fiduciary duties only arose after an Event of Default. Without an Event of Default, "the duties and obligations of the Trustee [were] determined solely by the express provisions of the [PSA], [and] the Trustee [would] not be liable except for the performance of such duties and obligations as … specifically set forth in th[e] [PSA]." (Compl. ¶ 72 (quoting PSA § 8.01)). The PSA further stated that "no implied covenants or obligations shall be read into this Agreement against the Trustee[.]" (*Id.* (quoting PSA § 8.01)).

### 3. Defendant's Alleged Breaches

Plaintiffs contend that while serving as Trustee, Defendant breached contractual, fiduciary, and statutory duties. Defendant "knew that Countrywide regularly disregarded its underwriting guidelines and representations and warranties made to securitization trusts … long before certificateholders learned of such problems." (Compl. ¶ 98). In administering various Countrywide RMBS trusts, Defendant "learned that Countrywide had

8

departed from their underwriting guidelines, engaged in predatory lending, and failed to ensure mortgage loans complied with state and federal laws." (*Id.* at ¶ 99). Defendant "received a 'high volume' of notices from certificateholders and other parties notifying [Defendant] of non-compliant Countrywide loans." (*Id.* at ¶ 104). The number of "written repurchase requests for Countrywide loans that breached their representations and warranties that [Defendant] received became so large that [Defendant] eventually created a repurchase tracking tool to manage the massive volume." (*Id.* at ¶ 105). Yet, as Plaintiffs would have it, Defendant failed to take any of the corrective actions required of it by the PSA.

Plaintiffs allege that Defendant had received written notice of various material breaches. (Compl. ¶ 106). Plaintiffs point to numerous instances where outside parties notified Defendant of specific or systemic concerns with Countrywide RMBS trusts. For example, on January 14, 2008, Hanover Capital Mortgage Holders sent to Defendant repurchase requests that highlighted Countrywide's breaches of the origination guidelines and misrepresentations regarding the mortgage loan schedule. (*Id.* at ¶ 107). On November 9, 2010, AIG notified Defendant of breaches of representations and warranties affecting numerous Countrywide RMBS trusts, including at least one of the Trusts at issue here. (*Id.* at ¶ 108). And "[m]onoline insurers ... repeatedly sent [Defendant] notices of breaches of representations and warranties in Countrywide RMBS trusts." (*Id.* at ¶ 109).

The Complaint further alleges that Defendant was provided other, more direct evidence of Countrywide's breaches of representations and warranties. For example, Defendant "was presented with a large number of defaulted loans, and foreclosures were often commenced in [Defendant's] name, including for loans in the Covered Trusts." (Compl. ¶ 115). In each foreclosure, Defendant "was the named plaintiff and real party in interest as it allegedly held title to the notes and mortgage ... [and as] the real party in interest it had knowledge of the contents of the foreclosure filings ... [and] knew that the borrowers either [i] did not qualify for the loans ... ; [ii] were victims of predatory lending; or [iii] were given ... loan[s] that did not comply with state or federal law." (*Id.* at ¶¶ 116-17).

Plaintiffs allege that Defendant knew of Countrywide's "systemic abandonment of its underwriting guidelines," which dereliction "had a devastating effect on the performance of the ... Trusts." (Compl. ¶ 122). When Plaintiffs purchased certificates in the Trusts, the certificates were rated double-A or higher. (*Id.*). Eventually, after repeated downgrades, they were considered "junk" bonds. (*Id.*). Plaintiffs allege that those downgrades "were prompted by the alarming rate of defaults and delinquencies of the mortgage loans ... and the information that has emerged concerning Countrywide's ... [failure to abide by] underwriting guidelines." (*Id.*). Plaintiffs conclude that, by October 2009, Defendant was aware that the Trusts were junk bonds and that the "sponsors and originators had systemically failed to comply with represented underwriting standards." (*Id.* at ¶ 123).

10

Plaintiffs further allege that, pre-EOD, Defendant failed to give notice of breaches of representations and warranties, and failed to enforce repurchase obligations. Defendant "never so much as analyzed the many breach notices it received, let alone attempted to enforce Countrywide's repurchase obligations." (Compl. ¶ 128). And "when investors placed [Defendant] on notice of problems with Countrywide loans, [Defendant] sat on its hands" rather than providing notice to Countrywide and requiring it to repurchase the defective loans. (*Id.* at ¶ 129). Defendant "had a continuing duty to provide such notice but failed to do so throughout its tenure as trustee." (*Id.* at ¶ 130). Nor did Defendant provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards. (*Id.*).

Post-EOD, Defendant "fail[ed] to take any actions for years to exercise rights and remedies in the PSAs for the benefit of certificateholders or to maximize the recoveries for investors"; this conduct, in Plaintiffs' view, "violated [Defendant's] post-[EOD] duty of prudence." (Compl. ¶ 131). Plaintiffs point to numerous EODs, including, *inter alia*, the Servicer's failure to provide notice or exercise repurchase remedies after representation and warranty violations (*id.* at ¶ 132); document delivery failures (*id.* at ¶ 133); Countrywide's failure to repurchase loans with flawed documentation (*id.* at ¶ 136); false servicer certifications (*id.* at ¶¶ 142-45); and other servicing breaches, including delayed foreclosures, unnecessary and excessive fees, failure to "charge off" delinquent loans, impermissible modification of loans, and forged documentation resulting from robo-signing practices (*id.* at ¶¶ 151-71).

Plaintiffs allege that these EODs "triggered [Defendant's] duty to act prudently to protect the interests of the certificateholders in all respects" and that at least some of these duties "continue[] to this day[.]" (Compl. ¶ 141). Yet Defendant failed to provide Plaintiffs with notice, as required under Section 7.03 of the PSA (*id.* at ¶ 172), or to "file Forms 8-K with the Securities and Exchange Commission disclosing that Events of Default had occurred, as it was required to do" (*id.* at ¶ 173).

### 4. Defendant's Settlement with Countrywide and the Related Article 77 Proceeding

In October 2010, Defendant and other holders of securities worth over $100 billion brought claims on behalf of 530 trusts against Countrywide and its successor, Bank of America. *See In re BNYM*, 42 Misc. 3d 1237(A), at *6-7 (N.Y. Sup. Ct. N.Y. Cty. Jan. 31, 2014). On June 28, 2011, the parties settled the investors' claims for $8.5 billion (the "Countrywide Settlement"). (Def. Br. 6; *see also* Houpt Decl., Ex. 5-6 (Dkt. #29-5, 29-6)). The settlement agreement released all claims against Countrywide relating to the origination, sale, or delivery of the mortgage loans to the Trusts; the documentation of the mortgage loans to the Trusts; and the servicing of the mortgage loans. (Def. Br. 7).

The settlement received court approval in March 2015, pursuant to an Article 77 proceeding in New York state court. N.Y. C.P.L.R. 7701. Article 77 provides a mechanism by which New York courts may consider all certificateholders' objections to the settlement. Some objecting certificateholders challenged the adequacy of the settlement and the manner in

which it was negotiated.  (Def. Br. 8).  After a trial and an appeal, the New York courts approved the settlement, as well as Defendant's actions in entering into the agreement.  (*Id.*).

### 5.    The *Retirement Board of the Policemen's Annuity* Class Action

Of the 13 Trusts at issue in this case, 10 were implicated in a class action lawsuit brought in this District in 2011.  *See Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chi.* v. *The Bank of N.Y. Mellon*, No. 11 Civ. 5459 (WHP) (S.D.N.Y. Aug. 5, 2011) (the "Policemen's Class Action").  The class was defined to include "all current and former investors who acquired the Countrywide Certificates for the Covered Trusts" and suffered losses "as a result of" Defendant's "misconduct[.]"  (Kane Decl., Ex. 7 (Dkt. #32-7) ¶¶ 65, 67).  Plaintiffs were "part of the class for the [10] Trusts [at issue]."  (Pl. Opp. 20).  The court dismissed claims relating to nine of the Trusts on April 3, 2012, for lack of standing.  *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi.* v. *The Bank of N.Y. Mellon*, 914 F. Supp. 2d 422, 426 (S.D.N.Y. 2012).  The Second Circuit affirmed dismissal of those claims on December 23, 2014.  *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi.* v. *The Bank of N.Y. Mellon*, 775 F.3d 154, 161-62 (2d Cir. 2014).

## B.    Procedural Background

On February 23, 2017, Plaintiff brought this action, alleging breach of contract, breach of fiduciary duty, negligence, breach of the implied covenant of good faith and fair dealing, and violations of the TIA and the Streit Act.  (Dkt. #1).  On June 9, 2017, Defendant filed a motion to dismiss and supporting

papers.  (Dkt. #28-30).  Plaintiffs filed their opposition papers on July 10, 2017

(Dkt. #31, 32), and Defendant filed a reply in further support of its motion to

dismiss on July 28, 2017 (Dkt. #35, 36).

## DISCUSSION

### A.    Applicable Law

When considering a motion to dismiss under Rule 12(b)(6), a court

should "draw all reasonable inferences in [the plaintiff's] favor, assume all

well-pleaded factual allegations to be true, and determine whether they

plausibly give rise to an entitlement to relief."  *Faber* v. *Metro Life Ins. Co.*, 648

F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan*

v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  Thus, "[t]o survive

a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*

v. *Twombly*, 550 U.S. 554, 570 (2007)).  In this regard, a complaint is deemed

to include any written instrument attached to it as an exhibit or any

statements or documents incorporated by reference.  *See, e.g.*, *Hart* v. *FCI*

*Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c)

("A statement in a pleading may be adopted by reference elsewhere in the same

pleading or in any other pleading or motion.  A copy of a written instrument

that is an exhibit to a pleading is a part of the pleading for all purposes.")).

"While *Twombly* does not require heightened fact pleading of specifics, it

does require enough facts to 'nudge [a plaintiff's] claims across the line from

conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## B.   Analysis

Defendant advances various arguments in favor of dismissal, many of which are substantially similar to ones that this Court has ruled on in another matter. *See BlackRock Series S*, 247 F. Supp. 3d at 377. Defendant argues that all of Plaintiffs' contract-based claims are barred, under either the applicable statute of limitations or principles of *res judicata*. As to the former, Defendant argues that New York's six-year statute of limitations applies to the Held Certificates and that, if the Court credits the allegations in Plaintiffs' supplemental letter brief, California's four-year statute of limitations applies to the Sold Certificates. As to the latter, Defendant claims that the Countrywide Settlement covers all conduct within the limitations period, and the Article 77 judgment approving that settlement binds this Court and precludes Plaintiffs' claims.

Defendant next asserts that Plaintiffs' EOD-related claims fail because they do not allege that either of two necessary conditions were met. *First*, Plaintiffs do not allege that the Master Servicer received written notice of servicing violations, which is required pursuant to Section 7.01 of the PSA, for servicing violations to ripen into EODs. Such failure, Defendant asserts, cannot be excused by the "prevention doctrine," because Defendant neither had an affirmative duty to notify the Master Servicer of violations nor actively prevented others from providing such notice. *Second*, Plaintiffs have not alleged that Defendant received written notice of an EOD, without which none of the heightened, post-EOD duties apply.

Defendant further argues that: (i) Plaintiffs' due care and conflict of interest claims are barred by the economic loss doctrine; (ii) Plaintiffs' claim that Defendant breached the implied covenant of good faith and fair dealing fails because implied duties were negated by the parties' contract; (iii) Plaintiffs' TIA claim fails because, under controlling precedent, PSA-based trusts are exempt from the TIA; (iv) Plaintiffs' Streit Act claims fail because the Streit Act does not impose any affirmative duties on trustees; and (v) Plaintiffs lacked standing to pursue claims relating to any of the Sold Certificates, under the theory that, upon sale of the certificates, Plaintiffs automatically transferred any potential claims against the Trustee.

The Court considers each of Defendant's arguments in turn.

1. **Defendant's Motion to Dismiss Plaintiffs' Breach of Contract Claims Is Denied**

    a. **Plaintiffs' Pre-EOD Claims Are Not Time-Barred**

In *BlackRock Series S*, this Court addressed statute of limitations claims that are strikingly similar to the ones that Defendant advances here. *See generally* 247 F. Supp. 3d at 377. There, this Court agreed with the plaintiffs' argument that "any statute of limitations defense cannot be resolved at [the motion to dismiss] stage because it involves factual questions as to when and against whom the claims accrued, whether violations were continuing, and whether tolling applies." *Id.* at 394 (internal quotation marks and citation omitted). This Court explained that "[e]ach of Defendant's arguments implicating the statute of limitations is premature; the Court cannot resolve these issues from the face of the Complaints." *Id.* (citing *Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (noting that a statute of limitations defense may be "raise[d] … in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint")). So too here: Because Plaintiffs have raised the specter of ongoing breaches, the Court is unable to determine as a matter of law that Plaintiffs have failed to allege discovery of breaches that occurred during the limitations period. Simply put, "[a]t this stage, Plaintiffs are not required to specify precisely when, and precisely on what basis, Defendant breached each of its contractual obligations." *Id.* at 394.

Although not necessary to resolve this issue, for the sake of completeness the Court addresses the parties' dispute as to whether any of

Plaintiffs' claims — related to 10 of the 13 Trusts implicated in the Policemen's Class Action — is tolled under *American Pipe & Const. Co.* v. *Utah*, 414 U.S. 538 (1974). Under the *American Pipe* doctrine, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties," even where the suit ultimately is not permitted to continue as a class action. *In re Initial Public Offering Secs. Litig.*, 617 F. Supp. 2d 195, 198 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). As the parties have rightly identified, there is a split in this District on whether *American Pipe* tolling applies where claims in a class action are dismissed because the class representative lacked standing. *Compare N.J. Carpenters Health Fund* v. *DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2010 WL 6508190, at *2 (S.D.N.Y. Dec. 15, 2010) ("But the *American Pipe* rule should not apply where the plaintiff that brought the dismissed claim was found by the court to lack standing."), *with In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 372 (S.D.N.Y. 2011) ("Because the additional Plaintiffs should not be punished for their failure to anticipate or timely remedy the standing deficiencies of the original *Bond/Notes* Complaint, the Court applies the *American Pipe* tolling doctrine and concludes that the claims of the additional Plaintiffs are not time-barred.").

This Court sides with its sister courts that have applied *American Pipe* tolling to putative class members even where the class representative was found to lack standing. In *American Pipe*, the Court noted that failure to toll the statute of limitations for class members would undermine the policies of

"efficiency and economy of litigation" underlying Rule 23, because "[p]otential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable." 414 U.S. at 553. The failure to apply *American Pipe* tolling to the instant case would contravene the very policies of efficiency and economy of litigation of which the *American Pipe* Court spoke. As another district court observed, "[T]o withhold *American Pipe* tolling in a securities action would punish class members for relying on the very thing Rule 23 is intended to provide: an efficient method for resolving class claims common to a class of individuals without the need for wasteful and duplicative litigation." *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d at 372 (internal quotation marks omitted).[5]

Though the Court finds that *American Pipe* tolling applies, it has little practical effect here. To begin with, the Court has already found that, even without any tolling, Plaintiffs' allegations are sufficient to survive — at this stage of litigation — Defendant's limitations claim. In addition, the amount of time tolled under *American Pipe* is minimal. The Court agrees with Defendant that tolling only applies until the date of a district court's decision, and does not extend through the pendency of any appeal. The Second Circuit has instructed that *American Pipe* tolling "ends upon denial of class certification."

---

[5]     It is worth noting that, of the two opinions that Defendant cites in arguing against this more expansive understanding of *American Pipe*, one — written by Judge Forrest — is factually inapposite. In that case, the "[p]roposed [i]ntervenor was never an 'asserted member' of the putative class … [who] could not have thought otherwise where there was no pleading which asserted [his] claims." *In re Direxion Shares ETF Trust*, 279 F.R.D. 221, 237 (S.D.N.Y. 2012).

*Giovanniello* v. *ALM Media, LLC*, 726 F.3d 106, 116 (2d Cir. 2013).  The Court further explained:  "We … join our sister circuits and hold that *American Pipe* tolling does not extend beyond the denial of class status.  Class status was denied in this case when the Southern District of New York determined that a class action was unavailable under New York law."  *Id.*  Here, the case was dismissed on the merits on April 3, 2012, "only eight months after the complaint was filed."  (Def. Reply 3).  Accordingly, the tolling period should only be eight months.

### b. Plaintiffs' EOD-Related Allegations Are Sufficient at the Pleading Stage

Defendant separately argues that Plaintiffs' pleadings are insufficient as a matter of law because they fail to allege (i) that the Master Servicer received written notice of its breaches from either the trustee or a sufficiently large group of investors, and (ii) that a responsible officer of the Trustee received notice of an EOD.  (Def. Br. 17).  The Court disagrees.  Like many a litigant, Defendant misperceives "the difference between sufficient pleading and successful claims."  *BlackRock Series S*, 247 F. Supp. 3d at 389.  At the pleading stage, Plaintiffs "satisfy their [pleading] burden where their allegations raise a reasonable expectation that discovery will reveal evidence proving their claim."  *Id.* at 390 (quoting *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.* (*"PL/DB"*), 172 F. Supp. 3d 700, 713 (S.D.N.Y. 2016) (internal quotation marks omitted)).  Plaintiffs have done so here.

Plaintiffs make numerous allegations that create a reasonable expectation that discovery will reveal evidence of written notice.  As to

Countrywide's receipt of written notice, Plaintiffs have in fact made specific

allegations that Defendant provided Countrywide with written notice of

misconduct. They allege that Defendant "provided a series of notices to

Countrywide (including in its capacity as Servicer) advising Countrywide of its

failure to cure the document exceptions." (Compl. ¶ 136). "When Countrywide

failed to repurchase the affected loans in response to this notification, an [EOD]

occurred under Section 7.01(ii) of the PSA for each Trust[.]" (*Id.*). They further

allege, when discussing notice that Defendant received regarding the Servicer's

failure to charge off delinquent loans, that "it appears that [Defendant]

forwarded such notice letters to Countrywide[.]" (*Id.* at ¶ 168). Finally, they

allege, albeit indirectly, that Defendant notified Countrywide of its failure to

hold investor funds in bank accounts "with the credit rating required under …

the PSAs." (*Id.* at ¶¶ 149-50).

Plaintiffs also allege that there were documentation defects in numerous

mortgage loan files of which Defendant regularly notified Countrywide. (Compl.

¶¶ 33-49, 61, 133-41). They further allege that failure to cure those defects

constituted an automatic EOD under Section 7.01(ii) of the PSA, which states:

> [A]ny failure by the Master Servicer to observe or
> perform in any material respect any other of the
> covenants or agreements on the part of the Master
> Servicer contained in this Agreement … which failure
> materially affects the rights of Certificateholders, that
> failure continues unremedied for a period of 60 days
> after the date on which written notice of such failure
> shall have been given to the Master Servicer or the
> Depositor … ; *provided, however, that the sixty-day cure
> period shall not apply to the initial delivery of the*

> *Mortgage File for Delay Delivery Mortgage Loans nor the*
> *failure to substitute or repurchase in lieu of delivery*[.]

(*Id.* at ¶ 61 (emphasis added)).  These allegations suffice at the pleading stage.

Plaintiffs' allegations of Defendant's receipt of notice are similarly sufficient.  Though Plaintiffs do not specifically allege that one of Defendant's Responsible Officers received written notice of an EOD, the well-pleaded allegations create a reasonable expectation that discovery will produce evidence of such notice.  Plaintiffs allege that Defendant "knew that Countrywide regularly disregarded its underwriting guidelines and representations and warranties made to securitization trusts … long before certificateholders learned of such problems."  (Compl. ¶ 98).  They state that Defendant "learned that Countrywide had departed from their underwriting guidelines, engaged in predatory lending, and failed to ensure mortgage loans complied with state and federal laws."  (*Id.* at ¶ 99).  By July 2007, they allege, Defendant had raised internal red flags due to Defendant's exposure to Countrywide (*id.* at ¶ 100), and "received a 'high volume' of notices from certificateholders and other parties notifying [Defendant] of non-compliant Countrywide loans" (*id.* at ¶ 104).  And "[t]he volume of written repurchase requests for Countrywide loans that breached their representations and warranties that [Defendant] received became so large that [Defendant] eventually created a repurchase tracking tool to manage the massive volume."  (*Id.* at ¶ 105).

Plaintiffs also allege that Defendant "received written notice from investors and other parties specifically notifying [it] of breaches with respect to the [] Trusts[.]"  (Compl. ¶ 106).  They point to instances in which outside

parties notified Defendant of specific or systemic concerns with Countrywide RMBS trusts.  (*See, e.g.*, *id.* at ¶¶ 107-08).  They observe that "[m]onoline insurers ... repeatedly sent [Defendant] notices of breaches of representations and warranties in Countrywide RMBS trusts." (*Id.* at ¶ 109).  These allegations create a reasonable expectation that Defendant's Responsible Officers had received written notice of Events of Default in accordance with Section 8.02(viii) of the PSA.  Though they do not prove that Responsible Officers at Defendant had received written notice, such proof is not required at the pleading stage, particularly where — as here — the information may well be "uniquely in the possession of defendants." *PL/DB*, 172 F. Supp. 3d at 713 (quoting *Policemen's Annuity & Ben. Fund of City of Chi.* v. *Bank of Am., NA*, 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013) (internal quotation marks and citation omitted)).  Accordingly, the Court rejects Defendant's argument that Plaintiffs have failed to allege adequately that Defendant received written notice.

Finally, the prevention doctrine bars Defendant from seeking to dismiss Plaintiffs' EOD-based claims on the grounds that Countrywide did not receive the requisite notice.  Courts in this District have consistently held that trustees "cannot take advantage of [their] own failure to give notice ... of the possible breaches of representations and warranties to argue that no Event of Default occurred." *PL/DB*, 172 F. Supp. 3d at 715; *see also RP/HSBC*, 109 F. Supp. 3d at 605; *Royal Park Investments SA/NV* v. *Deutsche Bank Nat'l Tr. Co.* (*hereinafter "RP/DB"*), No. 14 Civ. 4394 (AJN), 2016 WL 439020, at *8 (S.D.N.Y. Feb. 3, 2016); *Okla. Police Pension & Ret. Sys.* v. *U.S. Bank Nat. Ass'n*, 291

F.R.D. 47 (S.D.N.Y. May 31, 2013), *abrogated on other grounds*, 775 F.3d 154 (2d Cir. 2014). An RMBS Trustee "cannot rely on the lack of notice to excuse its own failure to act." *PL/DB*, 172 F. Supp. 3d at 715 (citing *RP/DB*, 2016 WL 439020, at *5; *Fixed Income Shares*, 130 F. Supp. 3d at 855. Here, Defendant was one of only two parties authorized to provide written notice to Countrywide to trigger an Event of Default.

Defendant argues that these decisions, however numerous, are nonetheless wrong because they overlook controlling precedent — namely, *In re Bankers Trust Co.*, 450 F.3d 121 (2d Cir. 2006). (Def. Br. 17-20). In fact, it is Defendant that is wrong. The courts in this District that have applied the prevention doctrine to RMBS trustees have not overlooked *Bankers Trust*; some even cite directly to *Bankers Trust*. *See, e.g.*, *Fixed Income Shares*, 130 F. Supp. 3d at 855; *PL/DB*, 172 F. Supp. 3d at 715 n.5; *Okla. Police Pension and Ret. Sys.*, 291 F.R.D. at 70; *BNP Paribas Mortg. Corp.* v. *Bank of Am., N.A.*, 778 F. Supp. 2d 375, 398 (S.D.N.Y. 2011).

*Bankers Trust* requires that this Court apply the prevention doctrine. As Defendant correctly notes, *Bankers Trust* stands for the proposition that the prevention doctrine applies where the party seeking to rely on the non-existence of a condition precedent (i) had a duty to bring about the condition precedent or (ii) actively frustrated its occurrence. *Bankers Trust*, 450 F.3d at 128. Here, Plaintiffs have alleged that Defendant *did* have a contractual duty to notify Countrywide of various breaches. As Plaintiffs note, "Section 7.01 of the PSA provides that [Defendant] 'shall' give notice of Master Servicer

breaches, and the use of the word 'shall' clearly imports a mandatory obligation[.]"  (Pl. Opp. 13 (citing the PSA) (internal quotation marks omitted)).  And they have also alleged that Defendant actively delayed Events of Default by, *inter alia*, filing false trustee certifications (Compl. ¶ 139), accepting "servicer certifications it knew to be false" (*id.* at ¶¶ 142-45), and allowing foreclosures to proceed "using forged and robo-signed documents" (*id.* at ¶ 171).

This Court adheres to the standards that its sister courts have consistently upheld.  Under those standards, Plaintiffs' allegations suffice to state a claim for breach of contract.

### c.   The Countrywide Settlement and Article 77 Proceeding Do Not Bar Plaintiffs' Claims

Defendant next argues that, by operation of *res judicata*, the Countrywide Settlement and related Article 77 proceeding bar any claims arising from conduct after February 2011.  (Def. Br. 10-14)).  "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,'" claim preclusion and issue preclusion "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions."  *Taylor* v. *Sturgell*, 553 U.S. 880, 892 (2008).  It is settled law "that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."  *Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  That means this Court "must use the *res judicata* doctrine of" New

York to determine whether Plaintiffs are precluded from suing Defendant. *Logan* v. *Maveevskii*, 175 F. Supp. 3d 209, 233 (S.D.N.Y. 2016) (emphasis added) (citation omitted).

*Res judicata* refers both to claim preclusion and issue preclusion. For the former, New York courts have adopted a "transactional approach" to *res judicata*, which bars "a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citing *Smith* v. *Russell Sage Coll.*, 54 N.Y.2d 185 (1981)). This approach "prevents piecemeal litigation, so that a decision is dispositive not only of the theory of recovery alleged, but also of all other theories that might have been cited in support against the same wrong." *Bd. of Mgrs. of the 195 Hudson St. Condo.* v. *Jeffrey M. Brown Assocs., Inc.*, 652 F. Supp. 2d 463, 472 (S.D.N.Y. 2009). Claim preclusion "will not apply … if the parties intended to settle only one part of a single claim and intended to leave another part open for future litigation." *Building Serv. 32BJ Health Fund* v. *Nutrition Mgmt. Servs. Co.*, No. 15 Civ. 3598 (KBF), 2017 WL 946331, at *3 (S.D.N.Y. Feb. 10, 2017) (internal quotation marks and citation omitted).

Issue preclusion, also referred to as collateral estoppel, bars relitigation of an issue when "[i] the identical issue necessarily was decided in the prior action and is decisive of the present action, and [ii] the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans* v. *Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006). Under

New York law, the party invoking issue preclusion bears the burden of establishing that the same issue was decided in the prior action. *In re Sokol*, 113 F.3d 303, 306 (2d Cir. 1997). The opposing party must then establish the absence of a "full and fair opportunity to litigate the issue in the prior action." *Id.* Whether an opposing party had a full and fair opportunity to litigate requires an analysis of several factors, including "[i] the nature of the forum and the importance of the claim in the prior litigation; [ii] the incentive to litigate and the actual extent of litigation in the prior forum; and [iii] the foreseeability of future litigation (because of its impact on the incentive to litigate in the first proceeding)." *Id.* (quoting *Ryan* v. *N.Y. Tel. Co.*, 62 N.Y.2d 494, 501 (1984)).

Here, Defendant argues that *res judicata* bars Plaintiffs' claims in light of the Countrywide Settlement and the ensuing Article 77 proceeding. As an initial matter, the Court finds that it may consider the Countrywide Settlement and the Article 77 proceeding in deciding the instant motion. As Defendant rightly notes, the relevant documents are court records of which the Court may take judicial notice for purposes of ruling on a motion to dismiss pursuant to Rule 12(b)(6). *See, e.g.*, *Halebian* v. *Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (on a motion to dismiss, a court may consider "matters of which judicial notice may be taken"); *Toliver* v. *City of N.Y.*, No. 10 Civ. 3165 (PAC)(JCF), 2011 WL 4964919, at *3 (S.D.N.Y. Sept. 15, 2011) ("federal courts are empowered to take judicial notice of state court records and decisions"). Of course, the Court is limited in its consideration of such documents: It does so merely to establish

27

the existence of the documents, not to establish the truth of their contents. *Global Network Communications, Inc.* v. *City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Yet the Court is unpersuaded that the Countrywide Settlement and the Article 77 proceeding preclude Plaintiffs' claims. Plaintiffs here allege injuries over and above whatever injuries were directly caused by Countrywide and its successor, Bank of America, and whatever injuries may have been covered by the Countrywide Settlement. And they assert claims against Defendant not for the Trustee's conduct in negotiating and executing the Settlement Agreement, and not for Countrywide's own misconduct, but rather for the Trustee's conduct in performing its substantive duties under the PSA. Plaintiffs' claims were not extinguished by the Countrywide Settlement, and the damages sought are distinct from those for which Plaintiffs have recovered. Critically, the present action pertains to conduct not directly at issue in the Countrywide Settlement; accordingly, the facts necessary for Plaintiffs to substantiate their claims are distinct from those that were relevant to the Countrywide Settlement. There, it was Countrywide's conduct that was primarily at issue. Here, by contrast, Defendant's own performance under the PSA is squarely at issue.

### 2. Defendant's Motion to Dismiss Plaintiffs' Fiduciary Duty Claims Is Granted in Part and Denied in Part

Defendant seeks to dismiss Plaintiffs' breach of fiduciary duty claim for alleged failures to avoid conflicts of interest and to perform ministerial acts with due care. (Def. Br. 17-27). The claim divides temporally into pre- and

post-default claims.  As it did in another case involving substantially similar claims, this Court will consider the claims chronologically.  *See Blackrock Series S*, 247 F. Supp. 3d at 395.

      **a.**    **Defendant's Motion to Dismiss Plaintiffs' Pre-Default Fiduciary Duty Claims Is Granted**

"Prior to an Event of Default, the Trustee has only the contractual duties specified in the [governing agreements], which include providing notice to all parties to the [agreements] upon certain breaches of a representation or warranty." *Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon*, No. 14 Civ. 10104 (VEC), 2017 WL 3973951, at *2 (S.D.N.Y. Sept. 7, 2017) (citing *PL/BNYM*, 2015 WL 5710645, at *2); *see also Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 192 (S.D.N.Y. 2011).  These pre-default obligations are not construed as fiduciary duties but rather "as obligations whose breach may subject the trustee to 'tort liability.'" *Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 192 (citing *AG Capital Funding Partners, L.P.* v. *State Street Bank and Tr. Co.*, 11 N.Y.3d 146, 157 (2008)); *see also PL/DB*, 172 F. Supp. 3d at 719 ("[C]onflict of interest claims and the claims that [Defendant] did not perform ministerial acts with due care are not proper breach of fiduciary claims under New York law, and can only be pleaded in the complaint as negligence claims.").  Therefore, insofar as Plaintiffs' conflict-of-interest and due-care claims are pleaded as violations of Defendant's fiduciary duties, Plaintiffs fail to state a claim and Defendant's motion to dismiss is granted.

### b.   Defendant's Motion to Dismiss Plaintiffs' Post-EOD Fiduciary Duty Claims Is Denied

An Event of Default transforms a trustee's fiduciary duties.  As a sister court in this District has noted, a trustee's "duties are considerably different prior to a so-called Event of Default than after."  *PL/BNYM*, 2015 WL 5710645, at *2.  And as this Court has previously explained, a trustee's obligations "come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the [agreement]."  *Blackrock Series S*, 247 F. Supp. 3d at 395-96 (internal citations omitted).  Under the relevant PSA, after an EOD occurred, Defendant was required to "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs."  (Compl. ¶ 60).

As described above, Plaintiffs have alleged that EODs occurred when the Master Servicer:

> (i) fail[ed] to provide notice and to enforce repurchase of numerous loans that breached representation and warranty provisions[]; (ii) submit[ted] false servicer certifications[]; (iii) fail[ed] to maintain eligible certificate accounts for holding investor funds[]; and (iv) breach[ed] the applicable servicing standards by, among other things, fabricating loan documents, delaying foreclosures, and overcharging borrowers for default services[].

(Pl. Opp. 6 (citing Compl. ¶¶ 132, 142-45, 148-71)).  Plaintiffs also allege that "failures to deliver complete mortgage files and to repurchase loans in lieu of delivery for all the Trusts" constituted events of default that "require[d] no

notice and ha[d] no cure period." (*Id.*).  And Defendant breached its post-EOD

duty to act as would a prudent person by failing to (i) protect the interests of

the beneficiaries of the Covered Trusts, (ii) cause Countrywide to repurchase

loans eligible for repurchase and pursue remedies against parties that

breached their contractual duties, (iii) give notice to all parties to the PSA of the

breach of representations and warranties relating to the mortgage loans upon

discovery, (iv) provide certificateholders notice of Events of Default, and

(v) provide notice of Servicers' failure to adhere to prudent servicing standards.

(Compl. ¶ 227).

Just as these allegations sufficed to support a post-EOD claim for breach

of contract, they also suffice to support Plaintiffs' post-EOD claim for breach of

fiduciary duty.  However, for the reasons explained more fully below, the

portion of this claim that is duplicative in its remedy with Plaintiffs' breach of

contract claims is ultimately barred by the economic loss doctrine, and

Defendant's motion to dismiss that portion of the claim is granted.

### c. Defendant's Motion to Dismiss Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Granted

Plaintiffs' claim sounding in breach of the implied covenant of good faith

and fair dealing fails, as it is based on the same facts and seeks the same

remedies as the breach of contract claim.  "New York law ... does not recognize

a separate cause of action for breach of the implied covenant of good faith and

fair dealing when a breach of contract claim, based upon the same facts, is also

pled." *PL/DB*, 172 F. Supp. 3d at 721 (omission in original) (quoting *Harris* v.

*Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002)).  A plaintiff may prosecute "a claim for breach of the implied covenant of good faith and fair dealing simultaneously with a breach of contract claim 'only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract.'"  *Id.* (quoting *Page Mill Asset Mgmt.* v. *Credit Suisse First Bos. Corp.,* No. 98 Civ. 6907 (MBM), 2000 WL 335557, at *8 (S.D.N.Y. Mar. 30, 2000)).

Here, because Defendant's pre-EOD duties were coextensive with its contractual duties, the claim cannot stand.  *PL/BNYM*, 2015 WL 5710645, at *9.  Nor can the claim stand with respect to any post-EOD duties:  Plaintiffs argue only that Defendant breached this covenant in failing to fulfill its contractual obligations.  (*See* Compl. ¶¶ 230-32).  Plaintiffs' breach of contract and breach of implied covenant claims are based on the same alleged facts, and therefore the latter must fail.

### d.  The Economic Loss Doctrine Bars Plaintiffs' Extra-Contractual Claims That Seek Only the Benefit of Plaintiffs' Contract

Plaintiffs' fiduciary duty claims do not "allow evasion of the economic loss rule, which presents a second, distinct barrier" to extra-contractual claims stemming from contractual relationships.  *RP/HSBC*, 109 F. Supp. 3d at 599.  Under the economic loss rule, "a contracting party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use of familiar tort language in its pleadings."  *Phoenix Light SF Ltd.* v. *U.S. Bank Nat'l Ass'n*, No. 14 Civ. 10116 (KBF), 2016 WL 1169515, at *9 (S.D.N.Y. Mar. 22, 2016)

(quoting *17 Vista Fee Assocs.* v. *Teachers Ins. & Annuity Ass'n of Am.*, 693 N.Y.S.2d 554, 559 (1st Dep't 1999)).  Yet "the rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty." *Hydro Inv'rs, Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000) (citing *17 Vista Fee Assocs.*, 693 N.Y.S.2d at 554; *Robinson Redev. Co.* v. *Anderson*, 547 N.Y.S.2d 458, 460 (3d Dep't 1989)).  In applying this doctrine, a court must therefore scrutinize with care a plaintiff's proffered extra-contractual claims.

Courts in this District "have split with regard to the application of the economic loss doctrine to tort claims brought against an RMBS trustee." *Blackrock Series S*, 247 F. Supp. 3d at 399.  In each case, the applicability of the economic loss doctrine turned on the nature of the plaintiff's claims, whether alleging damages that flow from the violation of a professional duty, or merely from the violation of the governing agreements.  *Id.*  Courts have denied motions to dismiss where plaintiffs have pleaded tort claims grounded in extra-contractual duties.  *See, e.g.*, *PL/DB*, 172 F. Supp. 3d at 719; *RP/HSBC*, 109 F. Supp. 3d at 608-10.  By contrast, motions to dismiss have been granted where plaintiffs alleged only damages arising from a defendant's contractual obligations.  *See, e.g.*, *PL/U.S. Bank*, 2016 WL 1169515, at *9.

This Court draws the same line.  Just as was true in *Blackrock Series S*, 247 F. Supp. 3d at 400, here the economic loss doctrine does not require dismissal of Plaintiffs' due care and conflict of interest claims because Plaintiffs have pleaded that Defendant breached extra-contractual duties for which

Plaintiffs are owed damages that do not lie simply in the enforcement of Defendant's contractual obligations. But "insofar as Plaintiffs have pleaded that Defendant breached, for example, its post-EOD fiduciary duty in failing to act as it was contractually required to, the economic[ ]loss doctrine *does* bar Plaintiffs' claims." *Id.* The Court grants Defendant's motion to dismiss the subset of Plaintiffs' tort claims that allege damages that flow from the violation of the governing agreements.

### 3. Defendant's Motion to Dismiss Plaintiffs' TIA Claim Is Granted

Plaintiffs assert claims under the TIA, though they "acknowledge[] that the Second Circuit has held that the TIA does not apply to RMBS similar to certain of the RMBS at issue here." (Compl. ¶ 235 n.7). They pursue the claim only "to the extent there are any further developments in the law and for purposes of preserving any rights on appeal." (*Id.*). In fact, the law continues to be that claims under the TIA can only be asserted with respect to trusts governed by indenture agreements, such that any claims brought under the TIA with respect to the PSA-governed Trusts must be dismissed. *See Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chi.*, 775 F.3d at 155 (holding that the TIA does not "impose obligations on the trustees of RMBS trusts governed by pooling and servicing agreements"); *Commerzbank AG* v. *U.S. Bank Nat'l Ass'n*, No. 16 Civ. 4569 (WHP), 2017 WL 4318065, at *11 (S.D.N.Y. Sept. 27, 2017); *PL/DB*, 172 F. Supp. 3d at 721 (dismissing TIA claims with respect to PSA-governed trusts on this basis). Accordingly, the Court dismisses Plaintiffs' claims under the TIA.

**4. Defendant's Motion to Dismiss Plaintiffs' Streit Act Claims Is Granted**

Plaintiffs allege that Defendant violated Section 126(1) of the Streit Act when it failed to:

> [i] protect the interests of the beneficiaries of the Covered Trusts; [ii] take steps to cause Countrywide to repurchase loans eligible for repurchase and to pursue remedies against parties that breached their duties in connection with the collateral backing the Covered Trusts; [iii] give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans upon discovery; [iv] exercise prudence concerning the exercise of appropriate remedies following Events of Default; [v] provide certificateholders notice of Events of Default; and [vi] provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs.

(Compl. ¶ 227). Plaintiffs misconstrue the requirements of Section 126(1), which. as numerous courts in this District have held, "requires only that trust instruments include certain provisions, and does not itself impose any affirmative duties on trustees." *Commerzbank AG* v. *HSBC Bank USA, N.A.* (hereinafter, "*CB/HSBC*"), No. 15 Civ. 10032 (LGS), 2016 WL 3211978, at *2 (S.D.N.Y. June 8, 2016); *see also id.* at 2-3 (collecting cases holding the same, and noting the dearth of support for argument to the contrary); *PL/DB*, 172 F. Supp. 3d at 723 ("Section 126(1) does not create any additional duties for trustees beyond the duties in the PSAs, and only requires that certain types of provisions be included in the indenture agreement."); *accord, e.g., Blackrock Series S*, 247 F. Supp. 3d at 404; *PL/U.S. Bank*, 2016 WL 1169515, at *10-11; *RP/BNYM*, 2016 WL 899320, at *11; *PL/BNYM*, 2015 WL 5710645, at *11.

Plaintiffs here have failed to plead a claim under Section 126(1) of the Streit Act because they have not alleged that Defendant accepted a deficient trust instrument.  Section 126(1) imposes no further duty.

Plaintiffs also cite Section 130-e of the Streit Act in their pleadings, which provides that:

> [a] trustee, committee or any member thereof and a depositary may be removed by the court for cause shown upon the application of any person aggrieved by the act or omission to act of such trustee ... after such notice and opportunity to be heard in his or its defense as the court shall direct.

(Compl. ¶ 226 (emphasis omitted) (quoting N.Y. Real Prop. Law § 130-e)). Plaintiffs do not seek equitable relief contemplated by Section 130-e (i.e., the removal of the Defendant as trustee of the Trusts).  Instead, they appear eager to "bypass the available equitable relief ... to seek money damages[.]" *Commerzbank AG* v. *Deutsche Bank Nat'l Trust Co.* (*hereinafter "CB/DB"*), 234 F. Supp. 3d 462, 474 (S.D.N.Y. 2017).  In doing so, they seek "to read a broad statutory private right of action for money damages into Section 130-e." *Id.*

This Court has previously expressed skepticism about claims under Section 130-e where the plaintiff has failed to seek the equitable relief afforded by the statute.  *See Blackrock Series S*, 247 F. Supp. 3d at 405 n.11 ("[T]he Court is skeptical that such a claim could succeed even if pleaded properly."). So too have sister courts in this District.  *See CB/DB*, 234 F. Supp. 3d at 474; *Commerzbank AG* v. *Bank of N.Y. Mellon* (*hereinafter "CB/BNYM"*), No. 15 Civ. 10029 (GBD), 2017 WL 1157278, at *6 (S.D.N.Y. Mar. 21, 2017).  The Court

now joins its sister courts in holding that "[t]he exclusive remedy to an aggrieved party under Section 130-e is the removal of the trustee." *CB/DB*, 234 F. Supp. 3d at 474; *accord CB/BNYM*, 2017 WL 1157278, at *6. Because Plaintiffs have not pleaded that they are entitled to such relief, their claim under Section 130-e fails.

For the foregoing reasons, Defendant's motion to dismiss Plaintiffs' Streit Act claims is granted.

### 5. Plaintiffs Have Standing to Bring Claims Relating to the Sold Certificates

Finally, in a single paragraph at the end of its opening brief, Defendant argues that Plaintiffs lack standing to pursue claims associated with six of the Trusts because "Plaintiffs do not even currently hold certificates in [those T]rusts[.]" (Def. Br. 29).[6] Indeed, between 2011 and 2014, Plaintiffs sold certificates in six of the Trusts at issue here. (Compl. ¶ 198). Defendant asserts that, under New York law, "when an investor sells a security, it

---

[6]     In its supplemental letter brief, Defendant "respectfully request[ed] permission to withdraw this portion of its motion to dismiss" because (i) "standing implicates potentially disputed facts" such that "discovery would be necessary to evaluate plaintiffs' allegations of standing" and (ii) "related issues have become the subject of two pending appeals in the Second Circuit." (Def. Supp. 1-2). The Court declines Defendant's request. Faced with Defendant's assertion that Plaintiffs lack standing to bring claims related to the Sold Certificates, this Court will not ignore the issue. Standing is a "threshold question in every federal case." *Leibovitz* v. *N.Y. City Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001); *cf. Adarand Constructors, Inc.* v. *Mineta*, 534 U.S. 103, 110 (2001) (holding that courts are "obliged to examine standing *sua sponte* where standing has erroneously been assumed below"); *Thompson* v. *Cty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994) (noting that the court has an independent obligation to examine standing because it implicates the court's subject-matter jurisdiction). Accordingly, this Court analyzes Plaintiffs' standing to assert claims relating to the Sold Certificates. In so doing, the Court considers material outside the pleadings, including the parties' supplemental letter briefs. *See Makarova* v. *U.S.*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction … , a district court … may refer to evidence outside the pleadings.").

automatically sells any claims against the trustee." (Def. Br. 29 (citing N.Y. G.O.L. § 13-107(1) (1963)).

Plaintiffs, for their part, claim that Defendant "incorrectly presumes that New York law governs [Plaintiffs'] sale of the six sold Certificates." (Pl. Opp. 28). Instead, they argue that California law applies to determine whether, in selling the certificates, Plaintiffs also assigned their rights to bring the present claims against Defendant. (*Id.* at 29). They further argue that, under California law, "a transfer of securities, like the Certificates, does not automatically transfer legal claims." (*Id.*). Instead, "the assignment, to be effectual, must be a manifestation to another person by the owner of the right indicating his intention to transfer[.]" *Cockerell* v. *Title Ins. & Tr. Co.*, 42 Cal.2d 284, 291 (1954); *Sunburst Bank* v. *Exec. Life Ins. Co.*, 24 Cal. App. 4th 1156, 1164 (Cal. Ct. App. 2d Dis. 1994).

Although the PSA contains a governing law clause applying New York law to the agreement, that clause has "no relevance to the question whether the contracts of sale ... operated to assign certain rights of action." *Semi-Tech Litig., LLC* v. *Bankers Tr. Co.*, 272 F. Supp. 2d 319, 330 (S.D.N.Y. 2003) (internal quotation marks and citation omitted). Instead, that question is controlled by New York choice of law principles. *Id.*; *see also Royal Park Investments SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 4394 (AJN), 2017 WL 1331288, at *7 (S.D.N.Y. Apr. 4, 2017). For contract disputes, New York courts have adopted a "center of gravity" or "grouping of contacts" approach designed "to establish which State has the most significant

relationship to the transaction and the parties." *Zurich Ins. Co.* v. *Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994); *see also In re Liquidation of Midland Ins. Co.*, 16 N.Y.3d 536 (2011). That analysis requires the Court to consider (i) the places of contracting, negotiation, and performance; (ii) the location of the subject matter of the contract; and (iii) the domicile or place of business of contracting parties. *See Zurich Ins. Co.*, 84 N.Y.2d at 317; *Integon Ins. Co.* v. *Garcia*, 721 N.Y.S.2d 660, 661 (2d Dep't 2001); *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 227 (1993).

The pleadings, as supplemented by Plaintiffs' letter brief, strongly suggest that California law applies, and that Plaintiffs have standing to pursue claims relating to the Sold Certificates. Plaintiffs' principal place of business is in Newport Beach, California. (Compl. ¶¶ 16-17). PacLife "was the original purchaser for all the Sold Certificates, and managed its RMBS portfolio, including the Sold Certificates, from the Newport Beach Office." (Pl. Supp. 2). It "conducted all activities in connection with the sales of the Sold Certificates through employees at the Newport Beach Office." (*Id.*). The purchasers were located in California at the time of the sale. (*Id.*). The business records regarding the sale are located in California. (*Id.*). And the transactions were "market sales without sale contracts," such that they "did not involve any contract provisions assigning PacLife's legal claims to the buyers[.]" (*Id.*).

On this record, applying the "center of gravity" test, the Court finds that California law governs the relevant sales. The contracting, negotiation, and performance of the sales all appear to have occurred in California, which is also

the domicile or place of business of the contracting parties. The records of the relevant transactions are all located in California. And there is no countervailing evidence that the center of gravity for these transactions was New York.

Under California law, absent a manifestation of intent, a seller does not transfer legal claims to the buyer. *See, e.g.*, *Cockerell* v. *Title Ins. & Tr. Co.*, 42 Cal.2d 284, 291 (1954) ("[w]hile no particular form of assignment is necessary, the assignment, to be effectual, must be a manifestation to another person by the owner of the right indicating his intention to transfer"); *Heritage Pacific Fin., LLC* v. *Monroy*, 156 Cal. Rptr. 3d 26, 40 (Cal. Ct. App. 2013) ("the assignment of this contract right did not carry with it a transfer of [seller's] tort rights"); *cf. Royal Park Investments SA/NV* v. *HSBC Bank USA, N.A.*, No. 14 Civ. 8175 (LGS), 2018 WL 679495, at *4 (S.D.N.Y. Feb. 1, 2018) ("Consistent with common law principles, many jurisdictions do not recognize an assignment of a litigation right or claim when an underlying property is transferred unless the assignor manifests an intention to transfer the right." (internal quotation marks, alteration, and citations omitted)). Nothing submitted to this Court suggests that Plaintiffs manifested an intent to transfer their legal claims along with the sale of the relevant certificates. For that reason, the Court rejects Defendant's argument that Plaintiffs lack standing to bring claims relating to the Sold Certificates, though Defendant is free to renew the argument, as appropriate, upon discovery of facts to the contrary.

**CONCLUSION**

For the foregoing reasons, Defendant's motion is GRANTED in part and DENIED in part, as described in the text of this Opinion. The Clerk of Court is directed to terminate Docket Entry 28. The parties are hereby ORDERED to file a Case Management Plan on or before **April 30, 2018**.

SO ORDERED.

Dated:     March 16, 2018
             New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge