**WOLLMUTH MAHER & DEUTSCH LLP**
500 FIFTH AVENUE
NEW YORK, NEW YORK 10110

———————

TELEPHONE (212) 382-3300
FACSIMILE (212) 382-0050

August 5, 2019

*By ECF*
The Honorable Katherine Polk Failla
United States District Court Judge for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> *Pacific Life Ins. Co., et al.  v. The Bank of New York Mellon*, 17-cv-1388-KPF
> **Subject: Pacific Life's Post-Conference Submission**

Dear Judge Failla:

This is Pacific Life's post-conference submission, as directed at our July 15, 2019 conference. In Point I, we detail what Pacific Life still needs, and why we are still entitled to it, in light of BNYM's opposition and any questions raised by the Court. 7/15/2019 Conf. Tr. at 105:15-106:3. In Point II, we supplement our objection to BNYM's outstanding requests. In Point III, we discuss other discovery disputes that have become ripe since the conference.

**I. BNYM should be compelled to provide the discovery requested in Pacific Life's motion; the court hearing and subsequent discovery have enhanced rather than obviated the need for this discovery (ECF 91 (Pacific Life's 6/18/19 Motion)).**

**A. Pacific Life is entitled to loan-by-loan discovery where BNYM demands loan-by-loan proof; therefore, BNYM must (a) identify exception reports, and (b) produce documents supporting its assertion that exceptions were cured, particularly documents showing when and how exceptions were cured.**

Interrogatory 2 states: "Identify all of the Exception Reports for each of the Covered Trusts." ECF 91-1 p. 7 of 9. BNYM admits that it did not produce the exception reports in any organized manner. 7/15/2019 Conf. Tr. at 56:24-57:11. BNYM even produced exception reports unattached to their certifications. For example, we believe that the final certification for CWALT 2007-24 is at BNYM-PacLife_00409380, while the final exception report is at BNYM-PacLife_00114464. Discovery should not be a guessing game. BNYM should be compelled to answer Interrogatory 2 and identify all the exception reports for each of the at-issue trusts.[1]

---

[1] Exception Reports include exception reports attached to Initial Certifications, Delay Delivery Certifications, Final Certifications, exception reports generated after Final Certifications, and exception reports generated in connection with the Article 77 Settlement. ECF 91-1 p. 4 of 9.

BNYM also refuses to produce documents showing how and when exceptions were "cured". BNYM argued that information about how and when exceptions were cured is irrelevant because BNYM claims that Pacific Life only needs evidence of one uncured exception to prove its alleged Events of Default ("EOD"). 7/15/2019 Conf. Tr. at 37:8-14. Pacific Life, of course, is entitled to discovery concerning more than one document exception per trust. It is true that Pacific Life can prove EODs based on produced documents, but that is only half the story.

**Automatic EODs.** Under the PSAs, the failure to repurchase "Delay Delivery Loans" in lieu of cure is an automatic EOD. PSA § 7.01(ii) (stating that the sixty-day cure period after notice for other EODs "shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery").[2] As BNYM's Rule 30(b)(6) witness testified, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Ex. 1 (Young 30(b)(6) Tr.) 39:03-39:17, 49:13-49:24. Because BNYM produced the final exception reports, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See id.* at 51:17-51:25. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See id.* at 52:03-52:25. But BNYM either knew EODs resulted from the Delay Delivery Mortgage Loan deficiencies or was willfully blind to the EODs.

Either way, after EODs, BNYM has the duty to "use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." PSA § 8.01. BNYM had the power to enforce repurchase of loans with document exceptions, and was required to exercise that power prudently after EODs.[3] BNYM also had the duty to enforce repurchase of loans with document defects before an EOD.[4]

**Discovery of "cures" is relevant to issues beyond EODs.** How and when exceptions were allegedly cured also is important to determining the universe of document defect loans that

---

[2] "PSA" refers to the PSA for CWALT 2006-32CB, which is representative of the PSAs in this action. An excerpted copy of the CWALT 2006-32CB PSA is attached as Exhibit 14.

[3] Section 2.01(b) of the PSA provides that "the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with *the Depositor's right to require each Seller to cure any breach of a representation or warranty made herein by such Seller, or to repurchase or substitute for any affected Mortgage Loan in accordance herewith*." PSA § 2.01(b) (emphasis added).

[4] Pursuant to Section 2.06 of the PSA, the trustee "agrees to hold the Trust Fund and exercise *the rights referred to above* for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement, to the end that the interests of the Holders of the Certificates may be adequately and effectively protected." PSA § 2.06 (emphasis added). The "rights referred to above" include the rights under Section 2.03(c), which refers to the rights to have the Seller repurchase loans subject to a breach of representation and warranty. PSA § 2.03(c).

should have been repurchased. BNYM admits that Pacific Life cannot determine when document exceptions were cured based on the reports produced:

> They're also asking for the cure dates, and it's true that if the only reports you have are 2011 and 2019 and the 2019 report states that it must have been cured, you can't tell when it was cured . . . . It is possible, by looking up not loan by loan but document by document, the history of that document. It is not possible to run a query on the database that says, give me the cure date for each document. So what we would have to do to generate the cure date is to manually go into the system for each of 33,000 exceptions, type in the loan number . . .

7/15/2019 Conf. Tr. at 52:23-53:11. As an initial matter, BNYM produced the current exception reports on the last day of discovery and claimed at the court conference that "it was over the last couple months that we were figuring out" how to produce exception reports that did not drop liquidated loans. *Id.* at 41:11-23. However, BNYM's 30(b)(6) deponent said that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 at 96:23-99:21. Thus, BNYM's delay in producing the current exception reports appears unjustified.

In any event, comparing the current exception reports (which were not produced for all the trusts) to older exception reports does not show how or when exceptions were cured, and cannot be a substitute for actual discovery into alleged cures. Actual discovery is needed because there are significant issues as to how and when exceptions were cured.

For example, it is unclear how missing title insurance policies dropped from BNYM's exception reports. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See*, *e.g.*, Ex. 2 at BNYM_PacLife_01426437. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 3 at BNYM-PacLife_01590571. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4 at BNYM-PacLife_01406031-32. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 5 at BNYM-PacLife_01426443.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 at 173:16-24, 233:22-234:23; ▮▮▮▮▮▮▮ *id.* at 173:21-174:13, 203:04-203:17; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at 198:09-22; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at 233:22-234:04; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at 233:04-20. The Rule 30(b)(6) deponent was not a cure for BNYM's failure to produce relevant documents and answer interrogatories. Given these facts, Pacific Life is entitled to discovery as to how and when exceptions were cured, if they were actually cured at all. At a minimum, BNYM should be required to provide discovery as to how and when title insurance policy exceptions were cured.

If BNYM does not identify exception reports in response to Pacific Life's interrogatories, it should not be permitted to contend that Pacific Life has identified the incorrect exception report at summary judgment or trial. If BNYM does not provide discovery into how and when exceptions were "cured," BNYM should not be permitted to contend that they were cured. Such an order is within the Court's powers under Rule 37(c). And such an order would be required as a matter of fairness as BNYM should not be able to rely upon a claimed cure that it refused to document in discovery, and to prevent sandbagging at summary judgment or trial by permitting BNYM to make arguments that Pacific Life was not allowed to test in discovery. *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 606–07 (S.D.N.Y. 2004).

### B. The BNYM committee documents relate to corporate trust activities, BNYM cannot say they are irrelevant because they never bothered to review them, and BNYM has not presented any evidence of undue burden.

Although BNYM has failed to search for any board of director or committee agendas, minutes and related documents, Pacific Life has limited its motion to the following committees in addition to the board of directors. The descriptions are taken from BNYM's own documents.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 6 at BNYM-PacLife_00161252 (chart's "purpose of committee" entry for Corporate Trust Oversight Committee) (emphasis

added). Given that Countrywide was a major corporate trust client, *see infra* pp. 6-7, it is hard to imagine that this committee would not have addressed issues concerning Countrywide RMBS. BNYM does not contend that the material is irrelevant or would be too burdensome to review and produce. BNYM has no idea of the relevance or burden because it refuses to even look. 7/15/2019 Conf. Tr. at 67:11-25.



Ex. 6 at BNYM-PacLife_00161252 (Attachment 1) (emphasis added).

Ex. 7 at BNYM-PacLife_00333886 (emphasis added).

*See* Ex. 6 at BNYM-PacLife_00161252 (Attachment 2) (emphasis added).

While we cannot know the content of documents that BNYM has not produced, it is likely that the above committees discussed relevant issues concerning Countrywide RMBS.

Ex. 8 at BNYM-PacLife_01409977.

Finally, BNYM's claim that Plaintiffs should have moved to compel sooner is without merit. First, BNYM actually agreed to search for and produce some Board of Directors documents, without the use of electronic search terms, leading Pacific Life to believe that they might receive sufficient documents without Court intervention. Ex. 9 at BNYM Resp. No. 8 ("Defendant will produce non-privileged presentations to Defendant's board of directors, management committees, or senior management committees, if any, concerning the procedures or policies applicable to Defendant's Trusteeship over the Covered Trusts that are within its possession, custody, or control.") Second, while BNYM objected to some requests concerning committee documents, BNYM objected to or refused to produce documents in response to approximately 78 requests before meeting and conferring. It would not have been reasonable to race to Court to file a motion to compel without trying to resolve as many of those issues as possible. Third, BNYM produced the bulk of its documents between March and June 2019.

Pacific Life promptly reviewed the productions and on May 2 notified BNYM of multiple production deficiencies, including that "BNYM has not produced any documents from its Board of Directors, Board Subcommittees, or multiple internal committees which were involved with the administration, supervision, or monitoring of RMBS trusts [including] BNYM Board of Directors, Board of Directors' Risk Subcommittee, Board of Directors Audit Subcommittee…." Ex. 10 at 3-4. In short, there was no delay.

### C. BNYM has not shown that it adequately searched its shared drive folders.

BNYM has trickled out information about its review of shared drive folders. BNYM initially told us that it only reviewed the 13 trust specific folders for the at-issue trusts. This prompted Pacific Life's motion to compel. In its opposition, BNYM stated that it reviewed an additional 1,500 documents and produced 48 documents from other folders. ECF 92 at 3. At the court conference, BNYM further disclosed that there are over 500,000 "file paths," "meaning a name for a folder or a subfolder" in the "shared drive with respect to document custody and corporate trust." 7/15/2019 Conf. Tr. at 76:15-19. Assuming conservatively that there are ten documents in a folder, this means that BNYM reviewed approximately 150 of the 500,000 file paths or folders.

According to BNYM, the shared drive is just for corporate trust; not the entire bank. It makes little sense that such a small number of shared drive folders were reviewed given that this case involves Countrywide RMBS and Countrywide was BNYM's top RMBS client leading up to the financial crisis. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ Ex. 11 at 34:14-25. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 12 at BNYM-PacLife_01445300. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 13 at BNYM-PacLife_01420820. Pacific Life is not asking BNYM to review the trust-specific folders related to the 706 Countrywide trusts not at issue in this case. Rather, Pacific Life is concerned that there has not been an adequate search of the folders related to general Countrywide issues.

This concern is not mere speculation; it is based on BNYM having reviewed only *1,500 documents* resulting in the production of only *48 documents* from approximately *500,000 shared drive folders*. Given this low volume of documents reviewed and even lower volume of documents produced, BNYM, at a minimum, should be required to disclose the non-trust specific folders that it reviewed and any non-trust specific Countrywide folders that it elected not to review. Absent such information, there is no way to test the adequacy of BNYM's search that yielded the production of only 48 documents.

### D. BNYM should provide a Rule 30(b)(6) witness on BNYM's lending relationship with Countrywide.

BNYM appears confused about the scope of this topic. The billion dollar lending arrangement *is* the repo lending facility involving BNYM and Countrywide. While BNYM made

a corporate witness available to testify as to its billions of dollars of other lending relationships with Countrywide in other cases and Pacific Life does not seek to repeat that testimony, BNYM has not made a witness available to discuss its repo lending facility. The repo lending facility, which is called a tri-party repo, involved three parties: (1) Countrywide, which borrowed cash using securities, including we believe Countrywide RMBS, as collateral; (2) cash investors who lent Countrywide cash and took the securities as collateral; and (3) BNYM which was the "clearing bank." While BNYM seeks to downplay its role as just an "intermediary," BNYM actually had great exposure to Countrywide through this lending arrangement. Because a tri-party repo is unwound on a daily basis, the clearing bank, BNYM, provided Countrywide daily credit (equal to the entire facility) secured by Countrywide securities. *See* The Federal Reserve Bank of New York*, * White Paper, *Tri-Party Repo Infrastructure Reform*, May 17, 2010, at 10.[5] Extending intraday credit to Countrywide was a significant component of BNYM's relationship with Countrywide and came with significant risk. The Federal Reserve Bank of New York described the risk in its White Paper:

> The market's dependence on a substantial amount of intraday credit supplied by the clearing banks to facilitate the clearing and settlement of securities creates the potential for two important destabilizing outcomes. First, the daily hand-off of credit extensions between overnight cash lenders and clearing banks creates an incentive for each to reduce its exposure quickly by pulling away from a potentially troubled dealer before the other one does. Indeed, as dealers came under severe stress, *clearing banks reconsidered their longstanding practice of routinely extending intraday credit, as they recognized the potential risk it posed to them. In the event of an intraday default, a clearing bank would have to take the dealer's entire portfolio onto its balance sheet*.

*Id*. at 13 (emphasis added). BNYM was tightly bound to Countrywide, so much so that BNYM faced the prospect of inheriting large swaths of Countrywide securities, if Countrywide defaulted on its financing arrangement. BNYM argues that there can be no conflict because it was allowed to enter banking relationships with Countrywide. ECF 92 at 3. This may be true, but the conflict of interest claim is that BNYM placed its own interests and its relationship with Countrywide above its duty of loyalty to investors such as Pacific Life. Establishing this claim requires discovery into the relationship between BNYM and Countrywide.

BNYM also argues that Pacific Life should be denied this topic because an Ohio court relieved BNYM of answering an interrogatory concerning the repurchase lending relationship. The interrogatory in the Ohio action sought the names of individuals at BNYM that had discussions with the Federal Reserve Bank of New York concerning the repo lending facility. ECF 92-3 at 4 of 24. The Ohio state court did not preclude all discovery into the repo lending arrangement, but rather granted a protective order as to the discrete interrogatory primarily because of bank examination privilege issues. *Id*. at 22 of 24. The 30(b)(6) topic is different from the interrogatory in the Ohio action, and BNYM does not even assert privilege objections as to the topic.

---

[5] *Available* at https://www.newyorkfed.org/medialibrary/media/banking/nyfrb_triparty_whitepaper.pdf.

**II. BNYM's interrogatories are premature, unnecessary, and improper. (ECF 99 (BNYM's 7/2/2019 Motion); 101 (Pacific Life's 7/11/2019 Opposition))**

Based on the court conference, we do not believe there are disputes concerning the following interrogatory responses:

**Interrogatories 18 and 22 (interrogatories for which BNYM raised no specific issues)**: As discussed at the court conference, BNYM's motion does not raise any specific issues concerning Pacific Life's responses to interrogatories 18 and 22. 7/15/2019 Conf. Tr. at 96:19-97:15. While the Court suggested that our answer to 18 was better than our answer to 22 (*id.*), Pacific Life fully responded to Interrogatory 22 by disclosing the reasons Pacific Life denied certain requests for admissions. In the weeks since the conference, BNYM has not raised any specific complaints to us concerning our answer to Interrogatory 22.

**Interrogatories 8, 9 and 10 (Interrogatories Pacific Life agreed to answer)**: Pacific Life has agreed to respond to these interrogatories as best it can 30 days after the conclusion of BNYM's Rule 30(b)(6) deposition (which concluded on Friday) and receipt of BNYM's responses to Pacific Life's requests for admissions (responses received this evening). *Id.* at 94:6-95:3.

We understand there are disputes concerning the following interrogatories:

**Interrogatories 15 and 20 (premature damages interrogatories)**: Interrogatory 15 requires an expert damages report to answer as it seeks the difference between Pacific Life's damages in this action and what Pacific Life received through the Countrywide Article 77 settlement, and Interrogatory 20 seeks an advance damages report. Interrogatory No. 15 is premature, and Interrogatory 20 is both premature and improper as BNYM will receive the requested information in a damages expert report.

**Interrogatory 12 (premature and overbroad interrogatory seeking each material fact and document identifying a breaching loan)**: Interrogatory 12 requests: "State each material fact and Document that identifies any specific loan as to which you contend BNYM discovered breaches of representations or warranties." Interrogatory 12 is premature as BNYM will receive expert reports that identify all the breaching loans in the at-issue trusts. Additionally, as explained in our opposition letter, interrogatories, such as Interrogatory 12, seeking "each material fact and document" are inherently overbroad and improper. ECF 101 at 2.

**Interrogatories 13 and 14 (overbroad interrogatories concerning the basis of contentions in the complaint)**: During the court conference, BNYM described these interrogatories as just asking if Pacific Life is still making two contentions in its complaint. 7/15/2019 Conf. Tr. at 90:6-17. If this is all the interrogatory seeks, Pacific Life will supplement its responses to confirm whether it is still making the two contentions. However, the interrogatories ask for far more information, and information that was not even available to Pacific Life when it filed its complaint. The interrogatories ask for the identification of "each material fact and Document" that identifies a loan with a representation and warranty breach or a document defect. As BNYM does not appear to be seeking that information based on its statements at the court conference, and such information would be premature before expert

discovery (when experts will assist in identifying such loans) and would be unduly burdensome to provide in response to interrogatories, those portions of Interrogatories 13 and 14 should be stricken as shown below.

> **Interrogatory No. 13:** State all bases for Pacific Life's contention, in paragraph 130 of the Complaint, that, if BNYM "had provided the required notices, it would have forced Countrywide to repurchase the defective loans pursuant to the repurchase protocol in the PSAs and Countrywide would not have been able to issue additional fraudulent RMBS certificates," ~~including each material fact and Document that identifies the specific loans that you contend should have been repurchased and the related Covered Trust~~.
>
> **Interrogatory No. 14:** State all bases for Pacific Life's contention, in paragraph 200 of the Complaint, that, "document delivery failures have placed a cloud over title and have limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts, which has ultimately impacted the market value of the Certificates," ~~including each material fact and Document that identifies the specific properties that have been affected, the impact on market value of the related Certificate, and the related Covered Trust~~.

**Interrogatories 6, 7 and 17 (overbroad and unduly burdensome interrogatories seeking contentions concerning BNYM's affirmative defenses)**: Even if these interrogatories sought contentions relevant to Pacific Life's claims as opposed to BNYM's affirmative defenses, they would be overly broad and unduly burdensome because they demand that Pacific Life catalogue every "act or omission, when it occurred, what duty or obligation it breached, and how it caused you to sustain losses" (Interrogatories 6 and 7) or with respect to BNYM's bad faith "each such act and the basis for your contention" (Interrogatory 17). As discussed above, interrogatories seeking all facts or all acts are impermissible. *See supra* p.8.  We also note that BNYM's notion of burden differs depending on whether it is asking or answering discovery requests. Whereas BNYM demands granular detail of loan-level breaches from Pacific Life, it refuses to provide discovery of loan-level breaches or even identify trust-level exception reports.

Additionally, these interrogatories are improper because they seek contentions concerning BNYM's affirmative defenses. Interrogatories 6 and 7 essentially request Pacific Life to show why each breach claim is timely, when it is BNYM's burden to show that claims are untimely. For example, Interrogatory 7 explicitly demands Pacific Life to state whether it contends claims "are not barred by any applicable statute of limitations." As for Interrogatory 17, it says: "State whether you contend that BNYM acted in other than good faith and/or on the belief that its conduct was not consistent with BNYM's duties as Trustee, and identify each such act and the basis for your contention." As explained in our opposition letter (ECF 101 at 3), this interrogatory relates to BNYM's so-called "good-faith" defense.  If there is such a defense, it requires BNYM to show that it acted in "good-faith," not for Pacific Life to prove that BNYM acted in bad faith. Pacific Life simply has to show that BNYM breached the contracts or committed torts. Showing "bad faith" is not an element of those claims.

### III. BNYM should be directed to provide additional interrogatory response and to provide compliant privilege logs. (New Motions)

By way of update, since the July 15 conference, Pacific Life has filed two additional discovery motions. First, Pacific Life filed a motion to compel BNYM to respond to its second set of interrogatories. ECF 103. BNYM refuses, without justification, to answer interrogatories seeking information central to this case, including breach notices, document exception information, and what, if anything, BNYM contends it did to fulfill its post-EOD duties. BNYM should be compelled to answer the second set of interrogatories. Second, Pacific Life filed a motion to compel BNYM to provide a proper privilege log. ECF 110. BNYM's categorical log omits essential information; aggregates mismatched documents into haphazard collections covering vast spans of time; and asserts compound, boilerplate justifications that cannot apply across the category, and may not apply at all. A categorical log is not a license to ignore the requirements of the Local Rules and produce a privilege log that frustrates rather than facilitates privilege review. Pacific Life asks the Court to order BNYM to create a compliant document-by-document log, or such other log that the Court deems appropriate, that contains all of the data-points required by Local Rule 26.2.

### Conclusion

For the reasons set forth above and in Pacific Life's prior submissions and at the July 15 court conference, Pacific Life requests that the Court grant Pacific Life's motion to compel (ECF 91) and deny BNYM's motion to compel (ECF 99).

Respectfully submitted,

*/s/ Ryan A Kane*

Ryan A. Kane

Attachments