UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PACIFIC LIFE INSURANCE COMPANY and PACIFIC LIFE & ANNUITY COMPANY,<br><br>Plaintiffs,<br><br>-v.-<br><br>THE BANK OF NEW YORK MELLON,<br><br>Defendant. | 17 Civ. 1388 (KPF)<br><br>**SEALED<br>OPINION AND ORDER<br>ADOPTING IN PART<br>REPORT AND<br>RECOMMENDATION** |

KATHERINE POLK FAILLA, District Judge:

    This case is one of many emanating from the 2008 financial crisis and the concomitant implosion of the residential mortgage-backed securities ("RMBS") market. Plaintiffs Pacific Life Insurance Company and Pacific Life & Annuity Company ("Plaintiffs") brought this suit against The Bank of New York Mellon ("Defendant") in 2017. Specifically, Plaintiffs contend that Defendant, acting as the trustee of several RMBS trusts, breached numerous duties to certificateholders like Plaintiffs by failing to enforce certain obligations imposed on Countrywide Home Loans, Inc. ("Countrywide") pursuant to various trust documents.

    This case has had an extensive procedural history; this Court has already decided both a motion to dismiss and a motion for reconsideration. Most recently, Judge Robert W. Lehrburger issued a comprehensive report and recommendation (the "Report") on the parties' dueling summary judgment motions. The Report addresses several threshold issues; if adopted, the Report would substantially narrow the issues left in this case. For the reasons that

follow, the Court adopts the Report's standing findings; adopts the Report's issue preclusion findings; adopts in part the Report's statute of limitations findings; adopts the Report's tort claims findings; and adopts those findings to which the parties have not objected.  Ultimately, the Court refers this case back to Judge Lehrburger for proceedings consistent with this Opinion.

## BACKGROUND[1]

### A.    Factual Background

The Court has discussed the factual and procedural backgrounds of this case at length in two prior decisions.  *See Pac. Life Ins. Co.* v. *Bank of N.Y. Mellon*, No. 17 Civ. 1388 (KPF), 2018 WL 1382105 (S.D.N.Y. Mar. 16, 2018) ("*PacLife I*") (granting in part and denying in part Defendant's motion to dismiss); *Pac. Life Ins. Co.* v. *Bank of N.Y. Mellon*, No. 17 Civ. 1388 (KPF), 2018 WL 1871174 (S.D.N.Y. Apr. 17, 2018) ("*PacLife II*") (denying Defendant's motion

---

[1]    This Opinion draws its facts primarily from the parties' Local Rule 56.1 statements submitted in connection with their cross-motions for summary judgment.  These include Defendant's Local Rule 56.1 Statement of Undisputed Facts (Dkt. #233 ("Def. 56.1")); Plaintiffs' counter-statement of undisputed facts (Dkt. #255 ("Pl. 56.1")); Defendant's reply to Plaintiffs' counter-statement of undisputed facts (Dkt. #265 ("Def. Reply 56.1")); and Plaintiffs' reply counter-statement of undisputed facts (Dkt. #276 ("Pl. Reply 56.1")).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  The Court also references the declarations submitted by the parties in connection with their cross-motions for summary judgment and the exhibits thereto, which are cited using the convention "[Name] Decl., Ex. [ ]."  In particular, the Court draws heavily from the settlement agreement between Defendant and Countywide/Bank of America (Houpt Decl., Ex. 17 ("Settlement")); the Amended Expert Report of Christopher J. Milner (Dkt. #252-1 ("Milner Report")); and the Pooling and Servicing Agreement for CWALT 2006-32CB (Houpt Decl., Ex. 49 ("PSA")).

For ease of reference, the Court refers to Defendant's partial objection to the Report as "Def. Br." (Dkt. #297); to Plaintiffs' objections as "Pl. Br." (Dkt. #298); to Defendant's opposition to Plaintiffs' objections as "Def. Opp." (Dkt. #300); to Plaintiffs' opposition to Defendant's objection as "Pl. Opp." (Dkt. #299); to Plaintiffs' reply in further support of their objections as "Pl. Reply" (Dkt. #302); and to Defendant's reply in further support of its objection as "Def. Reply" (Dkt. #305).

for reconsideration).  Given the specificity of those decisions, the absence of dispute as to the basic background facts, and the comprehensiveness of Judge Lehrburger's Report, the Court limits its factual recitation in this Opinion.  In particular, the Court focuses on three factual matters relevant to the issues of preclusion and timeliness: (i) the settlement entered into between Defendant and Countrywide in 2011 (the "Settlement"); (ii) the state court proceeding conducted pursuant to New York Civil Practice Law and Rules ("CPLR") Article 77 ("Article 77") to approve the Settlement; and (iii) Plaintiffs' claims in this litigation.

B.   **Procedural Background**

Plaintiffs filed the complaint in this case on February 23, 2017.  (Dkt. #1).  Shortly thereafter, Defendant moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. #28-30).  The Court granted in part and denied in part Defendant's motion in *PacLife I*.  (Dkt. #53).  *See PacLife I*, 2018 WL 1382105, at *1.  Defendant then moved for reconsideration of the Court's decision, arguing that the Court had misapprehended the significance of certain facts and overlooked controlling appellate authority.  (Dkt. #57-58).  The Court denied this motion, finding in *PacLife II* that Defendant's arguments failed to meet the "strict standard" applicable to motions for reconsideration.  (Dkt. #61).  *See PacLife II*, 2018 WL 1871174, at *1.  Following *PacLife II*, Defendant filed its answer to the complaint (Dkt. #62) and the parties proceeded to discovery (Dkt. #66).

On October 2, 2020, Plaintiffs and Defendant filed motions *in limine* to exclude the testimony of the other side's expert witnesses. (Dkt. #150-165). The Court referred the motions, as well as the parties' contemplated motions for summary judgment, to Judge Lehrburger for resolution on December 8, 2020. (Dkt. #213). On February 22, 2021, Judge Lehrburger issued a decision on the parties' respective motions *in limine*, granting them in part and denying them in part. (Dkt. #216). *See Pac. Life Ins. Co.* v. *Bank of N.Y. Mellon*, No. 17 Civ. 1388 (KPF) (RWL), 2021 WL 673479, at *1 (S.D.N.Y. Feb. 22, 2021). Defendant filed objections to Judge Lehrburger's decision on March 8, 2021 (Dkt. #218), and the Court rejected Defendant's objection and affirmed Judge Lehrburger's decision on November 15, 2021 (Dkt. #278). *See Pac. Life Ins. Co.* v. *Bank of New York Mellon*, 571 F. Supp. 3d 106, 110 (S.D.N.Y. 2021).

Following the submission of the parties' motions *in limine* but prior to the Court's order affirming the challenged portions of Judge Lehrburger's decision on those motions, the parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. More specifically, on June 7, 2021, Defendant filed its motion for partial summary judgment and supporting papers. (Dkt. #231-236). On August 6, 2021, Plaintiffs filed a consolidated cross-motion for summary judgment and brief in opposition to Defendant's motion. (Dkt. #245-253). Defendant then filed its consolidated brief in opposition to Plaintiffs' motion and reply brief in further support of its motion on October 5, 2021. (Dkt. #262-263). On November 4, 2021, Plaintiffs filed their reply brief in further support of their motion. (Dkt. #275-277). After the

close of briefing, on February 2, 2022, Judge Lehrburger held oral argument on the motions.  (*See* Minute Entry for February 2, 2022).

In a meticulous report and recommendation dated February 22, 2022, Judge Lehrburger resolved certain threshold issues raised in the parties' submissions and deferred judgment on the merits of the parties' claims pending this Court's resolution of any objections to the Report.  (Dkt. #292 ("Report")).  *See Pac. Life Ins. Co.* v. *Bank of New York Mellon*, No. 17 Civ. 1388 (KPF) (RWL), 2022 WL 1446552, at *1 (S.D.N.Y. Feb. 22, 2022).  As a preliminary matter, Judge Lehrburger found that Plaintiffs had standing to bring their claims in federal court.  (Report 4).  Notwithstanding their ability to sue, however, Judge Lehrburger concluded that Plaintiffs were precluded from bringing the bulk of their claims by the doctrine of *res judicata.*  (*Id.*).  "If adopted," Judge Lehrburger explained, his finding as to *res judicata* would "dispense with most of [Plaintiffs'] claims."  (*Id.*).  Judge Lehrburger also resolved several other issues, finding that (i) most of Plaintiffs' claims were also time-barred; (ii) Defendant was entitled to summary judgment on Plaintiffs' claims for negligence; (iii) Defendant was not entitled to summary judgment on claims related to two trusts that incurred no monetary damages; and (iv) Plaintiffs were entitled to summary judgment on Defendant's affirmative defenses grounded in champerty, monoline insurance, collateral source recovery, mitigation, and reliance, all of which Judge Lehrburger found to have been abandoned.  (*Id.*).  Lastly, Judge Lehrburger requested that the case be

remanded to him following this Court's resolution of the parties' objections to the Report in order to allow him to resolve any surviving claims. (*Id.*).

On February 23, 2022, the Court issued a scheduling order staying the case to allow the parties additional time to brief their objections to the Report. (Dkt. #294). The parties filed their objections on April 6, 2022 (Dkt. #297 (Defendant), 298 (Plaintiffs)), briefs in opposition to the other's objections on May 18, 2022 (Dkt. #299 (Plaintiffs), 300 (Defendant)), and reply briefs on June 8, 2022 (Dkt. #302 (Plaintiffs), 305 (Defendant)). Over the ensuing months, the parties have filed notices of supplemental authority, as well as responses to such notices. (Dkt. #308-313, 318).

On July 14, 2023, the Court filed and provided to the parties an unredacted copy of this Opinion under seal and allowed the parties to propose redactions in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). On or before **August 11, 2023**, the parties shall file a joint letter suggesting redactions to the Opinion. Taking the parties' suggestions into consideration, the Court will then file a redacted version of the Opinion on the public docket.

## DISCUSSION

### A.  Applicable Law

#### 1.  Reports and Recommendations of a Magistrate Judge

When reviewing a magistrate judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see*

*generally United States* v. *Romano*, 794 F.3d 317, 340 (2d Cir. 2015).  "To accept those portions of the Report to which no timely objection has been made, ... a district court need only satisfy itself that there is no clear error on the face of the record."  *Herrara* v. *12 Water St. Gourmet Cafe, Ltd.*, No. 13 Civ. 4370 (JMF), 2016 WL 1268266, at *1 (S.D.N.Y. Mar. 31, 2016).  By contrast, a district court must review *de novo* "those portions of the Report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3); *Miller* v. *Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022).  In undertaking this review, "[i]t is sufficient that the Court 'arrive at its own independent conclusion regarding those portions of the Report to which objections are made,' and the Court 'need not conduct a *de novo* hearing on the matter.'"  *City of Almaty* v. *Sater*, No. 19 Civ. 2645 (JGK), 2022 WL 1555542, at *2 (S.D.N.Y. May 16, 2022) (quoting *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 69 (S.D.N.Y. 2019)).

### 2.   Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Vt. Teddy Bear Co.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).[2]  A fact is "material" if it "might affect the outcome of

---

[2]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or other materials, but cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v.

---

guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Borley* v. *United States*, 22 F.4th 75, 78 (2d Cir. 2021) (internal alterations omitted).

## B.    Analysis

Judge Lehrburger's Report addresses four threshold issues: (i) standing; (ii) *res judicata*; (iii) timeliness; and (iv) the sufficiency of Plaintiffs' evidence as to their tort claims. Defendant has filed a narrow set of objections to the Report, challenging Judge Lehrburger's standing analysis and a limited set of his findings with respect to *res judicata* and timeliness. Plaintiffs mount the

inverse challenge to the Report, defending the Report's standing analysis, but arguing that the balance of its findings and recommendations should be rejected in their entirety.  As explained in greater detail below, the Court (i) adopts the Report's recommendation regarding Plaintiffs' standing; (ii) adopts the Report's recommendation regarding issue preclusion; (iii) adopts in part the Report's recommendation regarding timeliness; (iv) adopts the Report's recommendation regarding Plaintiffs' tort claims; and (v) adopts the Report's findings to which the parties have not objected.

### 1. Plaintiffs Have Standing to Pursue Claims Regarding the Sold Certificates

The Court begins with Defendant's challenge to the Report's standing analysis.  By way of background, Defendant had argued in its summary judgment motion that Plaintiffs lacked standing to pursue claims based on certificates in six trusts that they sold between 2011 and 2014 (the "Sold Certificates").  (Report 9).  Judge Lehrburger began his analysis by observing that Plaintiffs' standing to pursue these claims turned in large measure on the substantive law governing their sales of the Sold Certificates.  (*Id.*).  As Judge Lehrburger noted and the parties do not dispute, if New York law governed the sales, then Plaintiffs sold not only the Sold Certificates, but also their legal claims based on the certificates.  (*Id.*).  By contrast, if California law applied to the sales, then Plaintiffs retained their legal claims even after selling their ownership interests in the certificates.  (*Id.*).  After engaging in a detailed choice-of-law analysis, Judge Lehrburger found that California law applied to

Plaintiffs' sales of the Sold Certificates and thus that Plaintiffs had standing to pursue claims based on the certificates. (*Id.* at 12-28).

In its objections, Defendant argues that Judge Lehrburger misconstrued controlling provisions of the applicable PSAs, misapplied New York choice-of-law rules, and ignored this District's prevailing interpretation of California law governing securities sales. (Def. Br. 3-11). The Court is unpersuaded by Defendant's arguments and concludes that Judge Lehrburger appropriately found that Plaintiffs have standing to pursue claims based on the Sold Certificates.

### a.   The PSAs Do Not Override the Choice-of-Law Analysis

At the outset, Defendant argues that the Report's choice-of-law analysis is ineffectual because the relevant PSAs dictate that New York law applies to Plaintiffs' sales of the Sold Certificates. (Def. Br. 3).[3] Defendant's argument ostensibly rests on Section 5.02(e)(iii) of the PSAs, which provides that "ownership and transfers of registration of the Book-Entry Certificates shall be governed by applicable rules established by the [Deposit Trust Company, or DTC]." (*Id.*).[4] In Defendant's view, Section 5.02(e)(iii) "require[s] that the consequences of [Plaintiffs'] transfers of the Sold Certificates be determined by

---

[3]   As Judge Lehrburger explained in the Report, "[w]hile there is a PSA for each Trust, the relevant provisions among the PSAs are substantially identical." (Report 20 n.10). Judge Lehrburger and Defendant therefore cite to the PSA for the CWALT 2006-32CB Trust, and the Court does the same here. (*See id.*; Def. Br. 3).

[4]   "The DTC is a securities depository based in New York City that is organized as a limited purpose trust company and provides safekeeping through electronic record-keeping of securities balances. It also acts as a clearinghouse to process and settle trades." *Phoenix Light SF Ltd.* v. *Wells Fargo Bank, N.A.*, No. 14 Civ. 10102 (KPF) (SN), 2022 WL 2702616, at *14 (S.D.N.Y. July 12, 2022) (internal quotation marks omitted).

DTC's rules." (*Id*.).  Defendant asserts that DTC's rules, in turn, dictate that "all transfers of DTC-registered securities be governed by New York law." (*Id.* at 3-4).

Defendant's latter argument rests on a hodgepodge of DTC's rules.  For starters, Defendant quotes a provision of DTC's rules providing that "[t]he Rules, Procedures and rights and obligations under the By-Laws, the Rules and the Procedures, shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed and performed therein." (Def. Br. 3 (quoting Houpt Decl., Ex. 10 § 4)).  Next, Defendant observes that "the DTC Rules cover transactions in securities held with DTC." (*Id*.).  Lastly, Defendant quotes from a document authored by DTC entitled "Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures," which states that "[t]he relevant jurisdictions for all material aspects of DTC's activities are the United States and New York." (Houpt Decl., Ex. 9 at 15).  Defendant argues that these provisions, read together, dictate that New York law governs Plaintiffs' sales of the Sold Certificates.

Judge Lehrburger considered and rejected this argument in the Report. Although Judge Lehrburger did not address the issue at length, he began by questioning whether the DTC provisions on which Defendant relied "say[ ] anything relevant to" the choice-of-law analysis implicated by Defendant's standing argument.  (Report 20).  Judge Lehrburger then found that the DTC's rules were inapplicable in this case because neither Plaintiffs nor their affiliates

were DTC participants.  (*Id.*).  Based on these findings, Judge Lehrburger

concluded that "DTC's post-trade involvement in settlement is not dispositive

and does not shift the center of gravity to New York."  (*Id.*).

The Court finds no error in Judge Lehrburger's conclusion.  In *PacLife I*,

the Court rejected an argument similar to the one Defendant raises here.  *See*

*PacLife I*, 2018 WL 1382105, at *16.  There, the Court found that while the

PSAs applicable to the Sold Certificates contained New York choice-of-law

provisions, those clauses had "no relevance to the question whether the

contracts of sale ... operated to assign certain rights of action."  *Id.* (quoting

*Semi-Tech Litig., LLC* v. *Bankers Tr. Co.*, 272 F. Supp. 2d 319, 330 (S.D.N.Y.

2003)).  Defendant's argument in this case is only one level removed from the

one the Court rejected in *PacLife I*: rather than rely on the choice-of-law

provisions in the PSAs themselves, Defendant instead looks to the PSA's

incorporation of DTC's choice-of-law provisions.  What imperils both arguments

is that while Defendant has identified choice-of-law provisions applicable to

certain transactions, it has not shown that these provisions are relevant to "the

separate contracts between buyers and sellers of the certificates."  *BlackRock*

*Balanced Cap. Portfolio (FI)* v. *Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 9367

(JMF) (SN), 2018 WL 5619957, at *11 (S.D.N.Y. Aug. 7, 2018) (quoting *Royal*

*Park Invs. SA/NV* v. *HSBC Bank USA, N.A.*, No. 14 Civ. 8175 (LGS), 2018 WL

679495, at *5 (S.D.N.Y. Feb. 1, 2018)).  As in *PacLife I*, therefore, the Court

finds that the provisions identified in Defendant's objections are not

determinative of the substantive law applicable to the sale agreements through

13

which Plaintiffs transferred the Sold Certificates. "Instead, that question is controlled by New York choice of law principles." *Id.*

### b.   The Center of Gravity Is California

Turning to the heart of the Report's standing analysis, Defendant argues that Judge Lehrburger erred in finding that California, not New York, law applies to Plaintiffs' sales of the Sold Certificates under New York choice-of-law rules. (Def. Br. 6). In Defendant's view, DTC's role in holding and effectuating the transfers of the Sold Certificates calls for the application of New York law to Plaintiffs' sales of the Sold Certificates. (*Id.* at 6-10). The Court agrees with Judge Lehrburger that DTC's involvement is insufficient to move the center of gravity from California to New York, and therefore adopts the Report's finding that California law governs Plaintiffs' sales of the Sold Certificates.

The relevant legal standards are not in dispute. As Judge Lehrburger explained, "New York applies a 'center of gravity' or 'grouping of contacts' as the appropriate analytical approach to choice-of-law questions in contract cases." (Report 14 (quoting *Zurich Ins. Co.* v. *Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994) (internal quotation marks omitted))). "Under this approach, the spectrum of significant contacts — rather than a single possibly fortuitous event — may be considered." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of New York*, 822 F.3d 620, 642 (2d Cir. 2016). The factors to be considered include: (i) "the places of negotiation and performance"; (ii) "the location of the subject matter"; and (iii) "the domicile or place of business of the contracting parties." *Id.*; *see also Schwartz* v. *Liberty Mut. Ins. Co.*, 539 F.3d

14

135, 151-52 (2d Cir. 2008) (same).  While the Court considers each of these factors in its analysis, "[t]he place of contracting and place of performance are given the greatest weight."  *AEI Life LLC* v. *Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (quoting *Forest Park Pictures* v. *Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012)).

The Court previously addressed the identical choice-of-law issue in *PacLife I*, albeit in a different procedural posture.  In denying Defendant's motion to dismiss for lack of standing, the Court stated that the pleadings "strongly suggest that California law applies, and that Plaintiffs have standing to pursue claims relating to the Sold Certificates."  *PacLife I*, 2018 WL 1382105, at *15.  The Court based this observation on the facts that (i) Plaintiffs' principal place of business is in California; (ii) PacLife was the original purchaser for all the Sold Certificates; (iii) PacLife managed its RMBS portfolio, including the Sold Certificates, from California; (iv) PacLife conducted all activities in connection with the sales of the Sold Certificates through employees located in California; (v) the purchasers of the Sold Certificates were located in California; and (vi) the business records regarding the sale are located in California.  *Id.* at *16.  That said, the Court left the door open for Defendant to renew its standing argument, "as appropriate, upon discovery of facts to the contrary."  *Id.*

Picking up where this Court left off, Judge Lehrburger "again [found] that the center of gravity related to the Sold Certificates is California." (Report 15).  Judge Lehrburger began by observing that the "salient facts are undisputed."

(*Id.*).  These facts mirrored those upon which the Court based its decision in
*PacLife I*: Plaintiffs' principal place of business is in California; the Sold
Certificates were managed in California; the decision to sell the Sold
Certificates was made by Plaintiffs' employees in California; and the purchasers
of the Sold Certificates were in California.  (*Id.* at 16).  Judge Lehrburger also
considered whether the involvement of DTC in "settling" the purchases of the
Sold Certificates was sufficient to overcome the centrality of California to
Plaintiffs' sales of the Sold Certificates.  (*Id.* at 17-23).  Ultimately, Judge
Lehrburger found that DTC's role dictated that the place of performance and
the subject matter of the relevant contracts were in New York, but that "all
other factors relevant to the choice-of-law analysis are firmly grounded in
California," such that California law governed the sales of the Sold Certificates.
(*Id.* at 23).

Defendant's current challenges are unpersuasive.  *First*, Defendant
argues that Judge Lehrburger erred by considering that Plaintiffs negotiated
and entered into the sales contracts for the Sold Certificates in California.  (Def.
Br. 6).  According to Defendant, the place of negotiation and contracting "do
not bear *any* — let alone a 'significant' — relation to the 'matter in dispute[,]'
which is what rights passed when [Plaintiffs] transferred [their] beneficial
interest in the Sold Certificates on the DTC ledger."  (*Id.* (internal citations
omitted)).  The Court is not persuaded by Defendant's reframing of the relevant
issue.  Contrary to Defendant's suggestion, the issue presented is whether
Plaintiffs transferred both their ownership interest and their preexisting legal

claims in the Sold Certificates at the time of the relevant transactions.  As
Judge Lehrburger explained, those transactions occurred prior to DTC's
subsequent transfer of the certificates from Plaintiffs to the purchasers.
(Report 17-19).  And because those transactions occurred in California, Judge
Lehrburger did not err in finding that California law governed the transactions.
(*Id.* at 23).  Indeed, the Court is unaware of any authority supporting
Defendant's position that all transactions that are ultimately settled through
DTC are governed by New York law.  To the contrary, the considerable lengths
to which courts in this District have gone to determine the applicable law in
comparable circumstances suggests that DTC's role is but one of a
constellation of factors that must be considered in resolving choice of law
issues.  *See, e.g.*, *Phoenix Light SF Ltd.* v. *Wells Fargo Bank, N.A.*, No. 14 Civ.
10102 (KPF) (SN), 2022 WL 2702616, at *14 (S.D.N.Y. July 12, 2022) ("*PL/WF*")
("To be sure, decisions addressing the significance of the DTC's role in
securities-related cases are not perfectly consistent." (surveying approaches)).

    *Second*, Defendant challenges Judge Lehrburger's efforts to distinguish
the present case from *Commerzbank AG* v. *U.S. Bank Nat'l Ass'n*, 457 F. Supp.
3d 233 (S.D.N.Y. 2020) ("*CB/USB*"), and *Phoenix Light SF Ltd.* v. *Wells Fargo
Bank, N.A.*, No. 14 Civ. 10102 (KPF) (SN), 2021 WL 7082193 (S.D.N.Y. Dec. 6,
2021), *report and recommendation adopted in part, rejected in part, PL/WF*,
2022 WL 2702616.  As set forth in greater detail in the Report, Judge
Lehrburger noted that these decisions both found that New York law governed
similar sales of RMBS certificates based, at least in part, on DTC's involvement

in the transactions.  (Report 20-21).  Judge Lehrburger found, however, that
*CB/USB* was inapposite because the decision was based on the application of
Ohio, rather than New York, choice-of-law rules.  (*Id.* at 21-22).  And he further
found that *PL/WF* differed from the instant case in that it involved sales by a
German bank made from its London branch office to purchasers of unknown
domiciles.  (*Id.* at 23).  Here, by contrast, Judge Lehrburger found that
Plaintiffs' "principal place of business is California, the buyers operated out of
California, and all of the pertinent components of contract formation took place
in California."  (*Id.*).

While the Court does not quibble with Defendant's contention that
certain of the distinctions drawn in the Report are less persuasive than others,
it ultimately agrees that neither *CB/USB* nor *PL/WF* requires the application of
New York law in this case.  As it happens, the Court agrees with the defense
that the differences between Ohio and New York choice-of-law rules are too
insubstantial to distinguish this case from *CB/USB*.  (*See* Def. Br. 8 (observing
that the two tests consider substantially the same factors)).  That said, Judge
William H. Pauley, who decided *CB/USB*, found the difference to be material in
his decision denying a motion for reconsideration.  *See Commerzbank AG* v.
*U.S. Bank Nat'l Ass'n*, No. 16 Civ. 4569 (WHP), 2021 WL 603045, at *3
(S.D.N.Y. Feb. 16, 2021) (observing that "none of these cases apply Ohio law").
Further, Judge Pauley noted that, despite their facial similarities, "Ohio follows
the rule that where a conflict of law issue arises in a case involving a contract,
the law of the state where the contract is to be performed governs."  *CB/USB*,

457 F. Supp. 3d at 242 (quoting *Gries Sports Enter., Inc.* v. *Modell*, 15 Ohio St. 3d 284, 286 (1984)).  New York, by contrast, gives significant weight to both the place of performance *and* the place of contracting.  *See AEI Life LLC*, 892 F.3d at 135.  Given these distinctions, the Court agrees with Judge Lehrburger that *CB/USB* does not compel the application of New York law.

The Court also concurs with Judge Lehrburger's finding that *PL/WF* involved materially different facts.  Among other distinctions, *PL/WF* involved a German seller; a failure on the plaintiff's part to demonstrate that substantial negotiations took place in London with entities domiciled or with their principal places of business there; and a plaintiff who traded through a DTC participant. *PL/WF*, 2022 WL 2702616, at *15.  Precisely for these reasons, this Court distinguished the instant case in the *PL/WF* decision:

> Despite Commerzbank's repeated assertion that *PacLife* and this case are mirrors of one another, the factual record in *PacLife* differs in several critical respects, as was recognized by Judge Lehrburger in *PacLife* itself. To begin, "PacLife's principal place of business is California, the buyers operated out of California, and all of the pertinent components of contract formation took place in California."  By contrast, Commerzbank is located in Germany and there is insufficient evidence of where the Sold Certificates' ultimate purchasers reside. Furthermore, Judge Lehrburger deemed relevant the fact that PacLife (unlike Commerzbank) does not "trade through any subsidiary entities that were DTC participants." "Due to the[se] discernable differences," Judge Lehrburger "decline[d] to reach the same conclusion as" *CB/USB* or [Judge Netburn's report and recommendation].

*Id.* (internal citations omitted).  Notably, in *PL/WF*, this Court placed less weight on DTC's role in securities-related cases than Judge Netburn.  *Id.* at

*14. In other words, Judge Lehrburger's decision to find DTC involvement to be "relevant but not dispositive" (Report 22 n.15), fully accords with this Court's view.

More to the point, nothing in this Court's *PL/WF* decision suggests that because the relevant buyers were located in California bank branches, their location is irrelevant to the choice of law inquiry. (Def. Br. 8). In *PL/WF*, the Court rejected a party's position that because transactions took place in that party's London office, that fact could overtake the importance of the party's principal place of business being Germany. *PL/WF*, 2022 WL 2702616, at *14. Here, by contrast, Defendant does not engage with Judge Lehrburger's deep dive into *HSH Nordbank AG* v. *RBS Holdings USA Inc.*, No. 13 Civ. 3303 (PGG), 2015 WL 1307189 (S.D.N.Y. Mar. 23, 2015), the decision from which some courts have derived the rule that branches of an investment bank have no bearing on choice-of-law analysis. (Report 16-17 n.6). Had it done so, Defendant would have recognized the basic point that the case concerns determining residency in the context of New York's borrowing statute for statutes of limitations, rather than the center of gravity test for choice of law. *Id.* at *5. This Court agrees with Judge Lehrburger that even if the buyers' relevant places of business cannot be deemed "principal," the fact that the negotiation and execution of the purchases of the Sold Certificates occurred in California on the buyers' ends should be considered. (Report 16-17). In any event, because Plaintiffs' principal place of business was in California; the buyers had places of business involved in the relevant transactions in

California; the contracting, negotiation, and performance of the sales occurred

in California; and the subject matter of the contracts (other than DTC

involvement) leans toward California, the center of gravity is, on the whole,

California.  This would be true even if the buyers' principal places of business

were elsewhere.  It should be no surprise, then, that the Court agrees fully

with Judge Lehrburger's implementation of the center of gravity test in the

Report.  California law applies to the sales of the Sold Certificates.

### c.    California Law Affords Plaintiffs Standing

Defendant raises one challenge to Judge Lehrburger's interpretation of

California law, concerning California Commercial Code Section 8302(a), which

provides that "a purchaser of a certificated or uncertificated security acquires

all rights in the security that the transferor had or had power to transfer."

(Def. Br. 10 (quoting Cal. Com. Code § 8302(a)).  Judge Lehrburger found that

this provision of California law "does not apply to issues arising from contracts

for the purchase or sale of securities but instead only to those concerning the

settlement phase of securities transactions."  (Report 27).  Defendant argues

that this finding was erroneous because "this Court has held Article 8 *does*

'deal[ ] with the mechanisms by which *interests in securities are transferred*,'

which is precisely the issue here — what interests transferred upon sale."  (Def.

Br. 10 (quoting *Petroleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 495 F.

Supp. 3d 257, 284 (S.D.N.Y. 2020) ("*PdVSA*"))).

Defendant identifies no error in Judge Lehrburger's analysis.  As Judge

Lehrburger noted in the Report, Defendant does not cite to a decision by a

California court addressing Article 8 in comparable circumstances. (Report 27). Instead, Defendant points to certain general comments on Article 8 made by this Court in *PdVSA*, 495 F. Supp. 3d at 284, and by Judge John G. Koeltl in *Consolidated Edison, Inc.* v. *Northeast Utilities*, 318 F. Supp. 2d 181, 183 (S.D.N.Y. 2004) ("*Con Edison*"), *rev'd in part,* 426 F.3d 524 (2d Cir. 2005). (Def. Br. 10-11; Def. Reply 9). Neither of these decisions supports Defendant's argument. To be sure, Judge Koeltl observed in *Con Edison* that Article 8 "involves the mechanism for transferring rights and applies primarily to disputes over the quality of title and the competing ownership rights passed from transferor to transferee." (Def. Reply 9 (quoting *Con Edison*, 318 F. Supp. 2d at 188)). But he further explained that Article 8-302 "does not define 'rights in a security' or codify a rule assigning to purchasers any claim accrued while possessing the security." *Con Edison*, 318 F. Supp. 2d at 189. Thus, the "provision simply provides that whatever 'rights in the security' are, they are automatically transferred to a purchaser." *Id.* at 190. In other words, Article 8 principally concerns what Judge Lehrburger found, *i.e.*, the settlement phase of securities transactions, not the trade of securities, and certainly not every securities-related contract issue. (Report 27-28 & n.19).

This Court's decision in *PdVSA* is entirely in accord. 495 F. Supp. 3d at 284-85 (discussing the "narrow view of the Article's scope," including that "[it] does not deal with the process of entering into contracts for the transfer of securities or regulate the rights and duties of those involved in the contracting process" (quoting Prefatory Note to Article 8 at III.B (1994))). Defendant

seemingly overlooks this Court's statements in *PdVSA* that to read Article 8 as broadly as Defendant now seeks "would swallow any choice of law analysis involving the formation of a contract for securities." *Id.* at 285; *see also id.* at 284 ("Article 8 deals with the settlement phase of securities transactions[.]"). Article 8 does not control here, and it does not affect Plaintiffs' standing.

Defendant has not raised any other challenges to Plaintiffs' standing under California law. Having rejected Defendant's objections to Judge Lehrburger's choice of law and standing analysis, this Court adopts the Report's recommendations on these points and finds that Plaintiffs have standing to raise claims regarding the Sold Certificates.

### 2. The Article 77 Proceeding and Judgment Preclude Many of Plaintiffs' Claims

Judge Lehrburger ultimately found that the bulk of Plaintiffs' claims were barred by operation of the doctrines of claim and issue preclusion due to the Article 77 proceeding approving Defendant's settlement with Countrywide. (Report 28-51). Plaintiffs object to these findings, and raise myriad challenges to each step of Judge Lehrburger's analysis. As discussed herein, this Court adopts Judge Lehrburger's (arguably) narrower finding that issue preclusion (*i.e.*, collateral estoppel) bars the claims discussed in the Report. This is so because the Article 77 proceeding necessarily found that Defendant fulfilled "its obligations to certificateholders in resolving the Countrywide loan problems"; that settling claims was preferable to enforcing remedies, including repurchase obligations; and that such issues lie at the core of Plaintiffs' instant theories

23

concerning pre-Settlement breaches of contract, fiduciary duties, and negligence.  (*Id.* at 41-42).[5]

      **a.**    **Applicable Law**

"Traditionally, the doctrine of *res judicata*, or claim preclusion, provides that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Burgos* v. *Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994) (quoting *Allen* v. *McCurry*, 449 U.S. 90, 94 (1980)).  On the other hand, "the very similar but distinct doctrine of collateral estoppel, which is also known as issue, rather than claim, preclusion" "'may preclude relitigation of [an issue of fact or law necessary to a prior judgment] in a suit on a different cause of action involving a party to the first case.'"  *Id.* (quoting *Allen*, 449 U.S. at 94).  "It is settled law 'that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the

---

[5]    The Court focuses on issue preclusion in light of certain formal barriers to Plaintiffs asserting breach of contract claims (among others) against Defendant in the Article 77 proceeding.  (Pl. Reply 3-4).  As explained *infra* in the text, the nature of the proceeding was such that Plaintiffs (as well as other parties) could not pursue claims against Defendant directly for any alleged wrongdoing.  But such barriers do not mean that issues decided in the Article 77 proceeding cannot be afforded issue-preclusive effect.  For example, in *Parker* v. *Blauvelt Volunteer Fire Co.*, the New York Court of Appeals found that an Article 78 proceeding could not be afforded claim-preclusive effect because the Article 78 court severed certain claims and thus could not afford the plaintiff the relevant relief sought in a follow-on Section 1983 case (*i.e.*, money damages as opposed to restoration of employment as a firefighter).  93 N.Y.2d 343, 348 (1999).  Even then, the Court of Appeals found the Section 1983 claims barred by *issue* preclusion, because "[t]he dispositive factual and legal issues in plaintiff's claims of deprivation of his constitutional rights in this 42 USC § 1983 civil rights action are identical to the allegations of constitutional violations asserted as a basis for annulment of defendant's disciplinary determinations, decided against plaintiff in the prior CPLR article 78 proceeding."  *Id.* at 350.  As the Court discusses in the text, that basic point applies here.

judgment was rendered.'" *PacLife I*, 2018 WL 1382105, at *11 (quoting *Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).  "That means this Court 'must use the *res judicata* doctrine of' New York to determine whether Plaintiffs are precluded from suing Defendant." *Id.* (quoting *Logan* v. *Maveevskii*, 175 F. Supp. 3d 209, 233 (S.D.N.Y. 2016)).

### i.     *Res Judicata* or Claim Preclusion

"New York State law … has adopted a transactional approach to *res judicata*, barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Burgos*, 14 F.3d at 790 (citing *Smith* v. *Russell Sage College*, 54 N.Y.2d 185, 192-93 (1981)); *see also, e.g.*, *Ferris* v. *Cuevas*, 118 F.3d 122, 126 (2d Cir. 1997) ("We thus treat the claim at bar as being the 'same' claim as the prior state action because it arises from the same set of facts and seeks the same remedy, despite the different legal theory advanced.").  As a result, the New York Court of Appeals has described New York's doctrine as "arguably broader than the principles adopted by the federal courts." *Ins. Co. of State of Pennsylvania* v. *HSBC Bank USA*, 10 N.Y.3d 32, 38 n.3 (2008).

A party invoking *res judicata* must show that "[i] the previous action involved an adjudication on the merits; [ii] the previous action involved the plaintiffs or those in privity with them; and [iii] the claims asserted in the subsequent action were, or could have been, raised in the prior action."

25

*Monahan* v. *N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (citations

omitted).  Importantly, however,

> [t]his bar against later claims based upon the same
> cause of action is ... subject to certain limitations, one
> of which is that it will not be applied if the initial forum
> did not have the power to award the full measure of
> relief sought in the later litigation.   Where formal
> barriers to asserting a claim existed in the first forum it
> would be unfair to preclude [the plaintiff] from a second
> action in which he can present those phases of the
> claim which he was disabled from presenting in the
> first.

*Davidson* v. *Capuano*, 792 F.2d 275, 278 (2d Cir. 1986) (internal citations and

quotation marks omitted).

### ii.        Collateral Estoppel or Issue Preclusion

"Under New York law, the doctrine of collateral estoppel 'precludes a

party from relitigating in a subsequent action or proceeding an issue clearly

raised in a prior action or proceeding and decided against that party or those in

privity, whether or not the tribunals or causes of action are the same.'"

*Burgos*, 14 F.3d at 792 (quoting *Ryan* v. *N.Y. Tel. Co.*, 62 N.Y.2d 494, 500

(1984)).   "The equitable doctrine of collateral estoppel is grounded in the facts

and realities of a particular litigation, rather than rigid rules."   *Buechel* v. *Bain*,

97 N.Y.2d 295, 303 (2001).   "[C]ollateral estoppel bars relitigation of an issue

when [i] the identical issue necessarily was decided in the prior action and is

decisive of the present action, and [ii] the party to be precluded from relitigating

the issue had a full and fair opportunity to litigate the issue in the prior

action."   *Evans* v. *Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman* v.

*Eli Lilly & Co.*, 65 N.Y.2d 449, 455-56 (1985) (citations omitted)).   Still, because

the doctrine is a "flexible one," "the enumeration of these elements is intended merely as a framework, not a substitute, for case-by-case analysis of the facts and realities." *Buechel*, 97 N.Y.2d at 304; *see also Staatsburg Water Co.* v. *Staatsburg Fire Dist.*, 72 N.Y.2d 147, 153 (1988) ("In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of what are often competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results.  No rigid rules are possible, because even these factors may vary in relative importance depending on the nature of the proceedings." (internal citations omitted)).

### b.    Judge Lehrburger Properly Found an Identity of Issues[6]

A critical piece of Judge Lehrburger's analysis — and one that merits unpacking — is his finding that the Article 77 proceeding and this case present an identity of claims or issues.  (Report 37-42).  The Report finds preclusion appropriate because (i) many of the issues or claims that Plaintiffs assert here could have been or in fact were addressed in the Article 77 proceeding; (ii) the Article 77 judgment approved of Defendant's actions in releasing claims against Countrywide, which actions are the same failures Plaintiffs seek to hold Defendant liable for here; (iii) the Article 77 court necessarily rejected arguments that Defendant should have pursued rights and remedies against Countrywide in a different manner; (iv) Defendant's actions in handling

---

[6]    In this part of the Court's analysis, it references Judge Lehrburger's findings pertaining to identity of issues made in both his claim preclusion and issue preclusion discussions.

breaches were at issue, because the Article 77 court effectively blessed the Settlement as a means to resolve Countrywide's breaches; and (v) to find that the Article 77 proceeding does not bar many of the instant claims would allow Plaintiffs an end-run around the judicially-approved Settlement.  (*Id.*).

Plaintiffs object to this characterization of the Article 77 proceeding and, by extension, its effect on their instant claims.  Distilled down, Plaintiffs' objections are that (i) they could not have and did not assert contract claims in the Article 77 proceeding; and (ii) this case concerns different issues — namely, Defendant's alleged breaches rather than approval of Defendant's discretion to settle with Countrywide.  (Pl. Br. 4-6 ("As the New York courts held, under the deferential standard of an Article 77 Proceeding, [Defendant] was authorized to make the Settlement.  That does not begin to address, however, whether [Defendant] breached its contractual obligations to these certificateholders under these PSAs by forgoing putting loans back to Countrywide, bringing suit to enforce repurchase if needed, and failing to prudently exercise all of its rights and remedies after EODs."); Pl. Reply 3-4 ("The Article 77 Proceeding decided whether [Defendant] had *discretion* to settle.  This case decides a different question: did [Defendant] breach its *contractual* duties?")).  Plaintiffs' arguments are not persuasive, and the Court adopts Judge Lehrburger's analysis.

Resolving Plaintiffs' objections requires some explanation of the Article 77 proceeding.  As relevant here, on June 28, 2011, Defendant and Countrywide entered into an $8.5 billion settlement that sought to resolve any

claims that Defendant, acting as trustee, might have against Countrywide.

(*See* Settlement ¶¶ 3, 9-12).  The Settlement released Countrywide from:

> all alleged or actual claims … alleged Events of Default, damages, rights and causes of action of any kind or nature whatsoever … in contract, tort, or otherwise … that the Precluded Persons may now or may hereafter have against any or all of the [Countrywide parties] arising out of or relating to (i) the origination, sale, or delivery of Mortgage Loans to the Covered Trusts, including the representations and warranties in connection with the origination, sale, or delivery of Mortgage Loans to the Covered Trusts or any alleged obligation of any [Countrywide party] to repurchase or otherwise compensate the Covered Trusts for any Mortgage Loan on the basis of any representations or warranties or otherwise or failure to cure any alleged breaches of representations and warranties, including all claims arising in any way from or under Section 2.03 ("Representations, Warranties and Covenants of the Sellers and Master Servicer") of the Governing Agreements, (ii) the documentation of the Mortgage Loans held by the Covered Trusts (including the documents and instruments covered in Sections 2.01 ("Conveyance of Mortgage Loans") and 2.02 ("Acceptance by the Trustee of the Mortgage Loans") of the Governing Agreements and the Mortgage Files including with respect to alleged defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, and (iii) the servicing of the Mortgage Loans held by the Covered Trusts (including any claim relating to the timing of collection efforts  or foreclosure efforts, loss mitigation, transfers to subservicers, Advances, Servicing Advances, or that servicing includes an obligation to take any action or provide any notice towards or with respect to, the possible repurchase of Mortgage Loans by the Master Services, Seller, or any other Person), in all cases prior to or after the Approval Date (collectively, all such claims being defines as the "Trust Released Claims").

(Settlement ¶ 9(a).  Additionally, the Settlement allowed Defendant and

Countrywide to chart a new path forward for their ongoing relationship.

Specifically, Defendant agreed not to take any action against Countrywide

related to the subject matter of the Settlement:

> Absent direction from the Settlement Court in accordance with the next sentence below, between the Signing Date and the Approval Date (or such time as Final Court Approval becomes legally impossible), the Trustee covenants that it will not take any action with respect to any Covered Trust that is intended or reasonably could be expected to be adverse to or inconsistent with the intent, terms, and conditions of the Settlement and this Agreement, and will not commence or assist in the commencement of any litigation based upon any of the claims subject to the release and waiver in Paragraph 9.

(*Id.* ¶ 15(a)).  Flowing from this covenant, the parties also agreed that

> If after the Signing Date and before the Settlement Payment is made, any [Countrywide party] either (i) repurchases any Mortgage Loan(s) from any Covered Trust(s) or (ii) makes any make-whole payment with respect to any such Mortgage Loan(s) to any Covered Trust(s) … the Settlement Payment … shall be reduced dollar-for-dollar by the economic benefit to the Covered Trust(s) of such repurchase or make-whole payment(s)[.]

(*Id.* ¶ 15(b)).

In order for the Settlement to be approved and to be binding on all

relevant parties, Defendant commenced a special proceeding pursuant to

Article 77 of the New York CPLR.  The parties do not generally object to Judge

Lehrburger's recitation of the factual and procedural histories of the Article 77

proceeding, including its appeal.  (*See* Report 28-31).  *See generally In re Bank

of New York Mellon*, 986 N.Y.S.2d 864 (Table), 2014 WL 1057187 (N.Y. Sup. Ct.

30

Jan. 31, 2014) ("*Mellon I*"); *In re Bank of New York Mellon*, 4 N.Y.S.3d 204 (1st Dep't 2015) ("*Mellon II*").

Moving away from the Article 77 proceeding for a moment, the Court considers Plaintiffs' claims in this action, which claims it has analyzed in both *PacLife I* and *PacLife II.* Neither party disputes this Court's categorization of four basic at-issue duties allegedly imposed on Defendant under the PSAs, from which Plaintiffs' allegations of breaches flow:

- *First*, Defendant owed certain duties associated with taking possession of all relevant mortgage loan documents, and assigning back to the seller incomplete loans for substitution. *PacLife I*, 2018 WL 1382105, at *2. After this process was complete, Defendant was required to issue a final certification with an exception report for any deficient mortgages, and demand that such defects be cured. *Id.*

- *Second*, Defendant was to provide notice of defaults and enforce repurchase obligations as defined in the PSAs. *Id.* at *3. These notices of defaults were premised on certain representations and warranties ("R&W") regarding the mortgage loans. *Id.* After providing notice, the seller was obligated to cure the breach or remove the faulty loan from the trust. *Id.*

- *Third*, upon the occurrence of an Event of Default ("EOD"), Defendant was to "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs." *Id.* This included providing public notice of uncured EODs, and Plaintiffs contend that Defendant was obligated to, *inter alia*, enforce repurchase obligations. *Id.*[7]

---

[7]    As a sister court aptly summarized with respect to materially similar PSAs, "[t]he nomenclature of 'pre' and 'post-' EOD captures only the point in time that a duty arises. [A trustee's] pre-EOD obligations bind [it] whether or not an EOD actually occurs. And those pre-EOD obligations do not cease if and when an EOD does occur. Rather, after

▪       *Fourth and finally*, Defendant had a duty to address the servicer's failure to meet prudent servicing standards. *Id.* at *4.

Discovery has further clarified Plaintiffs' claims and their theories of harm.  Plaintiffs do not dispute Judge Lehrburger's basic premise that many of their core claims here are that Defendant "breached various duties by failing to provide notice of and enforce remedies for Countrywide's failures."  (Report 55; *see also, e.g.*, Houpt Decl., Ex. 57 at 32-34 (Plaintiffs' interrogatory responses) (cataloging claimed EODs premised on, *inter alia*, document defects and servicing issues, and noting that following EODs, Defendant "could have fulfilled [its duty of prudence] in several ways, such as exercising the remedy of putting back loans with R&W breaches and document defects, requesting that the Master Servicer fulfill its obligations under the governing agreements, and bringing lawsuits against [the] Master Servicer to recover losses incurred by the Covered Trusts as a result of the Master Servicer's misconduct, among others")).  Although Plaintiffs explicitly disavow direct challenges to the Settlement or the Article 77 court's approval of it, their principal manner of distinguishing the instant proceeding from a collateral attack on the Article 77 judgment (or its findings) is to assert that this is an action against *Defendant* for failing to take different action with respect to released claims.  (*See, e.g.* Pl. Br. 6 ("Plaintiffs do not challenge the Settlement or [Defendant] having made it….  That does not begin to address, however, whether [Defendant] breached

---

an EOD occurs, [the trustee] is bound by both its pre- and post-EOD obligations." *Ambac Assurance Corp.* v. *U.S. Bank Nat'l Ass'n*, No. 17 Civ. 2614 (PAE) (KHP), 2022 WL 4621431, at *4 (S.D.N.Y. Sept. 30, 2022).

its contractual obligations to these certificateholders under these PSAs by forgoing putting loans back to Countrywide, bringing suit to enforce repurchase if needed, and failing to prudently exercise all of its rights and remedies after EODs.")).

Plaintiffs' expert, Christopher Milner, corroborated Judge Lehrburger's general characterization of many of Plaintiffs' claims.  For example, Milner catalogs Plaintiffs' claims as (i) mortgage file breaches; (ii) R&W breaches; (iii) modification breaches; (iv) servicing breaches; and (v) Defendant's failure to exercise rights and duties as a prudent person would following claimed EODs. (Milner Report ¶¶ 3-7).  In calculating damages, Milner sought to determine how much more money Plaintiffs would have received had Defendant

> ([i]) taken steps to ensure the repurchase of Mortgage Loans with Mortgage File Breaches; ([ii]) taken steps to ensure the repurchase of Mortgage Loans with R&W Breaches; ([iii]) taken steps to ensure the repurchase of Mortgage Loans with Modification Breaches; and ([iv]) taken steps to ensure that the Master Servicer adhered to Prudent Servicing Standards to address Servicing Breaches.

(*Id.* ¶ 8; *see also id.* ¶¶ 14-17 (summarizing opinions)).  As Judge Lehrburger astutely noted in analyzing Plaintiffs' expert discovery, Plaintiffs' "primary damages scenario" assumes the non-existence of the Settlement and Defendant's enforcement of contractual duties against Countrywide without litigation, as well as alternative scenarios of enforcement through litigation. (Report 41).  As a result, Plaintiffs' expert's model and the Article 77 judgment and Settlement cannot co-exist.

Once Plaintiffs' claims are properly contextualized, it becomes clear that there is an identity of issues between the Article 77 proceeding and many of Plaintiffs' claims. Though Plaintiffs take care to couch their arguments under the rubric of claims *not* resolved through the Article 77 proceeding (*e.g.*, breach of contract), their theories still impugn the Article 77 court's findings or depend on arguments that were necessarily rejected by the Article 77 court. Judge Lehrburger underscored this point by cataloging the arguments and issues with which the Article 77 court was presented and which it necessarily decided, many of which arose from objectors in situations analogous to Plaintiffs'. (*See* Report 37-39). For example, objector Public Pension Fund Committee argued against approval of the Settlement on bases that included the following:

- "[Defendant] had full 'prudent person' obligations to protect [R]MBS holders' repurchase rights under the terms of the PSA…. Thus, [Defendant] had good reason to seek a quiet extra-judicial settlement, in lieu of a high profile lawsuit with full discovery that would shed unwelcome light on [its] own misconduct[.]"

- "What are the Alternatives to Settlement?' [T]he answer is that [R]MBS investors can sue [Defendant] for its refusal to perform as their fiduciary … including for their losses caused by [its] failure to institute suit to enforce the repurchase rights, and vigorously advocate for [R]MBS holders' interests."

- Defendant would have fulfilled its duties by investigating and pursuing repurchases.

(Houpt Decl., Ex. 88 at 9, 11, 13 (internal quotation marks and citations omitted)). The Retirement Board of the Policemen's Annuity & Benefit Fund and other pension fund objectors made similar arguments on appeal. (*See id.*, Ex. 89 at 23-26 (arguing that Defendant should have committed to enforcing

repurchase rights), 39 (raising due process arguments concerning release of claims of certificateholders without consent, including arguing under *Taylor* v. *Sturgell*, discussed *infra*)).

The Article 77 court (and later, the Appellate Division) reached its ultimate conclusion — that Defendant "did not abuse its discretion in entering into the Settlement Agreement and did not act in bad faith or outside the bounds of reasonable judgment," *Mellon I*, 2014 WL 1057187, at *20 — by rejecting the objectors' arguments.  In so doing, the Article 77 court necessarily passed on the conduct at issue here: whether Defendant's actions with respect to the released claims were in the certificateholders' best interests, and whether releasing such claims fulfilled Defendant's duties to certificateholders. *Id.*  That is, the Article 77 court blessed Defendant's decision *not* to pursue alternative means of enforcing rights and remedies against Countrywide and instead to settle potential claims against these entities for substantial consideration paid out to certificateholders.  Plaintiffs' theories of breach are directly contrary to these findings; they fault Defendant for not investigating various types of breaches, and they tether alleged harms to Defendant's failure to enforce the PSAs' remedies, whether through litigation or something short of it.  As such, to accept Plaintiffs' theories, this Court would need to reject the Settlement and the Article 77 judgment and find that Defendant was obligated to take a different approach.  *See, e.g.*, *Mellon II*, 4 N.Y.S.3d at 209 ("It is also worth noting that it would have been unreasonable to decline to enter into the settlement with the expectation of obtaining a much greater judgment after

years of litigation, while knowing that attempts to enforce such a judgment would likely result in the actual collection of a lesser sum than that offered in the proposed settlement.").

Plaintiffs get no mileage out of arguing mirror-image issues — rejected by New York courts — under new guises.  (*See* Report 39-40 (noting that Defendant's "resolution of Countrywide's breaches with respect to loans backing the Trusts" was directly at issue in the Article 77 proceeding, and that the Article 77 proceeding "resolved [Defendant's] obligations to Trust certificateholders in resolving and releasing claims against Countrywide")).  As Judge Lehrburger found, the PSAs gave Defendant the ability to compromise claims where doing so would be in the best interests of certificateholders.  (*See* PSA § 8.02(iii) (stating that Defendant "shall not be liable for any action taken, suffered[,] or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement)).  Likewise, the Article 77 court found that taking the actions for which Plaintiffs seek to hold Defendant liable now would not make sense with the Settlement on the table.  Just as Judge Lehrburger noted with respect to claim preclusion (Report 32-33), issue preclusion is similarly not amenable to "rigid rules," but instead must be considered "in light of what are often competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results."  *Staatsburg Water Co.*, 72 N.Y.2d at 153.  Certainly, avoiding a scenario where Defendant is faulted for obtaining $8.5 billion for

36

certificateholders through a proceeding intensely supervised by New York courts that rejected Plaintiffs' arguments calls for application of a totality of the circumstances approach.

For these reasons, the Court rejects Plaintiffs' primary contention that their inability to assert breach of contract claims in the Article 77 proceeding vitiates its preclusive effect. As discussed, that Plaintiffs could not have asserted breach of contract claims against Defendant may counsel in favor of hesitation in applying claim preclusion. *See Davidson,* 792 F.2d at 278. But that emphatically does not mean that the Article 77 court's findings have no legal bearing on this case, where Plaintiffs have put Defendant's conduct — necessarily passed upon in the Article 77 proceeding — directly at issue. *See Parker*, 93 N.Y.2d at 350. Judge Lehrburger properly found that Plaintiffs had an opportunity to raise the arguments that Defendant should have enforced rights and remedies against Countrywide in the Article 77 proceeding. (Report 38). Though Plaintiffs elected not to take that opportunity, as discussed *infra*, other objecting parties clearly made those exact arguments.

Finally, Plaintiffs' principal exhibit for why preclusion is inappropriate here — a May 20, 2013 oral argument transcript concerning motion practice on a jury demand in the Article 77 proceeding — actually undermines their position. Plaintiffs are correct that the Article 77 court stated that the proceeding was not a breach of contract case. (Pl. Br. 5). But more important than that one statement is what the parties to the proceeding, including

Defendant and objectors, maintained was necessary to get judicial approval of

the Settlement at this same hearing:

- "[F]or this court to make those findings, you will have to make a decision as to whether or not the trustee breached its obligations under the governing agreements, under the PSA's.  Did they breach that contract or not?"  (Kane Decl., Ex. 31 at 17:4-9).

- "[J]ust like you would do in a malpractice case involving a doctor, in a car collision, the facts are done.  The question becomes what do they mean[?]  Did they breach their obligations under the pooling and servicing agreements?  Did they violate their fiduciary duties[?]  Did they fail to meet the standard of care that is imposed upon them, meaning the trustee, by accepting their responsibilities under the governing agreements?" (*Id.* at 19:26-20:9).

And the Article 77 court itself, while noting that the proceeding was not a

breach of contract case, recognized that it would necessarily resolve contested

facts relevant to such claims, even if the proceeding remained equitable in

nature:

- "I never saw a case that said just because you might come in and bring that [future] case, because those [claims] are being extinguished, that gives you a right to a jury trial on issues in this case.  I find that sort of a contorted argument.  (*Id.* at 26:9-13).

- "This case is not a case for breach of contract, that's not what it is….  I understand that they are asking for judicial findings, including whether or not the trustee in any way breached the trust.  But that doesn't turn this into a case for — does not turn this into a breach of contract case or a case for negligence or a case for breach of fiduciary duty." (*Id.* at 53:24-54:10)

It is undisputed that the Article 77 proceeding was not a breach of

contract case, and that a jury was not required to resolve contested facts.  But

this says nothing about whether the proceeding addressed the same issues this Court must now consider. As Judge Lehrburger found, the Article 77 court had to address the same issues at the core of Plaintiffs' theories concerning pre-Settlement claims. (*See* Report 38). To find otherwise would risk entirely inconsistent judgments related to the same conduct.

### c. Judge Lehrburger Properly Determined the Burden of Proof

Plaintiffs next attack Judge Lehrburger's analysis of the relevant burden of proof. In essence, Plaintiffs suggest that Judge Lehrburger erred by not taking into account the fact that the Article 77 court assessed Defendant's conduct under an abuse of discretion standard, whereas here "Plaintiffs must prove their case by a mere preponderance of the evidence." (Pl. Br. 3). The Court disagrees.

At the outset, Plaintiffs are mistaken that Judge Lehrburger somehow overlooked this issue. To the contrary, he accurately discussed the Article 77 court's findings: that Defendant was within its discretion to settle the claims against Countrywide, and that it did not abuse that discretion. (Report 30-31). *See Mellon I*, 2014 WL 1057187, at *20 ("After reviewing the voluminous record and carefully considering the arguments presented by all counsel, this Court finds that, except for the finding below regarding the loan modification claims, the Trustee did not abuse its discretion in entering into the Settlement Agreement and did not act in bad faith or outside the bounds of reasonable judgment.").

Moreover, Plaintiffs appear to conflate a procedural issue — burden — with the substance of the Article 77 proceeding — namely, interpretation of the PSAs, whether Defendant was entitled to act as it did, and whether the Settlement was in the best interests of certificateholders.  The New York Supreme Court did not conjure up the abuse of discretion standard out of thin air; rather, it derived that standard from the PSAs themselves.  *Mellon I*, 2014 WL 1057187, at *9 (finding abuse of discretion review appropriate because "[u]nder the Governing Agreements, the Trustee holds all right, title and interest in the mortgage loans for the benefit of the Certificateholders," and that such "provision effectively grants the Trustee the power and authority to commence litigation" and likewise "the power to settle litigation").  The Article 77 court then relied on trust law and trust principles to flesh out precisely what was involved in determining an abuse of discretion, and what its review of the Settlement would entail.  *Id.*  As both Defendant and Judge Lehrburger point out, this standard also derives from Section 8.02(iii) of the PSAs, which states that "the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed to be authorized or within the discretion or rights or powers conferred upon it by this Agreement."  (Report 40 (quoting PSA § 8.02(iii) (internal quotation marks omitted))).[8]

---

[8]     In a separate Article 77 proceeding concerning another RMBS trust settlement, the New York State Supreme Court likened the proceeding to one for summary judgment.  *See In re U.S. Bank Nat'l Ass'n*, 27 N.Y.S.3d 797, 800 (N.Y. Sup. Ct. 2015) ("Section 409(b) makes clear that the special proceeding is to be adjudicated in the same manner as a motion for summary judgment.  Thus, if the papers fail to raise a triable issue of fact, the court is to grant judgment as a matter of law in favor of the appropriate party.  If a

Even taking their argument at face value, Plaintiffs fail to articulate what, exactly, their burden of proof was in the Article 77 proceeding.  As Defendant notes, preclusion is inappropriate where "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action." RESTATEMENT (SECOND) OF JUDGMENTS § 28(4) (1982).  But the "abuse of discretion" burden was Defendant's alone to bear in the Article 77 proceeding, and it is indeed unclear whether intervening parties had to prove anything. Stated differently, the Court agrees with Defendant's general observations that "[e]ven if this Court found, somehow, that the respondents had some burden, it could not have been any heavier than the preponderance of the evidence standard that [Plaintiffs] must meet here."  (Def. Opp. 6).  For these reasons, the Court is not persuaded by Plaintiffs' citations to cases reciting the general rule that differing burdens of proof may call for denying preclusive effect to prior judgments.

Further, as discussed above, Judge Lehrburger was correct to compare Plaintiffs' claims discussed in his preclusion analysis to challenges to the Settlement (or, at a minimum, relitigation of issues resolved by the Settlement). Plaintiffs are free to argue that they are not challenging Defendant's decision to enter into the Settlement, but instead holding Defendant to its contractual and fiduciary obligations.  At the motion to dismiss stage, this argument is

triable issue of fact is raised, reference must be made to CPLR 410, which requires that any such issues be tried forthwith." (internal citations and quotation marks omitted)).

precisely the one this Court entertained in denying preclusive effect to the Article 77 judgment. But to the extent Plaintiffs' claims necessarily impugn Defendant's actions in settling Countrywide's errors or omissions, they are barred based on both Section 8.02(iii) of the PSAs and the Article 77 resolution. (*See* Report 40 ("[Defendant] negotiated and entered into the Settlement to hold Countrywide accountable for breaches under the governing agreements, whether related to repurchase obligations, R&W breaches, document defect breaches, or servicing breaches.... And it is [Defendant's] actions in entering into the Settlement and compromising claims on behalf of the Trusts that the Article 77 court blessed as having been made in 'good faith' and 'within its discretion.'" (quoting *Mellon I*, 2014 WL 1057187, at *4))).

Once the issue is framed properly, Plaintiffs' burden of proof argument — even if accepted — is of no moment. In his preclusion analysis, Judge Lehrburger considered two New York cases that gave preclusive effect to the Article 77 proceeding: *In re Bank of New York Mellon*, 51 N.Y.S.3d 356 (N.Y. Sup. Ct. 2017),[9] and *Commerce Bank* v. *Bank of New York Mellon*, 35 N.Y.S.3d 63 (1st Dep't 2016). Plaintiffs rightly note that these cases concerned direct challenges to the Settlement, and thus are distinguishable. (Pl. Br. 16-17). Indeed, in *Commerce Bank*, the Appellate Division found the plaintiff's claim that Defendant was negligent and/or breached its duties to "analyz[e] and evaluat[e] the Loan Modification Claims in negotiating the greatest value

---

[9]    As the name implies, this case is a follow-on from the Article 77 proceeding, and concerns distribution of proceeds from the Settlement.

possible for such claims in any attempted settlement," Complaint ¶ 188(g),

*Commerce Bank* v. *Bank of New York Mellon*, No. 651967/2014, 2015 WL

5770467 (N.Y. Sup. Ct. Oct. 2, 2015), NYSECF No. 2, to be precluded by its

approval of the Settlement, *Com. Bank*, 35 N.Y.S.3d at 66 ("To the extent the

*Commerce Bank* complaint alleges that defendant breached its fiduciary duty

with respect to loan modification claims, that claim is precluded by our

approval of the settlement and our declaration that there is no indication that

[Defendant] was acting in self-interest or in the interests of [Countrywide]

rather than those of the certificateholders when it entered into the

[S]ettlement." (quoting *Mellon II*, 4 N.Y.S.3d at 208) (internal quotation marks

and citations omitted)).  Likewise, the 2017 *Mellon* case found that a party

objecting to distribution of Settlement proceeds was barred from relitigating the

issue, because the party "had a full and fair opportunity to raise its objection to

the Settlement Agreement's terms in the prior proceeding[.]"  *In re Bank of New

York Mellon*, 51 N.Y.S.3d at 361-62.[10]

---

[10]     To be clear, the caselaw discussing whether preclusion is warranted in the wake of an
Article 77 proceeding is decidedly mixed.  For example, the parties offer diametrically
opposed views of then-District Judge Amy J. St. Eve's opinion in *Sterling Federal Bank,
F.S.B.* v. *Countrywide Financial Corp.*.  No. 11 Civ. 2012 (AJS), 2012 WL 2368821 (N.D.
Ill. June 21, 2012).  In that case, the court stayed, pending resolution of an Article 77
proceeding in New York State court, breach of fiduciary duty claims against Defendant
for, *inter alia*, "failing to investigate the Master Servicer's nonperformance of its
obligations under the PSAs, after [Defendant] had actual knowledge of an Event of
Default, and by failing to make demands on the Master Servicer and suing if the
demands were not met."  *Id.* at *9, 16.  The court reached this result by reasoning that
"the issue of whether [Defendant] acted in accordance with its obligations under the
PSAs and state law in investigating and choosing to settle claims against the Master
Servicer and the Seller, rather than litigating those claims, is directly present in both
proceedings."  *Id.* at *11.  At the same time, the court allowed breach of contract claims
to proceed, although it did not explain why those claims should not be similarly stayed
pending the Article 77 proceeding.  *See id.* at *20-21.  More recently, a New York court
found that similar breach claims premised on document defects were not barred by *res*

Plaintiffs overstate the centrality of these two cases to Judge Lehrburger's analysis. But as it happens, discovery has confirmed that these cases actually support issue preclusion as to Plaintiffs' core contention: that Defendant was obligated to enforce Countrywide's duties or otherwise litigate breaches as opposed to settle them. Plaintiffs' basis for casting these cases aside — that they were direct challenges to the Settlement — accordingly does not withstand scrutiny. *First*, as discussed, this Court agrees with Judge Lehrburger's general view, confirmed by Plaintiffs' expert and interrogatory responses, that many of the claims here predicated on pre-Settlement conduct are different in degree, but not in kind. *Mellon I* found that Defendant had the discretion and authority to enter into the Settlement, and more importantly that Defendant "did not abuse its discretion in entering into the Settlement Agreement and did not act in bad faith or outside the bounds of reasonable judgment." *Mellon I*, 2014 WL 1057187, at *20. *Mellon II* echoed the point. *See Mellon II*, 4 N.Y.S.3d at 209 ("It is also worth noting that it would have been unreasonable to decline to enter into the settlement with the expectation of obtaining a much greater judgment after years of litigation, while knowing that

---

*judicata. Zittman* v. *Bank of N.Y. Mellon*, No. 650599/2022 (AB), 2023 WL 2895171, *3 (N.Y. Sup. Ct. Apr. 11, 2023). In so holding at the motion to dismiss stage, the court relied heavily on this Court's findings concerning preclusion in *PacLife I*. *Id.* at *1, 4. As discussed throughout this Opinion, discovery has conclusively demonstrated that issues integral to Plaintiffs' claims concerning pre-Settlement breaches and conduct were necessarily passed on in the Article 77 proceeding and, further, that Plaintiffs' claims are inconsistent with that judgment. This is a fact-specific inquiry, and one that shows preclusion is warranted based on Plaintiffs' present theories.

attempts to enforce such a judgment would likely result in the actual collection of a lesser sum than that offered in the proposed settlement.").

*Second*, once many of Plaintiffs' claims are understood as arguing against the decision to settle, the burden of proof issue disappears. Judge Lehrburger did not miss Plaintiffs' objection on this point. Rather, as discussed above, he found it appropriate — and this Court agrees — to not allow Plaintiffs to pursue claims that rely on contravention of the Article 77 findings. (Report 37). *Commerce Bank* found that the plaintiff, in a separate case under the same preponderance standard here, was barred from arguing that Defendant had breached fiduciary duties by settling the loan modification claims. *Com. Bank*, 35 N.Y.S.3d at 65-66. Once one brushes aside the labels on claims (*see* Report 41-42 ("[I]ssue preclusion would bar relitigation of the primary issue in dispute: whether [Defendant], as Trustee, fulfilled its obligations to certificateholders in resolving Countrywide's breaching loans, repurchase obligation, events of default, and servicing failures.")), it becomes clear that the findings from the Article 77 proceeding are entitled to no less preclusive effect here than they merited in *Commerce Bank*. *See, e.g.*, *Parker*, 93 N.Y.2d at 350 (finding issue preclusion bars claim where prior Article 78 proceeding adjudicated "the very same legal and factual issues … that now form the basis of [the] current action"). This would be true even if Plaintiffs were correct on the burden issue.

### d.   Plaintiffs Are Subject to Preclusion as "Parties"

Plaintiffs alternatively contend that the Article 77 findings cannot be afforded preclusive effect because they were not parties to the Article 77 proceeding.  As noted above, both claim preclusion and issue preclusion require an identity of parties.  *See Burgos*, 14 F.3d at 792; *Monahan*, 214 F.3d at 285.  Judge Lehrburger found that Plaintiffs could be considered parties to the Article 77 proceeding — in other words, that they "had a full and fair opportunity" to litigate the issues decided there — because they were given notice of the proceeding, and had the opportunity to litigate the same issues there as here.  (Report 35-38).  In objecting to this finding, Plaintiffs raise two arguments: (i) Plaintiffs cannot be bound by the Article 77 findings because they did not actually appear; and (ii) Supreme Court precedent forecloses preclusion in any event.  (Pl. Br. 6-10, 18-20).  Both contentions fail.

Plaintiffs' first argument misperceives the law of preclusion generally, and the manner in which Plaintiffs were bound by the Article 77 proceeding specifically.  Plaintiffs do not contest that they were served with notice of the proceeding and were allowed to object.  (*See* Report 35-36; Pl. Counter 56.1 ¶¶ 42-43).  *See Mellon I*, 2014 WL 1057187, at *8 ("By Order to Show Cause signed on June 29, 2011, this Court ordered that notice of the commencement of this special proceeding be disseminated to all Potentially Interested Persons within forty-five (45) days via nine different domestic and international methods or channels of communication." (internal citations omitted)); *id.* (discussing objection procedure)).  Nor can Plaintiffs object to the fact that the

notice of the Article 77 proceeding sent to certificateholders clearly stated that "[t]he Settlement, if approved by the Court, will affect the rights and interests of all Certificateholders," and that "anyone who fails to object … shall be deemed to have waived the right to object … and shall be forever barred from raising such objection before the Court or in any other action or proceeding[.]"  (Houpt Decl., Ex. 27).  Indeed, the Article 77 proceeding was contested — if not fully adversarial — because many parties did object to Defendant's decision to enter into the Settlement, for reasons this Court has already discussed.  *See Mellon I*, 2014 WL 1057187, at *10 ("The [r]espondents contend that the Trustee acted in bad faith and unreasonably both in its actions while the Settlement was being negotiated and in accepting the terms of the Settlement and the amount of the Settlement Payment."); *Mellon II*, 4 N.Y.S.3d at 207 (discussing the objecting parties' claims, including that "some of the [o]bjectors specifically argued that the seller or servicer of the Trusts' loans had breached their obligation under the PSAs to repurchase modified loans from the Trusts, and that the settlement improperly releases those claims without the necessary scrutiny or assessment of their value").

After receipt and review of more than 1,000 documents; consideration of expert witness submissions; and testimony from twenty-two witnesses over the course of thirty-six days, the Article 77 court made its decision to approve the Settlement and reject the objectors' contentions.  (Pl. Counter 56.1 ¶¶ 44-47). In so doing, the Article 77 court found that "a full and fair opportunity has been offered to all Potentially Interested Persons, including the Trust

Beneficiaries, to make their views known to the Court, to object to the Settlement and to the approval of the actions of the Trustee in entering into the Settlement Agreement, and to participate in the hearing thereon." *Mellon I*, 2014 WL 1057187, at *8. That Plaintiffs did not avail themselves of this opportunity does not mean they cannot be bound by the Article 77 findings. How else could *res judicata* bar the plaintiff's relitigation of issues and claims necessarily decided in the Settlement in *Commerce Bank*? In essence, Plaintiffs are rejecting the notion that issues necessarily decided in the Article 77 proceeding — that Defendant had the discretion to enter into the Settlement, that the Settlement was in certificateholders' best interests, and that it was preferable to settle rather than to enforce Countrywide's duties — bear on their claims here. Their rejection, however, defies both the record and the law.

Neither *Taylor* v. *Sturgell*, 553 U.S. 880 (2008), nor *Chase National Bank* v. *Norwalk*, 291 U.S. 431 (1934), saves Plaintiffs' argument. Quite to the contrary, Plaintiffs' invocation of these cases misses the foundational premise of the Report that the Article 77 court and the Appellate Division made findings necessary to approve the Settlement that preclude Plaintiffs' current claims. Plaintiffs are bound by the Article 77 proceeding; indeed, they do not (and cannot) contest this basic point. Thus, to the extent the findings and judgment from the Article 77 proceeding bind Plaintiffs — as they would in a direct challenge to the Settlement — so too do they bind Plaintiffs here.

Judge Lehrburger was correct to distinguish *Taylor* on the basis that the case concerned the theory of "virtual representation" and the federal law of

preclusion.  (Report 36-37 (noting, for instance, that New York preclusion law is arguably broader than federal law)).  *See Taylor*, 553 U.S. at 892 ("A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit.").[11]  *Taylor* accordingly concerned nonparty preclusion, and discussed six exceptions to the rule against it.  *Taylor*, 553 U.S. at 893-96.  These exceptions do not matter here; *Mellon I* recognized that every interested party had an opportunity to participate and was afforded a full and fair opportunity to raise objections. *Mellon I*, 2014 WL 1057187, at *8.  That Plaintiffs forwent this opportunity does not mean that they were not parties to the Article 77 proceeding or bound by its findings.[12]  As above, the logic of *Commerce Bank* does not depend on formal appearance or nonappearance: the plaintiff there was subject to *res judicata* because it was directly attacking the Settlement and Article 77

---

[11]    Plaintiffs are incorrect that *Taylor* overrides state preclusion law.  Though of course due process emanates from the Constitution, the Court does not read *Taylor* to state that *only* its recognized exceptions are consistent with constitutional protections.  Indeed, *Taylor* expressly limits itself to the federal common law of preclusion.  *See Taylor* v. *Sturgell*, 553 U.S. 880, 904 (2008) ("The preclusive effects of a judgment in a federal-question case decided by a federal court should instead be determined according to the established grounds for nonparty preclusion described in this opinion."); *see also, e.g.*, *Burton* v. *Am. Cyanamid Co.*, 588 F. Supp. 3d 890, 908 n.12 (E.D. Wis. 2022) ("[T]his case is based on diversity and therefore is governed by Wisconsin's preclusion principles.  The plaintiffs have not cited, and I have not found, any Wisconsin cases indicating that the Wisconsin Supreme Court would abandon the 'sufficient identity of interest' test in light of *Taylor*.").  Moreover, as discussed in this Opinion, parties to the Article 77 proceeding raised due process challenges to the binding effect of the resulting judgment based on *Taylor*.  Plaintiffs cannot meaningfully suggest that the Article 77 court transgressed constitutional limits in binding certificateholders to the judgment.

[12]    For similar reasons, the Court is not persuaded by Plaintiffs' appeal to *Chase National Bank*, 291 U.S. 431 (1934).  (Pl. Br. 7).  That case stands for the basic proposition that a nonparty who fails to voluntarily intervene in a suit "to which he is a stranger" is not bound by the suit.  *Chase*, 291 U.S. at 441.  As above, Plaintiffs were far from strangers in the Article 77 proceeding.

judgment.  Plaintiffs are functionally doing the same here, and cannot advance

contrary theories under new claims.  If Plaintiffs are bound by the Article 77

judgment, they are likewise bound by its findings.  Once this point is

understood, the remainder of Plaintiffs' objections on this issue fall away.

In any event, affording preclusive effect to the Article 77 proceeding with

respect to the party/nonparty distinction is consistent with the purposes of the

Article 77 mechanism.  Indeed, it is consistent with *Taylor* and with the

arguably broader New York law of preclusion.  As the Second Circuit described

the Article 77 mechanism in a case involving the very proceeding at issue here,

"[s]uch proceedings are used by trustees to obtain instruction as to whether a

future course of conduct is proper, and by trustees (and beneficiaries) to obtain

interpretations of the meaning of trust documents."  *BlackRock Fin. Mgmt. Inc.*

v. *Segregated Acct. of Ambac Assur. Corp.*, 673 F.3d 169, 174 (2d Cir. 2012);

*see also id.* at 177 ("Thus [Defendant] asks for a construction of the PSA and

an instruction that its planned course of action complies with its obligations

under that document and the law of trusts — consistent with other

proceedings brought under Article 77.").[13]  In so determining these issues, the

Article 77 proceeding "concern[ed] the relationship between the entity which

administers the securities, [Defendant], and the certificateholders."  *Id.* at 178.

---

[13]     As discussed by the Report and by Defendant, *BlackRock* indicates an identity of issues
between this case and the Article 77 proceeding, one that has been confirmed by
discovery in this case.  *BlackRock Fin. Mgmt. Inc.* v. *Segregated Acct. of Ambac Assur.
Corp.*, 673 F.3d 169, 178 (2d Cir. 2012) ("Because [Defendant] seeks a construction of
its rights under the PSA and an instruction from the court as to whether it has
complied with its 'duties ... and obligations' arising from the PSA and its 'fiduciary
duties' superimposed by state law, we conclude that [the case must be remanded.]").

This is precisely the point of Article 77.  *See* 4E N.Y. PRAC., COM. LITIG. IN NEW YORK STATE COURTS § 113:45 (5th ed.) ("In any event, while it is useful to have a procedural hook for the resolution of trust matters, it is not clear that much turns on the characterization of a case as an Article 77 proceeding.  The key substantive features are the ability of any beneficiary to be heard and the *power of the court to bind all beneficiaries*." (emphasis added)).  To allow Plaintiffs to escape the preclusive effect of the Article 77 court's findings made in approving the Settlement would confound Article 77's purpose and undermine its power to bind all beneficiaries, regardless of appearance.

Thus, even assuming the nonparty issue exists, the Court agrees with Judge Lehrburger and Defendant that Article 77 effectively presents one of the "statutory scheme[s]" foreclosing relitigation of issues necessarily decided. *Taylor*, 553 U.S. at 895.  Plaintiffs advance a narrow reading of both *Taylor*'s import on this point and the text of Article 77.  In essence, they contend that because Article 77 "does not say successive litigation by nonlitigants is foreclosed," Defendant cannot avail itself of this *Taylor* exception.  (Pl. Br. 8-9).  But *Taylor* refers not to the plain text of a "statute" on this point, but rather a "statutory scheme."  Article 77 plainly states that "[a] special proceeding may be brought *to determine a matter* relating to any express trust[.]"  N.Y. C.P.L.R. § 7701 (emphasis added).  And the Article 77 proceeding emanated from this statutory scheme, which empowered the Article 77 court to warn all certificateholders explicitly that they would be bound by the proceeding and resulting judgment.  *See supra*.  This scheme allowed the Article 77 court to

bind all certificateholders, whether or not they appeared.  *See Com. Bank*, 35 N.Y.S.3d at 66 (invoking *res judicata* to preclude beneficiary's claim challenging the Settlement).  This statutory scheme thus expressly put certificateholders on notice that their rights would be affected by the proceeding and judgment.

In this respect, the Court fully adopts Judge Lehrburger's likening of the Article 77 proceeding to the Minnesota trust instruction proceeding ("TIP") discussed in the report and recommendation in *PL/WF*, 2021 WL 7082193. (Report 22-23).  There, Judge Sarah Netburn found that Minnesota court orders approving a settlement entered into by the trustee on behalf of certificateholders relieved the trustee of repurchase-related obligations and likewise barred claims dependent upon the same.  *PL/WF*, 2021 WL 7082193, at *16.  Relying on the text of the TIP statute and three Minnesota rules of preclusive effect, Judge Netburn cast aside the plaintiffs' contention, similar to that argued by Plaintiffs here, that the mere fact that the claims were brought against the trustee denied the TIP orders preclusive effect.  *Id.* at *18 ("Plaintiffs identify the wrong issue: it is Wells Fargo's duty to enforce repurchase obligations that was before the TIP courts, the same duty Plaintiffs allege in this litigation.").  This Court subsequently adopted Judge Netburn's analysis. *PL/WF*, 2022 WL 2702616, at *21 ("Plaintiffs have failed to explain how the Report's findings transgress these constitutional limits.  The Report found only that Plaintiffs were bound to the TIPs orders' resolution of Wells Fargo's duty to enforce repurchase obligations, which is the exact intangible property at issue

52

that Plaintiffs identify in their briefing before this Court." (internal quotation marks and citations omitted)).

To be sure, the Minnesota TIP statute is more explicit than Article 77. *See* Minn. Stat. Ann. § 501C.0204 (noting that for *in rem* proceedings "[t]he order is binding … upon the interests of all beneficiaries," and that for *in personam* proceedings it is "binding on … a party who is served with notice of the judicial proceeding"). (*See* Pl. Br. 9-10). But Judge Lehrburger took this difference in scope into account. (Report 44 & n. 27). This Court agrees that based on the purpose of Article 77, and the notices, orders, and ultimate judgment that flowed from the statutory scheme, Plaintiffs were on express notice that relitigation of issues decided in that proceeding would be precluded. Regardless, it bears repeating that *Taylor* concerned federal law, whereas this Court must apply New York law. It would not make sense for New York to have the Article 77 procedure — one that effectively gathers all beneficiaries in the same room and binds them to an outcome — if New York courts then failed to afford an Article 77 judgment (and those issues necessarily decided in rendering that judgment) preclusive effect. The *Commerce Bank* decision makes that point.

Preclusion in this instance is also consistent with basic principles of trust law. In the Report, Judge Lehrburger drew guidance from *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). (*See* Report 35). *Mullane* concerned New York's Banking Law Section 100-c, but more broadly recognized the state's interest in organizing trust affairs and allowing special

53

proceedings to bind beneficiaries.  And it was in giving effect to those interests

that the Supreme Court stated:

> It is sufficient to observe that, whatever the technical definition of its chosen procedure, the interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or nonresident, provided its procedure accords full opportunity to appear and be heard.

*Id.* at 313.  Thus, a state may, consistent with due process and its own state

law, "cut off their rights to have the trustee answer for negligent or illegal

impairments of their interests."  *Id.*[14]

The Article 77 proceeding fulfilled the same purpose as the statute at

issue in *Mullane.*  To the extent Plaintiffs' one objection to Judge Lehrburger's

reliance on *Mullane* is that New York Banking Law Section 100-c calls for

appointment of a guardian ad litem, this Court, like Judge Lehrburger, is not

convinced that such fact deprives the Article 77 judgment of preclusive effect.

---

[14]   The Court accepts the parties' view that the statute at issue in *Mullane* was not a predecessor statute to Article 77, and thus to the extent the Report adopted Defendant's assertion on this point, it was in error.  (Def. Opp. 12 n.4).  That the Report mentions this in passing does not affect its analysis, and the Court agrees with Judge Lehrburger's decision to seek guidance from a *similar* statutory scheme.  Further, Plaintiffs object to the citation to *Mullane* because the statute at issue calls for representation by a guardian ad litem for non-appearing parties.  Of course, Judge Lehrburger did not cite *Mullane* to discuss *Taylor* or the like.  That would not make sense — *Mullane* preceded *Taylor* by some fifty years.  Rather, he cited it for the basic point that state trust regimes are special and play an important role in adjudicating the rights of myriad beneficiaries, whether those beneficiaries appear or not.  Again, Plaintiffs do not contest that if they were to challenge the Settlement directly, the Article 77 proceeding would be afforded preclusive effect.  That is true regardless of their party or nonparty status to the proceeding.  Thus, Plaintiffs' objection boils down to recharacterizing their claims here from the claims adjudicated in the Article 77 proceeding.

(Pl. Br. 9-10).  The Article 77 proceeding gave "express advance notice to non-appearing interested persons" that they would be bound.  (*Id.*).  This Court sees no reason to give less credit to the Article 77 court's findings in a collateral attack on the judicially-approved Settlement (or at least a challenge to the judgment's basic foundations) than a New York court would give to the Article 77 court's findings in a direct challenge to the Settlement.[15]

### e.   Collateral Estoppel and Law of the Case Do Not Prevent Defendant From Arguing in Favor of Preclusion

Plaintiffs' final challenge to the Report's preclusion findings flips the script:  Rather than argue that the Article 77 judgment has no preclusive effect, Plaintiffs contend that *Defendant* is barred by operation of collateral estoppel.

To understand Plaintiffs' argument, a bit of context is necessary.  As part of the Article 77 proceeding, Defendant offered a proposed judgment for the Article 77 court to consider.  The Article 77 court rejected certain of Defendant's proposed findings, including findings "(p)" and "(q)," which in essence would have "permanently barred and enjoined" beneficiaries from commencing actions against Defendant based on actions related to the Settlement or "the actions of [Defendant] in entering into the Settlement Agreement or this Article 77 proceeding."  *Mellon I*, 2014 WL 1057187, at *5.

---

[15]   Plaintiffs also object to Judge Lehrburger's invocation of another *Taylor* exception concerning judgments where a party was "adequately represented by someone with the same interests who was a party to the suit."  *Taylor*, 553 U.S. at 894 (internal citations, quotation marks, and alteration omitted).  As one example of such scenario, *Taylor* discusses "suits brought by trustees, guardians, and other fiduciaries[.]"  *Id.*  The Court largely agrees with Judge Lehrburger that this exception is likely applicable here, too, because Defendant represented beneficiaries while also being adverse to objectors' claims.  (Report 36 n.24).  Regardless, it does not appear that Judge Lehrburger relied on this exception in rendering his decision.

Rather than adopt any of Defendant's proposed findings, the Article 77 court found it appropriate to "adopt[] some of the factual findings, in whole or in part, in the context of discussing particular issues." *Id.* at *6 n.5. In a brief submitted in connection with Defendant's opposition to converting the Article 77 proceeding to a plenary action, Defendant justified including its proposed findings, including the ones discussed above, because the Article 77 court was free to consider "the *res judicata* effect of the resulting judgment." (Kane Decl., Ex. 27 at 10).

Judge Lehrburger properly rejected Plaintiffs' argument. Based on the plain words of the proposed findings, these provisions concern an anti-suit injunction, and not the *res judicata* effect of the Article 77 court's judgment. (Report 47-48). An anti-suit injunction "may be needed to protect the court's jurisdiction once a judgment has been entered," where, for example, a court has doubts that a foreign tribunal will afford preclusive effect to a prior judgment. *Paramedics Electromedicina Comercial, Ltda.* v. *GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004). But "[t]he doctrine of *res judicata*, where applied, may obviate injunctive relief against re-litigation in a second forum." *Id.* This Court does not read the Article 77 court's rejection of Defendant's anti-suit injunction as saying anything about *res judicata*; perhaps, contrary to Plaintiffs' argument, the court was confident that such provisions were unnecessary.

More basically, nothing in *Mellon I* or *Mellon II* discusses the future *res judicata* effect of the Article 77 judgment. This makes sense — "[o]rdinarily

both issue preclusion and claim preclusion are enforced by awaiting a second action in which they are pleaded and proved by the party asserting them.  The first court does not get to dictate to other courts the preclusion consequences of its own judgment[.]"  *Covanta Onondaga Ltd.* v. *Onondaga Cnty. Res. Recovery Agency*, 318 F.3d 392, 397-98 (2d Cir. 2003) (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 4405, at 82 (2d ed. 2002) (internal quotation marks omitted)).

What is more, nothing in these bar provisions was necessary to the Article 77 court rendering its decision that Defendant did not abuse its discretion or that the Settlement was in the beneficiaries' best interests; rather, these provisions would have been a preemptive strike by Defendant, allowing it to nip future lawsuits in the bud.  The Court will not read one ambiguous statement from Defendant's brief made in the context of a non-dispositive motion to stand for the extraordinary proposition that the Article 77 court's judgment has no *res judicata* effect.  Again, New York courts have already given the judgment such effect.  *See generally Com. Bank*, 35 N.Y.S.3d 63.  In sum, this Court fully adopts Judge Lehrburger's rejection of Plaintiffs' collateral estoppel argument.

In a similar vein, this Court agrees with Judge Lehrburger that an Ohio decision does not preclude Defendant from invoking preclusion here. (Report 48).  In *Western and Southern Life Insurance Company* v. *The Bank of New York Mellon*, an Ohio court rejected Defendant's argument that the Article

77 judgment precluded claims similar to those made here.  No. A1302490,

2017 WL 3392856, at *6 (Ohio Ct. Com. Pl. Aug. 4, 2017).  The court

explained:

> As I read the statute and the court case, the defendant
> secured a great deal of money from Countrywide and its
> successor Bank of America for bad acts committed by
> Countrywide.  I can find nothing where the defendant
> has paid for bad acts alleged to have been committed by
> it.
>
> I have never seen a document releasing the defendant
> from any liability from its actions as trustee in these
> trusts.  The money in the settlement was paid by Bank
> of America not the defendant.  As noted above, given
> that I have found that the defendant is entitled to
> judgment in this case in any and every way this case is
> analyzed, the Article 77 settlement is a moot point.

*Id.*  Of course, as Judge Lehrburger noted, by its own terms this section of the

court's decision is dicta (Report 49), inasmuch as the court had already ruled

in Defendant's favor on all issues.  *See, e.g.*, *In re Bean*, 252 F.3d 113, 118 (2d

Cir. 2001) ("The *sua sponte* finding of abuse of discretion was pure *dicta*; it was

not necessary to decide the issue before the district court on appeal from the

bankruptcy court.  As such, the finding of abuse of discretion cannot have any

collateral estoppel effect.").  Further, the Court agrees with Judge Lehrburger

that the Ohio court appears to have confused the issue of release as to

Defendant (of which there is none) with the *res judicata* effect of the Article 77

judgment (which required detailed findings regarding Defendant's conduct).

(Report 49).

Finally, a word is in order on law of the case and this Court's prior

decisions in this case.  As the parties are aware, this Court previously rejected

Defendant's invocation of preclusion premised on the Article 77 proceeding

twice: once in its motion to dismiss decision, and once in its decision on

Defendant's motion for reconsideration of that decision.  *PacLife I*, 2018 WL

1382105, at *11-12; *PacLife II*, 2018 WL 1871174, at *1.  In denying

Defendant's preclusion argument in *PacLife I*, the Court focused principally on

identity of issues:

> [T]he Court is unpersuaded that the Countrywide
> Settlement and the Article 77 proceeding preclude
> Plaintiffs' claims.  Plaintiffs here allege injuries over and
> above whatever injuries were directly caused by
> Countrywide and its successor, Bank of America, and
> whatever injuries may have been covered by the
> Countrywide Settlement.   And they assert claims
> against Defendant not for the Trustee's conduct in
> negotiating and executing the Settlement Agreement,
> and not for Countrywide's own misconduct, but rather
> for the Trustee's conduct in performing its substantive
> duties under the PSA.   Plaintiffs' claims were not
> extinguished by the Countrywide Settlement, and the
> damages sought are distinct from those for which
> Plaintiffs have recovered.  Critically, the present action
> pertains to conduct not directly at issue in the
> Countrywide Settlement; accordingly, the facts
> necessary for Plaintiffs to substantiate their claims are
> distinct from those that were relevant to the
> Countrywide Settlement.  There, it was Countrywide's
> conduct that was primarily at issue. Here, by contrast,
> Defendant's own performance under the PSA is
> squarely at issue.

*PacLife I*, 2018 WL 1382105, at *12.  At the time this Court rendered these

decisions, it relied only on judicially noticed documents from the Article 77

proceeding, the Article 77 decisions, and the Complaint.  What this Court could

not have known — and what Judge Lehrburger properly found — is that

Plaintiffs' theories necessarily attack the foundations of the Article 77 judgment

necessary to approve the Settlement.  Discovery has shown this to be the case.

To be clear, the law of preclusion would not bar claims for breaches of

contract or fiduciary duty that do not rely on theories at odds with the Article

77 court's findings.  In this respect, Defendant has the correct view of this

Court's prior decisions.  (Def. Opp. 16 ("It is possible that a plaintiff could

assert claims against [Defendant] that are *not* based on the alleged failure of

[Defendant] to prosecute breaches by Countrywide … and this Court's prior

ruling, we believe, meant only that the complaint here could be read as

asserting such claims.")).  But having reviewed the wealth of discovery

produced in this case as well as the Report, the Court agrees with Defendant's

position that Plaintiffs' core theories of breach — that Defendant "breached its

contractual obligations to … certificateholders under these PSAs by forgoing

putting loans back to Countrywide, bringing suit to enforce repurchases if

needed, and failing to prudently exercise all of its rights and remedies after

EODs" — were resolved by the findings the Article 77 court made and the

arguments it rejected on its way to approving the Settlement.  (Pl. Br. 6; Def.

Opp. 14).

In conclusion, the Court adopts Judge Lehrburger's finding that issue

preclusion bars pre-Settlement claims.  (Report 41-42, 51).[16]  The Court briefly

---

[16]     In their objections, Plaintiffs contend that claims involving the re-securitization trust
(referred to as the "Re-Sec Trust") cannot be barred, because the Article 77 proceeding
concerned only the 13 RMBS trusts, not the Re-Sec Trust.  (Pl. Br. 5 n.3).  In point of
fact, the Re-Sec Trust is backed by certificates in the RMBS trusts.  (Dkt. #246
(Plaintiffs' memorandum of law in support of its cross-motion for summary judgment) at
17).  Thus, all of the relevant rights and duties for the Re-Sec Trust flowed directly from

notes that the latter half of Defendant's objections to the Report seek to expand Judge Lehrburger's preclusion analysis to effectively encompass all of Plaintiffs' claims. (Def. Br. 11-16). As relevant here, Judge Lehrburger found that claims post-dating the Settlement — including certain servicing claims — were not precluded, because "at least some of [Plaintiffs'] post-Settlement servicing claims are based on Countrywide admissions of events of default made in reports and attestations received by [Defendant], as Trustee, on a yearly basis, including reports filed year-end 2012 to 2015." (Report 50-51; *see also* Def. Br. 12-15 (explaining that under Judge Lehrburger's approach, Plaintiffs could still pursue post-Settlement servicing claims and post-Settlement EOD claims)). Plaintiffs, unsurprisingly, object to Defendant's arguments on these points. (*See* Pl. Opp. 11-19).

Defendant's objection invites consideration of a whole host of issues that are not clearly addressed by the parties in the underlying summary judgment briefing and that are subject to a fair amount of ambiguity concerning Plaintiffs' servicing expert's opinion and interpretation of the post-servicing standards set by the Settlement. Because this Court is referring this case back to Judge Lehrburger for proceedings consistent with the instant Opinion, it sees no reason to go beyond Judge Lehrburger's explicit preclusion findings at

---

an RMBS trust. Plaintiffs do not respond to Defendant's argument that Plaintiffs' "only claims on the Re-Sec Trust are that its trustee should have (somehow) prosecuted claims that belonged to the underlying RMBS trusts, both of which *were* part of the Settlement and Article 77 proceeding." (Def. Opp. 9 n.3). In sum, the Court agrees that the Re-Sec Trust's claims are equally subject to preclusion.

this juncture.  (*See* Def. Br. 16 ("[T]his Court could refer the motion back to Judge Lehrburger for confirmation[.]]).

### 3. Many of Plaintiffs' Claims Are Also Untimely[17]

The Court now turns to the parties' objections to the Report's findings regarding the timeliness *vel non* of Plaintiffs' claims.  Judge Lehrburger began this portion of the Report by finding that Plaintiffs' claims were required to be timely under *both* New York and California law.  (Report 51-54).  From there, Judge Lehrburger found that many of Plaintiffs' claims had accrued at the date of the Settlement, and thus that a significant portion of the claims were untimely.  (*Id.* at 54-65).  Lastly, Judge Lehrburger rejected Plaintiffs' arguments related to continuing duties, the California discovery rule, and equitable estoppel.  (*Id.* at 65-77).  Judge Lehrburger also found, however, that

---

[17]   This section focuses on the more extensive objections to the Report's timeliness analysis proffered by Plaintiffs.  However, Defendant also partially objects, insofar as it seeks an expansion of the Report's reasoning to bar — as a matter of either *res judicata* or statute of limitations — all of Plaintiffs' claims.  Neither Defendant nor Plaintiffs object to Judge Lehrburger's alternative findings pertaining to the timeliness of the R&W breaches, and finding no clear error, the Court adopts that portion of the Report. (Report 64-65).  As previously noted, the Court sees no reason at this juncture to accept Defendant's invitation to go beyond the Report's recommendations on contested issues of timeliness.

Defendant also objects to one issue associated with specific time bars for certain claims. Judge Lehrburger adopted a chart prepared by Defendant for purposes of assessing the timeliness of certain claims.  (Def. Br. 16).  That chart incorporated eight months of *American Pipe* tolling to accrual of contract claims, such that a contract claim that had accrued by June 23, 2012, would be timely.  (Report 54).  In their objection, Defendant clarifies that *it* erred in preparing this chart, because the *Retirement Board* class action triggering *American Pipe* tolling only applied to these trusts until April 2012.  (Def. Br. 16).  *See generally American Pipe & Const. Co.* v. *Utah*, 414 U.S. 538 (1974). Consequently, Defendant seeks correction of the relevant cut-off date, to find that the California statute of limitations bars claims that accrued before February 23, 2013. (*Id.*).  Plaintiffs chide Defendant for this mistake.  (Pl. Opp. 20).  But they make no actual argument that Defendant's position is incorrect, because it is not.  Given the Court's disposition of the timeliness issues, it finds the putative chart error to be immaterial at this juncture.

certain of Plaintiffs' claims fell outside the scope of Defendant's motion and thus were timely. (*Id.* at 77-78). The Court discusses each of these findings, and the parties' objections thereto, in turn.

      **a.**    **New York's Borrowing Statute**

Plaintiffs first object to Judge Lehrburger's statute of limitations findings concerning New York's borrowing statute. (Pl. Br. 21-23). As Judge Lehrburger explained, "[i]t is well established that, under New York's 'borrowing statute' that 'when a nonresident sues on a cause of action accruing outside New York, the cause of action must be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued.'" (Report 51 (quoting *Homeward Residential, Inc.* v. *Sand Canyon Corp.*, 499 F. Supp. 3d 18, 24 (S.D.N.Y. 2020), *aff'd*, No. 20-4068-cv, 2022 WL 402389 (2d Cir. Feb. 10, 2022) (summary order) (internal quotation marks omitted))). Judge Lehrburger further explained that "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." (*Id.* at 53 (quoting *Glob. Fin. Corp.* v. *Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)). *See also Homeward Residential, Inc.*, 2022 WL 402389, at *2 (same). Observing that "PacLife has consistently argued that it is located in and operates out of California," Judge Lehrburger found that "PacLife is a resident of California and suffered its alleged economic injuries in California," and thus that Plaintiffs were required to demonstrate that their claims were timely under both New York's and California's statutes of limitations. (Report 53).

Plaintiffs mount two brief, and ultimately unavailing, attacks on the Report's finding that California law supplies the relevant limitations period. *First*, Plaintiffs argue that the Report erred by finding that their residence is determined by their principal place of business (California) rather than their place of incorporation (Nebraska and Arizona).  (Pl. Br. 22).  In this regard, Plaintiffs assert that "[f]or a corporation, the place of residence under [New York's borrowing statute] is *either* the state of incorporation or principal place of business," and that several "New York courts have found that the residence is the place of incorporation" under the borrowing statute.  (*Id.*).  But these assertions are legal truisms that say nothing about where *Plaintiffs* reside or where *they* suffered the economic harm for which they seek redress in this case.  Indeed, Plaintiffs' brief does not dispute Judge Lehrburger's observation that Plaintiffs suffered their economic injuries in California (Report 53) and does not identify any injuries that they experienced in Nebraska or Arizona (*see* Pl. Br. 22-23).  Further, the Second Circuit has explicitly declined to follow the cases recited in Plaintiffs' brief, explaining that "the New York Court of Appeals would likely hold that [economic] claims accrue at a corporation's principal place of business" because "[i]t would seem that an economic harm has greater effect on a for-profit enterprise's activities at its principal place of business rather than at its place of incorporation."  *Luv N' Care, Ltd* v. *Goldberg Cohen, LLP*, 703 F. App'x 26, 28 n.1 (2d Cir. 2017) (summary order).  Plaintiffs have not identified any reason why this logic is inapplicable here.

64

*Second*, Plaintiffs argue that "the special significance that the place of incorporation has for regulated insurance companies" should have led Judge Lehrburger to find that Nebraska and Arizona provide the limitation periods applicable to their claims.  (Pl. Br. 22-23).  But beyond merely asserting that there is significance to an insurer's place of incorporation, Plaintiffs offer no evidence or argument that undercuts the authorities discussed above.  Instead, Plaintiffs cite two insurance treatises for the uncontroversial propositions that (i) "[a]n insurer is a 'domestic' insurer in the state in which it is organized to do business" and (ii) "[t]he insurance commissioner in the insurer's state of domicile is often referred to as the 'lead' regulator."  (Pl. Br. 23 (quoting 2 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 8.04 (2021) and 9 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 98.01 (2021))).  Neither these treatises nor Plaintiffs' limited quotations from them suggest that the Report erred in its analysis of New York's borrowing statute, and the Court therefore adopts Judge Lehrburger's analysis in full.

### b.      All of Plaintiffs' Pre-Settlement Claims Are Time-Barred[18]

The Court fully agrees with Judge Lehrburger that to the extent any of Plaintiffs' claims necessarily relies on Defendant's failures to take action with

---

[18]      As the Report notes, the Settlement's marking of the accrual period is its principal holding on the limitations issue.  Any specific discussion by Judge Lehrburger of different types of claims constitutes an alternative holding.  (*See* Report 56 ("By virtue of [Defendant's] entry into the Settlement, all of [Plaintiffs'] pre-Settlement claims are barred by the statute of limitations.  But even if [Plaintiffs'] claims were not grounded in negating the Settlement, most of its claims would still be time-barred.")).

On this point, it is worth responding to Plaintiffs' contention that four categories of claims went unchallenged on timeliness grounds: (i) Re-Sec Trust claims; (ii) servicing damages; (iii) Defendant's failure to seek repurchase of loans with loan breaches discovered in April 2011; and (iv) conflict of interest claims.  (Pl. Br. 21).  This Court

respect to possible claims Defendant released against Countrywide, such claims are time-barred.  Of note, the Court reaches this conclusion without entering the legal thicket of the Report's *res judicata* analysis, and, relatedly, without having to determine whether this case is properly characterized as one seeking negation of the Settlement.

As discussed, the Settlement Agreement was sweeping.  It released any and all claims and alleged EODs "in contract, tort, or otherwise" that the parties may have had against Countrywide "arising out of or relating to" three categories of claims.  (Settlement ¶ 9).  Those categories include: (i) claims premised on the origination, sale, or delivery of mortgage loans to the trusts and "any alleged obligation" to address alleged defects or R&W breaches pertaining to origination, sale, or delivery of mortgage loans, including through repurchase or curing; (ii) claims premised on addressing defective, incomplete, or non-existent mortgage loan documentation; and (iii) claims premised on the servicing of loans, including obligations to provide notice or enforce repurchase obligations.  (*Id.*).

Plaintiffs cannot escape the Settlement's impact on the *accrual* of their claims premised on Defendant enforcing Countrywide's duties, regardless of whether the Article 77 judgment in fact bars Plaintiffs from bringing such

---

agrees with Defendant that Judge Lehrburger did in fact address the timeliness of these claims, insofar as Plaintiffs' "theories related to [these claims] all boil down to the same theory of liability that Judge Lehrburger found" to be time-barred by the Settlement. (Def. Opp. 21-22).  As discussed in this Opinion, the Court agrees with Judge Lehrburger that theories of liability that necessarily depend on Defendant's failure to provide notice or to enforce remedies against Countrywide accrued on June 28, 2011.

claims.  Time and time again, Plaintiffs have recognized that many of their claims depend on Defendant's alleged failure to enforce Countrywide's contractual duties, including curing and repurchasing obligations.  For example, in arguing that their claims are "compatible with the Article 77 judgment," Plaintiffs point out that they "asserted no contract claims against [Defendant] in the Article 77 proceeding," and that such claims were "outside the scope of the proceeding."  (Dkt. #272 (Plaintiffs' reply summary judgment memorandum of law) at 17).  But that is Plaintiffs' only basis for contending that their claims went unaffected by the Article 77 judgment.  (*See, e.g.*, Pl. Br. 6 (arguing that the Article 77 proceeding "does not begin to address, however, whether [Defendant] breached its contractual obligations to these certificateholders under these PSAs by forgoing *putting loans back to Countrywide*, *bringing suit to enforce repurchase if needed*, and failing to exercise all of its rights and remedies after EODs" (emphasis added))).

The fact remains that as of June 28, 2011, Defendant could not further enforce these contractual duties concerning pre-Settlement affairs.  And that is because Defendant released any possible claims and remedies it might have pertaining to R&W, document defect, and servicing breaches against Countrywide through the vehicle of the Settlement.  As Judge Lehrburger notes, under Plaintiffs' theories of breach, "[t]he culmination of [failures to provide notice of and enforce remedies for Countrywide breaches] was [Defendant's] entry into the Settlement with Countrywide," because the Settlement "prohibited [Defendant] from commencing any litigation based upon

any of the released claims." (Report 55 (citing Settlement ¶ 15(a))).  Plaintiffs'
response to the Report's logic on this point is a feint: Rather than engage with
the Settlement and its effect on accrual of their claims, Plaintiffs return to their
mantra that Plaintiffs "did not assert a challenge to the Settlement [at the time
of the motion to dismiss], and they do not do so now, rendering June 28,
2011[,] an inappropriate accrual date for any claims." (Pl. Br. 25).  Even if
true, the statement is beside the point.  What matters is that Plaintiffs are
claiming that Defendant committed acts of breach by failing to police
Countrywide and exercise remedies under the PSAs.

Whether the Settlement is better construed as Defendant fulfilling or
abdicating its duties to certificateholders does not matter.  Once Defendant
entered into the Settlement, it could not take the actions that Plaintiffs contend
were necessary to avoid Defendant's own breaches.[19]  As Judge Lehrburger
noted, under New York law, the cause of action for breach of contract accrues
when the breach occurs.  (Report 55).  California law is the same.  *See, e.g.*,
*Deutsche Bank Nat'l Tr. Co.* v. *Barclays Bank PLC*, 34 N.Y.3d 327, 341 (2019).
By outright declaring that the Settlement released claims against Countrywide,

---

[19]   Plaintiffs also objects to the Report on the basis that it found that New York accrual
rules applied, irrespective of the borrowing statute.  (*See* Report 55 n.38; Pl. Br. 25
n.17).  The Court agrees that both states' laws apply with respect to accrual, *see, e.g.*,
*Deutsche Bank Nat'l Tr. Co.* v. *Barclays Bank PLC*, 34 N.Y.3d 327, 340 (2019), but this
point was immaterial.  Judge Lehrburger noted that New York's accrual rules control
merely for the proposition that "[u]nder New York law, contract claims accrue upon
breach." (Report 55).  Plaintiffs' own cited authority notes that California law is the
same.  *Deutsche Bank*, 34 N.Y.3d at 341 ("In any event, plaintiff's arguments are
unavailing even under California law.  In both New York and California, a breach of
contract cause of action generally accrues upon the breach.").  Plaintiff does not explain
how Judge Lehrburger's choice of New York accrual principles had any effect on the
outcome of his analysis with respect to the Settlement.

the Settlement necessarily means that Defendant compromised its ability to enforce.  Thus, to the extent that Plaintiffs' claims are premised on failures to enforce, this Court fully adopts Judge Lehrburger's accrual finding: Defendant's "alleged breach of its duties to [Plaintiffs] crystallized at the point of entry into the agreement."  (Report 56).  As such, the Court adopts the Report's finding that Plaintiffs' claims "for any failure by [Defendant] to act to provide notice to certificateholders or enforce remedies against Countrywide accrued no later than June 28, 2011," which falls outside California's four-year statute of limitations.  (*Id.*).  The Court likewise adopts the finding that Plaintiffs' breach of fiduciary duty and negligence claims premised on the same grounds fall outside the statute of limitations, which would be the case even if accrual were tethered to judicial approval of the Settlement.[20]

Plaintiffs' attempts to recast the Settlement's effect on the accrual of their claims fail.  Principally, Plaintiffs contend that "the signing of the Settlement has no legal significance, because by its own terms the Settlement was not final, but would be rendered void, unless and until approved by the court."  (Pl. Br. 25).  In other words, Plaintiffs would have the accrual date tied to the January 31, 2014 court approval of the Settlement (if the Settlement is at all relevant), rather than the June 28, 2011 signing.  (*Id.*).  Further, Plaintiffs point to Paragraphs 15(a) and (b) of the Settlement, which they contend contemplate

---

[20]   Defendant requests that the Court find that two additional categories of claims are also barred by *res judicata* and the logic of the above limitations analysis beyond what Judge Lehrburger found.  (Def. Br. 12-16).  Again, the Court does not believe it necessary to go beyond the Report.  (*Id.* at 14 (noting that "the Court could defer this issue to a later report")).

"potential enforcement action by specifying the procedures that [Defendant]
should follow for such enforcement." (*Id.*).

These arguments are without merit. In no uncertain terms, Defendant
covenanted upon signing to

> *not* take any action with respect to any Covered Trust
> that is intended or reasonably could be expected to be
> adverse to or inconsistent with the intent, terms, and
> conditions of the Settlement and this Agreement, and
> will not commence or assist in the commencement of
> any litigation based upon any of the claims subject to
> the release and waiver in Paragraph 9.

(Settlement ¶ 15(a) (emphasis added)). These actions are precisely what
Plaintiffs now claim Defendant should have done. Defendant made these
promises — not to sue, not to enforce, and not to take actions inconsistent with
the broad release — in June 2011, years before court approval of the
Settlement. Simply because the Article 77 court did not approve the
Settlement until three years later does not mean that the Settlement had no
force between Defendant and Countrywide. To the extent that the Settlement
(i) notes that "[a]bsent direction from the Settlement Court," Defendant would
take no action (*id.*), and (ii) contemplates dollar-for-dollar reductions for post-
signing date repurchases (*id.* ¶ 15(b)), these provisions do not affect the release,
nor do they change the fact that Defendant had specifically forsworn
enforcement in June 2011. Plaintiffs mistake a possibility — having to take
actions contrary to the Settlement if the Article 77 court so ordered — for
Defendant apparently agreeing to a self-defeating duty to continue enforcement
despite the covenants. (Def. Opp. 28-29).

Further, Plaintiffs gain no traction by arguing that the Settlement could be voided by lack of approval by the Article 77 court.  Again, the covenant not to enforce and sue was in place regardless of approval.  Additionally, Plaintiffs' theory of breach is that Defendant should have taken the very actions against Countrywide that it covenanted not to do based on claims Defendant released through the Settlement.  At a minimum, then, Defendant's signing of the Settlement and agreement to stand down with respect to enforcement is an anticipatory repudiation, which would have kicked in the limitations period regardless of final approval.  *See, e.g.*, *Lucente* v. *Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Anticipatory repudiation occurs when, before the time to performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty.").  Courts analyzing analogous circumstances where a trustee publicly forswore taking action with respect to claimed breaches have similarly tied accrual to the trustee's announcement that it would not take further action.  *See, e.g.*, *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 578 (S.D.N.Y. 2022) (finding loss EOD claims time-barred because trustee's "decision to take no action absent investor direction is [a] single, discrete decision, and any alleged harm sustained by the [p]laintiffs was caused by that decision"), *aff'd sub nom. Phoenix Light SF Ltd.* v. *Bank of New York Mellon*, 66 F.4th 365 (2d Cir. 2023); *PL/WF*, 2022 WL 2702616, at *26 ("Defendant committed its alleged breach upon learning of the EODs and … informing investors that it would not take action to address them."); *Ambac Assurance Corp.* v. *U.S. Bank Nat'l Ass'n*,

71

No. 17 Civ. 2614 (PAE) (KHP), 2022 WL 4621431, at *16 (S.D.N.Y. Sept. 30, 2022) (cataloging cases, including the instant case, in which "[t]he common thread … is that the trustee's actions had eliminated any opportunity on the part of the trusts to recover via lawsuits against originators, triggering an earlier accrual of claims against the trustee based on these actions").

In sum, the Court agrees with Judge Lehrburger that Defendant's entry into the Settlement marks the moment of accrual for Plaintiffs' claims based on Defendant's failure to provide notice to certificateholders and to enforce the PSAs' remedies against Countrywide. (Report 55-56). Thus, using the June 28, 2011 date, Plaintiffs' contract claims discussed in this section of the Report are time-barred by function of the California four-year statute of limitations, and Plaintiffs' negligence and fiduciary duty claims based on the same are barred by both California's and New York's statutes of limitations (two and three years, respectively).[21]

---

[21] The Court declines to adopt the Report's recommendations concerning specific time bars for pre-EOD document defect claims and post-EOD claims. As noted, Judge Lehrburger's discussion of specific issues for these claims are alternative findings without regard to the Settlement. This Court agrees with Judge Lehrburger that the Settlement date is the accrual date for many of Plaintiffs' claims, and thus the majority of these claims are barred irrespective of Judge Lehrburger's alternative findings.

To be clear, this Court agrees with Judge Lehrburger's decision to apply the reasonable time rule to accrual of claims. And the Court finds Judge Lehrburger's analysis reasonable. That said, the Court agrees with Judge Paul A. Engelmayer's discussion in *Ambac Assurance Corporation* v. *U.S. Bank National Association* concerning nearly identical PSA language and similar put-back claims to those at issue here. 2022 WL 4621431. In *Ambac*, the court found that the defendant had conflated its duty to notify with its follow-on duty to enforce, which Plaintiffs here similarly argue. *Id.* at *9. Because trustees may also have a duty to enforce, including by bringing put-back suits, *Ambac* found that stacking the limitations periods for such claims makes sense (*i.e.*, running the limitations period based on when the underlying limitations period ran). *Id.*; *see also Phoenix Light SF Ltd.* v. *Wells Fargo Bank, N.A.*, No. 14 Civ. 10102 (KPF) (SN), 2022 WL 2702616, at *25 (S.D.N.Y. July 12, 2022) ("Given the parties' disagreement as to what constituted a reasonable time for Defendant to discharge its

### c.    The Open Repudiation Doctrine Is Not Applicable

Plaintiffs also challenge Judge Lehrburger's rejection of their arguments

premised on the open repudiation doctrine.  Plaintiffs contend that, because "a

statute of limitations does not begin to run until there has been an open

repudiation by the trustee," and because Defendant has offered no such proof

of repudiation, their claims remain timely under California law.  (Pl. Br. 23-24).

Plaintiffs accuse Judge Lehrburger of "brush[ing] off" their "long line of

California cases in a footnote."  (*Id.* at 24 (citing Report 70 n.51)).  But Judge

Lehrburger's terse treatment of this argument was warranted.  Plaintiffs' cited

---

enforcement duties, the Court cannot conclude as a matter of law that a reasonable time for performance had expired.").  Though this Court need not adopt a stacking theory as a matter of law, it has reviewed the evidence in this case, including Plaintiffs' expert reports and contemporaneous documents suggesting that even Defendant and Countrywide were confused about the PSAs' time limits.  Given this evidence and the developing line of cases discussed in and applied by *Ambac*, the Court declines to adopt the Report's alternative findings pertaining to document defect claims.  *Cf. Ambac*, 2022 WL 4621421, at *17 ("In sum, the assembled evidence, viewed in light of the apposite precedents, supply a sufficient basis for Ambac's claim that U.S. Bank had until the date on which the statutory limitations period expired to carry out its enforcement responsibility against CHL, including by means of bringing a putback lawsuit.").

Likewise, though the Court agrees with Judge Lehrburger's rejection of the continuing breach theory with respect to post-EOD claims and his finding that post-EOD claims premised on provision of the 60-day notice (PSA § 7.03(a)) are mostly time-barred, Plaintiffs appear also to press claims based on Section 8.01 of the PSAs, which states that "[i]n case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs" (*id.* § 8.01).  It is unclear from Plaintiffs' papers whether they are arguing that these "prudent person" claims are timely based on the continuing breach theory or because a reasonable time has not passed.  As in *Ambac*, the PSAs are silent with respect to Defendant's compliance with its prudent person duties.  *Ambac*, 2022 WL 4621421, at *18.  Thus, "[l]ike the question of the 'reasonable timeframe' to comply with pre-EODs obligation to sue [the servicer], the question of when a 'prudent person' would sue [the servicer] is a fact-intensive question."  *Id.*  Judge Engelmayer largely found that the post-EOD timeliness analysis tracked that of pre-EOD claims; this Court agrees, and does not believe that summary judgment on these alternative timeliness grounds is justified based on the conflicting evidence.  Again, this point only affects post-settlement post-EOD claims, as Judge Lehrburger properly found.

authority is indeed "inapt."  (Report 70 n.51).  *See England* v. *Winslow*, 196 Cal. 260, 263 (1925) (concerning claim for accounting and payment over of trust money); *Higgins* v. *Higgins*, 11 Cal. App. 5th 648, 663 (2017) (concerning repudiation of express voluntary trust and creation of constructive trust); *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010) (similar analysis); *Manchester Band of Pomo Indians, Inc.* v. *United States*, 363 F. Supp. 1238, 1241 (N.D. Cal. 1973) (concerning claim that defendants mismanaged assets held in trust).

Plaintiffs read the broad language employed in these cases to mean that the statute of limitations for their claims does not come into play until Defendant "repudiates" the Trusts.  But the claims in those cases do not map easily onto those raised here.  The Court instead accepts Defendant's more nuanced view of when the doctrine is applicable: "when the dispute is whether property that the defendant holds belongs to the defendant personally or is held by the defendant in trust," or where other unique trust claims, such as an accounting, are at issue.  (Def. Opp. 26).  In other words, the doctrine is consistent with New York's open repudiation doctrine, which Plaintiffs do not attempt to refute.  (Pl. Reply 12).  *See Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d at 708 ("[T]he open repudiation doctrine applies only when the remedy sought is an accounting or other form of equitable relief, not a remedy at law."); *see also, e.g.*, 3 WITKIN, CAL. PROC. 6th Actions § 735 (2023) (discussing delayed accrual in actions against fiduciary for, *e.g.*, actions to establish express trusts and actions to establish resulting trusts).

74

In any event, to the extent that Plaintiffs' claims are dependent upon Defendant enforcing duties and remedies that it released as to Countrywide through the Settlement, the Settlement constituted an open repudiation under Plaintiffs' theory.  Plaintiffs cite a plain statement of California law for the proposition that "repudiation of a trust is not effective, and therefore cannot commence the running of the statute of limitations, unless and until the fact of repudiation is brought home to the beneficiary."  *Strasberg* v. *Odyssey Grp., Inc.*, 51 Cal. App. 4th 906, 917 (1996).  But that is the sum total of their rebuttal of Defendant's position that the Settlement — "when [Defendant] very publicly announced that it did not plan to sue Countrywide" and thus forswore enforcing the remedies and duties Plaintiffs argue it must have — was not an open repudiation of the Trusts.  (Def. Opp. 27).  Plaintiff offers no reason for why the Settlement would not constitute knowledge or notice of the repudiation.

### d.   The Discovery Rule Is Not Applicable

Plaintiffs likewise contend that none of their claims is time-barred based on another aspect of California law: the discovery rule.  (Pl. Br. 32).  Both in their summary judgment briefing (*see, e.g.*, Dkt. #246 at 68-69), and in their current objections (Pl. Br. 32), Plaintiffs contend that certain employee witness testimony suggests that Plaintiffs were unaware of breaches.[22]  Thus, Plaintiffs argue that at a minimum Judge Lehrburger improperly weighed conflicting

---

[22]   The Court has reviewed this evidence, which is decidedly mixed for Plaintiffs' arguments on this point.

evidence at the summary judgment stage in finding that the discovery rule was inapplicable.  (*Id.* at 34).

The Court fully adopts Judge Lehrburger's analysis.  "In order to invoke the delayed discovery exception to the statute of limitations, the plaintiff must specifically plead facts which show [i] the time and manner of discovery and [ii] the inability to have made earlier discovery despite reasonable diligence." *Allen* v. *Similasan Corp.*, 96 F. Supp. 3d 1063, 1071 (S.D. Cal. 2015) (quoting *Yumul* v. *Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1130 (C.D. Cal. 2010)). As the California Supreme Court has explained, "the discovery rule most frequently applies when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand"; courts decline to apply the rule when "the basis for a claim has been published in the public record or has been the subject of publicity[.]" *Shively* v. *Bozanich*, 31 Cal. 4th 1230, 1248 (2003), *as modified* (Dec. 22, 2003).

Contrary to Plaintiffs' suggestion that ambiguity in any of the evidence counsels in favor of not granting summary judgment to Defendant on this issue, "[i]t is the burden of the plaintiff to 'show a triable issue of fact under the discovery rule and the corollary rule of fraudulent concealment' when the applicable statute of limitations would otherwise bar the plaintiff's claims, as in the instant case." *Rustico* v. *Intuitive Surgical, Inc.*, 424 F. Supp. 3d 720, 737 (N.D. Cal. 2019) (quoting *Ornelas* v. *Yamaha Motor Corp.*, No. A104665, 2004 WL 2191324, at *3 (Cal. App. Sept. 30, 2004)), *aff'd*, 993 F.3d 1085 (9th Cir.

76

2021).  "Since the investigation is not for the purpose of establishing sure knowledge of another's fault, but only a suspicion, the rendition of summary judgment in favor of defendants … is more common than might initially be supposed."  *Id.* (quoting *Bristol-Myers Squibb Co.* v. *Superior Court*, 32 Cal. App. 4th 959, 964 (1995)).

Judge Lehrburger did not impermissibly weigh evidence in reaching his conclusion.  Rather, he applied straightforward California law.  Though Plaintiffs' witnesses may have introduced a degree of ambiguity into the record, uncontroverted evidence shows that Plaintiffs could have discovered the bases for bringing this suit through reasonable diligence.  (*See, e.g.*, Houpt Decl., Ex. 11 (*Bloomberg* article concerning Defendant's refusal to address demand from investors to pursue repurchases, which was circulated internally by Plaintiffs); Ex. 2 (witness testimony concerning the same); Ex. 12-13 (investor letter sent to Countrywide and Defendant concerning breaches, and internal email discussing the letter, noting that "[i]nterestingly the letter does not direct the trustee to review loan files for breaches of reps and warranties, but instead begins a process to force a change in servicer")).  Plaintiffs acknowledged these issues, as well as the very public statements from other investors concerning breaches in myriad trusts, well before developments in the *Western & Southern* case in 2016.  *See The Western and Southern Life Ins. Co.* v. *The Bank of New York Mellon*, No. A1302490, 2017 WL 3392856 (Ohio Com. Pl. Aug. 04, 2017). As Judge Lehrburger noted, Plaintiffs' appeal to *Western & Southern* should be viewed with deep skepticism; indeed, the plaintiff in that case felt that it had a

basis to sue years prior to the complaint in this case, as did many other investors.  (Report 72-73).  Plaintiffs did not need to appreciate with precision the bases for their claims for the discovery rule to be inapplicable; rather, if they could have discovered these claims through reasonable diligence — relying on their own knowledge of possible breaches, public news of the issues associated with Countrywide and Defendant, and other information — the rule would not apply.  The evidence discussed in the Report shows that this is the case.

In their objections, Plaintiffs do not address Judge Lehrburger's more basic point that the Article 77 proceeding clearly put them on notice of their claims.  (Report 73-74).  Plaintiffs merely state that the Report's finding that the Article 77 proceeding gave them "reason to suspect" a factual basis for their claims is "conjecture."  (Pl. Br. 33).  But the Court need not perfectly determine what Plaintiffs knew and did not know in order to find the discovery rule inapplicable; "if reasonable minds can draw only one conclusion from the proffered evidence, the application of the discovery rule becomes a question of law."  *Rustico*, 424 F. Supp. 3d at 737.  No reasonable mind could find that Plaintiffs had no reason to suspect the bases for their instant claims, at least by the time of the Settlement and the Article 77 proceeding.

### e.  Defendant Is Not Estopped from Raising a Limitations Defense

Finally, Plaintiffs contend that Judge Lehrburger erred by rejecting their argument that Defendant — as a fiduciary — is estopped from raising any limitations defenses.  Judge Lehrburger rejected Plaintiffs' position because he

found that (i) the acts or alleged concealment forming the basis for Plaintiffs'
estoppel argument form the basis for Plaintiffs' claims; and (ii) the acts or
omissions to which Plaintiffs point were not intended to induce Plaintiffs from
filing suit, but rather for other purposes, including placating Countrywide or
avoiding taking on additional duties.  (Report 76-77).

As Judge Lehrburger noted, a party may avail itself of an exception to the
general rule that it must show affirmative deception where a fiduciary duty
exists.  (Report 75-76).  In such cases, concealment or nondisclosure of the
relevant facts suffices.  *See Ross* v. *Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491
(2007); *Cross* v. *Bonded Adjustment Bureau*, 48 Cal. App. 4th 266, 281 (1996),
*as modified* (Aug. 8, 1996).  However, a party may not rely on the same acts or
omissions that give rise to its claims to argue that the estoppel doctrine is
applicable.  *See, e.g.*, *N.Y.S. Workers' Comp. Bd.* v. *Fuller & LaFiura, CPAs, P.C.*,
46 N.Y.S.3d 266, 273 (3d Dep't 2017).

The Court agrees with Judge Lehrburger that Plaintiffs' estoppel
argument fails because it relies on the same bases as Plaintiffs' other claims.
Once again, Plaintiffs' claims distill to criticisms that Defendant both failed to
provide notice of EODs and other breaches, and failed to enforce rights and
remedies based on EODs pursuant to the PSAs.  Plaintiffs' theory of estoppel is
that the trustee had a duty to "disclose EODs and breaches."  (Pl. Reply 18).
The Court can discern no daylight between these claims, on the one hand, and
Plaintiffs' theory of concealment by Defendant, on the other.  *See, e.g.*,
*Cusimano* v. *Schnurr*, 27 N.Y.S.3d 135, 140-41 (1st Dep't 2016) ("[E]quitable

estoppel is inapplicable because the alleged fraudulent concealment forms the basis of both plaintiff's estoppel argument and the underlying claims[.]").

In any event, "[t]he doctrine of equitable estoppel will not apply if the plaintiff possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable [s]tatute of [l]imitations." *McIvor* v. *Di Benedetto*, 503 N.Y.S.2d 836, 838 (2d Dep't 1986); *see also Gregory* v. *Venbrook Ins. Servs.*, No. B230860, 2012 WL 5505058, at *16 (Cal. Ct. App. Nov. 14, 2012) (unpublished).  As discussed above in the context of the inapplicability of the discovery rule to Plaintiffs' claims, Plaintiffs had sufficient knowledge to ascertain the bases for their claims, regardless of any alleged concealment by Defendant.

### 4. The Court Grants Defendant's Motion for Summary Judgment on Plaintiffs' Tort Claims

In its final section, the Report recommends granting Defendant's motion for summary judgment with respect to two categories of tort claims this Court did not previously dismiss: due care and conflict of interest.  (Report 78).  The Court addresses Plaintiffs' objections to the Report's findings on these two categories in that order, though it recognizes that Plaintiffs' arguments pertaining to conflict of interest are more robust.

Plaintiffs devote one paragraph in their objections to contesting Judge Lehrburger's recommendation that this Court grant Defendant summary judgment on their due care claims.  (Pl. Br. 40).  Plaintiffs do not dispute that the obligation to exercise due care applies only to non-discretionary, ministerial

tasks.  (Report 79).  Nor do they seek to distinguish the wealth of cases cited by

Judge Lehrburger — or, indeed, offer any evidence to suggest that Judge

Lehrburger misunderstood their claims premised on notices of EODs.

Plaintiffs' due care theory is plainly foreclosed by the cases cited in the Report,

including *Commerce Bank*.  *See Com. Bank*, 35 N.Y.S.3d at 66 ("[I]n order to

give plaintiffs such notice, defendant would have had to monitor other parties.

A failure to monitor other parties plainly do[es] not involve the performance of

basic non-discretionary ministerial tasks[.]" (internal quotation marks and

citation omitted)).  Because Plaintiffs' due care claim does not involve

performance of ministerial tasks, Defendant is entitled to summary judgment.

Plaintiffs offer a more extensive objection to Judge Lehrburger's

recommendation that this Court grant summary judgment in favor of

Defendant on their conflict of interest claim.  On this point, Plaintiffs contend

that Judge Lehrburger both disregarded evidence favorable to them and

impermissibly weighed conflicting evidence in making this determination.  (Pl.

Br. 37-39).  The Court identifies no triable issue based on this evidence, and

agrees with Judge Lehrburger's assessment of the conflict of interest claim.

The Court begins by reviewing the evidence discussed by the parties and

Judge Lehrburger.  Some of these documents address general concerns over

Defendant's management of its relationship with Countrywide in the context of

Defendant's role as trustee.  (*See, e.g.*, Kane Decl., Ex. 236 (email sent from

Davina Zeidel stating "[g]iven the statute and sensitivity surrounding this

relationship [with Countrywide], we will not ask them for an original

81

incumbency certificate going forward"); Ex. 237 ("[S]o we are going to hold

[C]ountrywide's hand to the fire and not sign something.…  [I] don't think this

is going to help our relationship continue in a positive manner."); Ex. 238 ("We

need to continue to represent Countrywide with high standards, while

maintaining our role as trustee."); Ex. 148 ("Prefer to leave [reference to control

over servicers] out, not so much as it may cause an issue with our servicers …

but more so … that I don't want us to be viewed as having any sway/influence

over what the Servicer does.")).  Others discuss the management of the at-times

fraught relationship with Countrywide leading up to the Settlement.  (*See, e.g.*,

*id.*, Ex. 35 ("[W]e have been working hard to AVOID a formal declaration of an

EOD.…  [T]he whole point of the forbearance agreement is to toll the running of

time … [and] create some breathing room to work with BoA toward a plan that

avoids an EOD and allows for review of the files."); Ex. 145 (deposition

testimony concerning the same); Ex. 146 (email exchange discussing similar

considerations)).  Plaintiffs contend that this evidence supports three ways in

which Defendant was motivated by a conflict of interest: (i) it pursued joint

interests with Countrywide, contrary to certificateholders' interests; (ii) it

avoided declaring EODs in order to not be subject to heightened duties; and

(iii) it prioritized its relationship with Countrywide over its duties to

certificateholders.  (Pl. Br. 37).

"To prove a conflict-of-interest claim, [a plaintiff] must show 'specific acts

of self-dealing.'"  *CB/USB*, 457 F. Supp. 3d at 262 (quoting *Ellington Credit

Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 193 (S.D.N.Y.

2011); *see also Fixed Income Shares: Series M* v. *Citibank N.A.*, 314 F. Supp. 3d 552, 562 (S.D.N.Y. 2018) ("Plaintiffs do not provide any concrete evidence that the Trustee's actions were influenced in any way by a conflict of interest. That is, conclusory assertions aside, [p]laintiffs fail to prove that, by virtue of any conflict of interest, Citibank caused them concrete harm."). Though Plaintiffs marshal the most nefarious sound bites from their proffered evidence, this Court, like Judge Lehrburger, has reviewed the full context of the evidence and cited conversations. There is a difference between weighing conflicting evidence on the one hand, and finding that no reasonable juror could find a cognizable conflict of interest on the other. The latter was what Judge Lehrburger did, and his conclusions were correct. Having reviewed the same evidence, this Court does not perceive a conflict of interest simply because Defendant was concerned about maintaining a productive relationship with Countrywide — indeed, the Court would expect that any entities working closely together would be equally concerned with maintaining a close working relationship. Moreover, as Judge Lehrburger found, Plaintiffs fail to show how these issues "caused them concrete harm." *Fixed Income Shares*, 314 F. Supp. 3d at 562.

Plaintiffs' most concrete examples of a potential conflict concern communications leading up to the Settlement. But the fact that Defendant was concerned with taking actions that would compromise getting the Settlement done did not engender a conflict of interest. As discussed, New York courts found that the Settlement was in certificateholders' best interest. *See, e.g.,*

*Mellon I*, 2014 WL 1057187, at *17 ("The Trustee argues that the evidence shows that the real reason it entered into the Forbearance Agreement was to avoid litigation over the question of whether or not an event of default had occurred as a matter of law, which litigation ultimately would have delayed any prospect of settlement.").  In short, this Court agrees with Judge Lehrburger's decision to properly contextualize documentary evidence and testimony, and to find that in any event Plaintiffs failed to tie any alleged conflict to concrete harms.

> **5.  The Court Adopts in Full Judge Lehrburger's Findings Regarding Trusts with No Damages and Defendant's Affirmative Defenses**

Neither party has objected to Judge Lehrburger's findings that (i) Plaintiffs' contract claims for trusts for which Plaintiffs have not introduced evidence of damages should not be dismissed; and (ii) Defendant's affirmative defenses of champerty, monoline insurance coverage, collateral source, failure to mitigate, and absence of reliance should be dismissed.  Having reviewed the parties' summary judgment arguments on these points and Judge Lehrburger's recommendations, the Court finds no clear error in Judge Lehrburger's findings on these points and adopts them in full.

## CONCLUSION

For the reasons discussed in this Opinion, the Court adopts the majority of the Report's findings and analysis.  Specifically, the Court: (i) adopts in full its standing analysis; (ii) adopts in full its issue preclusion analysis; (iii) adopts its analysis that the Settlement Date bars many of Plaintiffs' claims, and rejects

in part its analysis of the timeliness of specific claims; (iv) adopts its tort claims analysis; and (v) adopts those findings to which the parties have not objected. The remainder of the parties' cross-motions for summary judgment are denied without prejudice to their renewal before Judge Lehrburger.  The parties are hereby ORDERED to submit a joint letter proposing redactions to this Opinion on or before **August 11, 2023**.

The Clerk of Court is directed to unstay this case and to terminate the motions pending at docket entries 231 and 245.  The Clerk of Court is further directed to file this Order under seal, viewable only to the parties and the Court.

The Court refers this case back to Judge Lehrburger for proceedings consistent with this Opinion.

SO ORDERED.

Dated:      July 14, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge